1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        NORTHERN DIVISION

3


4       UNITED STATES OF AMERICA

5            v.                          CRIMINAL CASE NO.
                                          JFM-06-0309
6       JAMES DINKINS, ET AL.

7            Defendants

8       _____/

9

10                     AFTERNOON SESSION
                     Tuesday, May 26, 2009
11                   Baltimore, Maryland

12

Before:  Honorable J. Frederick Motz, Judge
13                   And a Jury

14

Appearances:
15          On Behalf of the Government:
             Kwame J. Manley, Esquire
16           Debra L. Dwyer, Esquire
            On Behalf of Defendant Gilbert:
17           Arcangelo M. Tuminelli, Esquire
             Jonathan P. Van Hoven, Esquire
18          On Behalf of Defendant Dinkins:
             Gary E. Proctor, Esquire
19           Joseph Murtha, Esquire
            On Behalf of Defendant Goods:
20           C. Justin Brown, Esquire
             Thomas J. Saunders, Esquire
21

22      Reported by:
        Mary M. Zajac, RPR
23      Room 3515, U.S. Courthouse
        101 West Lombard Street
24      Baltimore, Maryland 21201

25

1              (Proceedings at 2 p.m.)

2              THE COURT:  Let's get the jury.

3              MR. TUMINELLI:  Your Honor, pursuant to your agreement

4      that one counsel could leave, I need to go see Ms. Shearer.

5              THE COURT:  Sure.  That's fine.

6              MR. TUMINELLI:  Thank you, Judge.

7              THE COURT:  Do you want me to say anything to the jury?

8      When somebody can't be here, do you want me to say something to

9      the jury or not?  About it's okay for you to not be here.  I

10     think they can figure that out.

11             MR. SAUNDERS:  I think you did at the beginning, Your

12     Honor.

13             MR. TUMINELLI:  Thank you, Judge.

14             THE COURT:  Thank you.

15             (Jury enters the courtroom.)

16             THE CLERK:  Jurors all present.  Please be seated.  Ms.

17     Dwyer.

18             MS. DWYER:  Thank you, Your Honor.  The government

19     calls Special Agent William Nickoles.

20             THE CLERK:  Raise your right hand.

21         DETECTIVE WILLIAM NICKOLES, GOVERNMENT'S WITNESS, SWORN

22             THE WITNESS:  I do.

23             THE CLERK:  Please be seated.  Sir, if you would, state

24     your name and then spell your name for the record.

25             THE WITNESS:  My name is William Nickoles.  That's

1    N-I-C-K-O-L-E-S.  I'm a detective with the Baltimore Police

2    Department, currently assigned with the Drug Enforcement

3    Administration as a task force officer.

4                 DIRECT EXAMINATION

5    BY MS. DWYER:

6    Q    Thank you.  How long have you been a police officer?

7    A    Approximately 17 years.

8    Q    And how long have you been assigned to the task force with

9    the Drug Enforcement Administration?

10   A    Over eight years.

11   Q    And Detective Nickoles, on January the 2nd of 2007, did you

12   receive information from other law enforcement sources that had

13   was a, possibly a firearm located in the woods in Baltimore,

14   Maryland off of Wabash Avenue that was possibly related to the

15   homicide of Shannon Jemmison?

16   A    Yes, ma'am.

17   Q    And based upon that information from other law enforcement

18   sources, did you go to the location that was described to you in

19   an effort to find that firearm?

20   A    I did.

21   Q    Can you tell the ladies and gentlemen, first of all, where

22   that area is?  With the assistance of a map here that I'm going

23   to show you, which is Government's Exhibit SJ-30, would you be

24   able to show the ladies and gentlemen where that firearm was

25   eventually located by you?

1    A    This park right here or this grass area is Towanda Park.

2    Q    Right here?

3    A    It's right at Quantico and Towanda Avenue.  Yes, ma'am.

4    Q    Right here?

5    A    Yes, ma'am.

6    Q    Okay.  Here's Quantico.

7    A    That's correct.  There's a section of woods alongside the

8    grass area of the park.

9    Q    Right here?

10   A    Yes, ma'am.

11   Q    Right in the area approximately where your pen is, there's

12   an opening into that wood line that cuts through and crosses some

13   railroad tracks towards Wabash Avenue.  You can see the railroad

14   tracks here, I believe?

15   A    That's correct.

16   Q    And here's Wabash?

17   A    That is correct.

18   Q    Okay.  Go ahead.  I'm sorry.

19   A    Between the wood line where the grass is at the park but

20   prior to the railroad tracks, in the wooded area, approximately

21   halfway into the wooded area, on the right-hand side of a trail,

22   there's a trail that's commonly used by people in the

23   neighborhood to travel from the park over to Wabash Avenue.  So

24   approximately halfway through from the grass area where the woods

25   begin and the railroad tracks, on the right-hand side of that

1   trail I was able to locate a firearm.

2   Q    Okay.  I'm going to show you some other photographs of that

3   but I first wanted to show you, you can see Quantico and

4   Reisterstown Road right here, this intersection?

5   A    Yes, ma'am.

6   Q    Do you know whether or not this is the location of the

7   Quantico Car Wash where Shannon Jemmison was murdered?

8   A    It is.

9   Q    If the car wash were on this corner, would you go down

10  Quantico to the park, obviously?

11  A    Yes, ma'am.

12  Q    Okay.  I'm going to show you what we've marked as

13  Government's Exhibit SJ-31.  You've seen this photograph,

14  correct?

15  A    I have.

16  Q    And is this the area of the park where the wood line starts?

17  A    Yes, ma'am.  That would be, I believe that's like a

18  southeasterly view into the grass area where the tree line and

19  the path cuts into the tree line.

20  Q    And that would be this corner right here, close up of this

21  corner?

22  A    That's correct.

23  Q    Okay.  You can actually see kind of a ball diamond here,

24  some type of, you can see the ball diamond here, is that right?

25  A    Yes, ma'am.  That is the old ball diamond, I believe.

1  Q    Okay.  And I'm going to ask you to describe what this is.

2  What are we looking at here?

3  A    Where your pen is traveling, that is the dirt path traveling

4  from the Towanda Park on its way over to Wabash Avenue, which is

5  in the bottom right-hand side of that photograph.

6  Q    I'm going to show you Government's Exhibit SJ-32.  What are

7  we looking at here?

8  A    It's a little tough to tell with the colors.

9  Q    Let me show you the actual photos and I'll use the bullets

10 for the ladies and gentlemen of the jury.  SJ-32 is on the top.

11 What is -- and I'm going to put that on the screen.  What are we

12 looking at here?

13 A    That would be a view from the park where the trail begins,

14 goes through a fence line, up into the wood area, headed toward

15 the Wabash Avenue.

16 Q    Okay.  This is the opening in the fence you traveled?

17 A    Yes, ma'am.

18 Q    Show you Government's Exhibit SJ-34.  What are we looking at

19 here?  And that should be somewhere in your stack.

20 A    Yes, I have it.

21 Q    Okay.  What are we looking at here?  You see a path?

22 A    That is also another photograph of the trail, same trail

23 leading from the park area up toward Wabash.

24 Q    And these houses there on Wabash?

25 A    The houses are on Wabash, correct.

1    Q    I'm going to show you Government's Exhibit SJ-37.  What are

2    we looking at here?

3    A    That is actually a photograph of myself standing over top

4    and holding an ID number of the location where the handgun was

5    found and recovered.

6    Q    Okay.  If I were to show you -- disregard.  Government's

7    Exhibit SJ-38.  What are we looking at here?  First of all, we've

8    seen these placards throughout the trial.  Is that a typical

9    placard that's used to identify a piece of evidence?

10   A    Yes, it is.

11   Q    And I'm going to zoom in here.  What are we looking at?

12   A    We are looking at a photograph of the handgun that I located

13   in its original state.

14   Q    Okay.  Show you Government's Exhibit SJ-40.  What are we

15   looking at here?

16   A    That is another photograph.  It is of the handgun.  It's at

17   the same location but it's after the foliage was pulled back.

18   Q    Okay.  Did you see, did you witness that?

19   A    I did.

20   Q    All right.  Going to take you right back here to SJ-31,

21   which we've seen earlier, the path.  Can you describe for the

22   ladies and gentlemen of the jury, when you went into the path

23   based on the information you received, did you know the exact

24   location of the firearm?

25   A    I did not.

1    Q    Okay.  And can you tell the ladies and gentlemen, what

2    efforts did you make to recover, to eventually recover that

3    firearm?

4    A    First off, I worked in that area for several years and I'd

5    known about that travel path and that dirt path from the park up

6    to Wabash Avenue.  So as I arrived there, I stood at the opening

7    of the fence area where the trail begins.

8         Walked myself in and I looked, as you continued in up

9    the trail, as you get closer to the railroad tracks, it opens up

10   a little more so, you know, there's not a lot of foliage right

11   there.  Obviously, the train tracks and so forth are coming

12   through there.

13        So I figured based off of, if the crime had occurred

14   and someone was disposing of a handgun, that they would try to

15   get rid of the handgun relatively quick as they entered into the

16   wood area.  And also believing, you know, based off of, you know,

17   just countless, you know, interactions with people, most people,

18   I believe, were right handed.  I walk into the trail, went

19   approximately halfway up, I believe, and around 15 to 20 feet to

20   the right-hand side of the trail and began my search.  And within

21   a rough estimate of three, four, maybe five minutes, I looked

22   down and located the handgun.

23   Q    When you located the handgun, did you call any other members

24   of the Baltimore Police Department to help you with retrieving

25   it?

1   A    I did, utilizing a Baltimore Police Department radio.  I

2   contacted a Crime Lab Unit, had them respond as I stood by over

3   the handgun, had them respond to recover, photograph and

4   ultimately recover the weapon.

5   Q    Going to show you what we've marked as SJ-41.  Do you

6   recognize this item?

7   A    Yes, I do.  This is the handgun that was located by myself

8   and then later recovered by the Crime lab in the wood line along

9   the Towanda Avenue Park.

10  Q    And does the gun as it appears today to be in relatively the

11  same condition as when you retrieved it?

12  A    Yes, ma'am.

13  Q    And when you retrieved it, do you know whether or not the

14  firearm was loaded?

15  A    The firearm, I believe, had one live cartridge in it and

16  five empty cases.

17  Q    And how many does it hold?  Six?

18  A    It holds six.

19  Q    When the firearm was ultimately recovered, do you know

20  whether or not it was submitted to Baltimore Police Department

21  for further analysis?

22  A    Yes, it was.

23  Q    All right.  Court's indulgence, Your Honor.  That's all I

24  have.  Thank you, Detective.

25           THE WITNESS:  Yes, ma'am.

1          THE COURT:  Mr. Murtha.

2          CROSS EXAMINATION

3   BY MR. MURTHA:

4   Q    Thank you, Your Honor.  Good afternoon, Detective Nickoles.

5   A    Good afternoon.

6   Q    You indicated that information was provided to you through

7   another law enforcement agent, which led you to seek the

8   retrieval of this weapon, is that right?

9   A    That is correct.

10  Q    And you are not, you are not in any way associated with a

11  criminal investigation which was the subject of this potential

12  weapon, or this weapon was potentially used in another --

13  A    Could you rephrase?

14  Q    Yeah.  That wasn't a very good question.  I apologize.  The

15  reason for your going to look for the weapon is because, I

16  assume, it was associated with a criminal investigation, is that

17  right?

18  A    That's correct.

19  Q    And there was a person in law enforcement who said, I have

20  some information about a gun that might have been used in a

21  shooting and this is where we're told it's located.  Is that a

22  fair assessment of how that went?

23  A    Correct.

24  Q    Did you know where the location of the shooting was, where

25  the gun may have been used, like in relationship to where you

1    were looking for the gun?

2    A    I did.

3    Q    And it was at Quantico and Reisterstown Road, is that

4    correct?

5    A    At the car wash, correct.

6    Q    And the pictures that have just been shown to you were taken

7    in January of 2007, is that right?

8    A    That is correct.

9    Q    Are you familiar with the fact that the shooting that was

10   being investigated occurred in September of 2005?

11   A    I am.  I do know that, yes, I do.

12   Q    So you have no idea, you personally have, other than

13   something that someone may have told you about how long the

14   weapon may have been there, is that right, from your looking at

15   it?

16   A    All I know is the weapon was recovered in the wood line.

17   Q    And the pictures that have been shown were taken in January,

18   is that correct?

19   A    They were.

20   Q    And it appears that there's, obviously, because of the

21   nature of the climate in our area, there are no leaves that are

22   on the trees or the bushes or the vines or anything, that you can

23   literally see the weapon, is that right?

24   A    No.  That's not actually the case.  There is foliage

25   covering over where the weapon was.  But if you're asking about

1   leaves, no, there isn't an abundance of leaves.  It is the

2   wintertime, correct.

3   Q    Well, it's actually not foliage.  It's actually the remnants

4   of leaves and branches that actually had fallen in the area, is

5   that correct?

6   A    Leaves, branches, that's correct.

7   Q    And it's your testimony that you weren't directed

8   specifically to this location.  But because of your familiarity

9   with the area, you walked in an area that you thought might be

10  consistent with someone who's right handed throwing a weapon as

11  they trotted or walked along the trail, is that right?

12  A    The information -- do you want me to get into the

13  information that I received?  The information that I received

14  brought me to that location, to the park.

15  Q    Well, to the park.  But in regards to the park, after you

16  got to the park, you were never told specifically where the, at

17  least as far as your direct testimony is concerned, you didn't

18  know exactly where the weapon was located, right?

19  A    Only that it was in the woods, but not directly.  I did not

20  know where the weapon was, correct.

21  Q    And within three or four minutes of your arriving at the

22  scene of the park, you said that you actually visually depicted

23  the gun or you visually observed the gun and were able recover

24  it, is that right?

25  A    It wasn't three to four minutes after I arrived.  It was

1    after I stood back, observed the area, and then walked in.  And

2    within three to four, five minutes of searching, that's when I

3    located the gun.

4    Q    Now, and the picture, and it's a little difficult to see.

5    But that is the actual weapon right there, is that correct?

6    A    That is correct.

7    Q    Now, you directed someone from the Baltimore City Crime,

8    Police Department Crime Lab to come and recover the gun, is that

9    correct?

10   A    I did.

11   Q    And you had no control, as far as the investigation is

12   concerned, what happened to the gun once it was removed, is that

13   right?

14   A    No, I did not.

15   Q    So you don't know whether or not there was any testing that

16   was actually conducted to determine whether or not it had any

17   biological samples or had blood on the gun, is that correct?

18   A    That's correct.

19   Q    Or whether or not they could ever recover fingerprints off a

20   weapon that had been sitting in the wood for over 18 months?  You

21   had nothing to do with any testing that would have been done, is

22   that correct?

23   A    I had nothing to do with that, correct.

24   Q    Now, are there, does Baltimore City Police Department have a

25   K-9 unit?

1   A    They do.

2   Q    And are there, and when I say K-9, that's actually dogs that

3   are trained to assist in locating physical evidence, is that

4   correct?

5   A    They can locate persons, weapons, narcotics, things of that

6   nature.  Correct.

7   Q    So there are dogs that are available to assist in locating

8   weapons, is that correct?

9   A    If you mean available -- I can't say they're available all

10  the time.  But the police department does have those types of

11  dogs.

12  Q    And there was never any decision that was made on your

13  behalf, knowing that you were going to be searching through a

14  wooded area, to actually use a K-9 to try to locate the gun, is

15  that correct?

16  A    I was not using K-9, correct.

17  Q    And during the period of time that had passed, you said

18  you're familiar with this area.  This is a heavily traveled path,

19  isn't that correct?

20  A    The path is, correct.

21  Q    And in fact, in that area off of Reisterstown Road, and that

22  would just be, that would be south of Reisterstown Road, is that

23  correct?

24  A    I believe it's actually east.

25  Q    West?

1    A    Or west.

2    Q    Okay.

3    A    But either way, it is, it's chose proximity to Reisterstown

4    Road.

5    Q    And there is a lot of drug activity in that neighborhood, is

6    that correct?

7    A    There has been in the past.

8    Q    And in fact, you worked that area for quite sometime, is

9    that correct?

10   A    I did.

11   Q    And were you in a Narcotics Division at the time?

12   A    I was.

13   Q    And did you, in the course of your investigations, did you

14   ever have the opportunity to investigator or arrest Frank Batts?

15   A    I don't believe --

16        MS. DWYER:  Objection.  To relevance based on his

17   direct exam.

18   Q    I'll withdraw the question.  In that area at Towanda Park,

19   you're familiar with the fact that that area is regularly used by

20   people who are either involved in drug transactions or in using

21   drugs, isn't that right?

22   A    During the time that I worked the area, yes, it was used for

23   that.

24   Q    And so for a long period of time preceding January 2nd of

25   2007, there was probably a lot of foot traffic that traveled from

1    the Reisterstown Road area over through the park, is that right,

2    from your experience?

3    A    I would say there was quite a bit of foot traffic.

4    Q    And there's probably quite a bit of people that hang out in

5    the park, get high, dispose of things, including needles, vials

6    and a variety of other things that are associated with drug

7    paraphernalia after it's used, is that right?

8    A    I wouldn't say that the park was used by drug users.  I

9    mean, it was a travel path to go from one location, to one

10   street, one side of the railroad tracks to the other.

11   Q    And other than the gun that you actually located, you were

12   not looking for anything else that would have been associated

13   with any other criminal activity, is that correct?

14   A    That is correct.

15   Q    And once you recovered -- you didn't physically recover the

16   gun, someone else did, is that right?

17   A    Crime Lab recovered the gun.

18   Q    Court's indulgence, Your Honor.

19        Detective Nickoles, had you prepared a report as a

20   result of your involvement in retrieving the weapon?

21   A    I believe I did prepare a report.

22   Q    Do you have that report with you today?

23   A    I do not.

24   Q    Did you look at it to refresh your memory prior to coming to

25   court today?

1    A    I did not.

2    Q    And so your testimony is just based on your independent

3    recollection of what occurred in 2007?

4    A    That is correct.

5    Q    What other law enforcement officers were present with you at

6    the time that you actually recovered the weapon, if you recall?

7    A    Special Agent Brian High was will.  I believe Sergeant

8    Marjorie German was there.  Possibly one or two other people.

9    Maybe one other person.

10   Q    No further questions, Your Honor.

11              THE COURT:  Anybody else?

12              MS. DWYER:  No.  Thank you, Your Honor.

13              THE COURT:  I'm sorry.  Yes, no?

14              MS. DWYER:  No.  The government has no other questions.

15   I don't think the defense does.  We're done.

16              THE COURT:  Thanks.

17              MS. DWYER:  Thank you.  Your Honor, the government

18   would call Technician Muhangi.

19              THE COURT:  Please come forward.

20              THE CLERK:  Raise your right hand.

21              AKIL KASUMBA MUHANGI, GOVERNMENT'S WITNESS, SWORN

22              THE WITNESS:  Yes.

23              THE CLERK:  Please be seated.  If you would adjust the

24   microphone.  Please state your name and then spell your name for

25   the record.

1          THE WITNESS:  My name is Akil Kasumba Muhangi.  First

2     name is A-K-I-L.  Last name first word K-A-S-U-M-B-A, second word

3     is M-U-H-A-N-G-I.

4          THE CLERK:  Thank you.

5          DIRECT EXAMINATION

6     BY MS. DWYER:

7     Q    Can you tell the ladies and gentlemen with whom you're

8     employed?

9     A    I work for the Baltimore City Police Department in the

10    Mobile Crime Lab Unit.

11    Q    And how long have you been there?

12    A    Four years.

13    Q    And what are your duties and responsibilities as part of

14    that Mobile Crime Unit?

15    A    We respond to crime scenes for documentation and collection

16    of evidence, including firearms, fingerprints, clothing items,

17    etc.

18    Q    And Technician Muhangi, were you called to a location on

19    January the 2nd of 2007 to assist with recovery of a firearm that

20    had been found there earlier?

21    A    Yes.

22    Q    And when you arrived at that location, did you see a firearm

23    that the other detectives had found?

24    A    Yes.

25    Q    I'm going to show you Government's Exhibit -- actually, I'm

1   going to give you these photographs, a series of photographs that

2   I'll ask you to look at.  And then I have a copy of them on the

3   screen.  Because these a little easier for you to see.

4                Show you SJ, Government's Exhibit SJ-38.  If you look

5   on the back, you can see the exhibit number.  Do you recognize

6   that photograph?

7   A    Yes.

8   Q    And is that a photograph of the firearm that you were asked

9   to recover?

10  A    Yes.

11  Q    Did you put the government placard -- excuse me -- the

12  evidence placard down?

13  A    Yes, I did.

14  Q    And does this photograph accurately show the ladies and

15  gentlemen of the jury how the gun was observed and where the gun

16  was located with, regarding the twigs and branches, when you saw

17  it for the first time on January the 2nd of 2007?

18  A    Yes, it does.

19  Q    Okay.  And this area where you, you found the firearm, is

20  that in an area known as Towanda Park, near an area known as

21  Towanda Park?

22  A    I'm not exactly sure.  I know the street that I was on was

23  Towanda Avenue but I don't know the name of the park itself.

24  Q    I'm going to show you Government's Exhibit SJ-30.  You see

25  Towanda Avenue here?

1   A    Yes.

2   Q    And is this the area of the park where you were asked to

3   recover the firearm?

4   A    Yes.

5   Q    Okay.  And I'm going to show you Government's Exhibit SJ-31,

6   which is a close-up of that area.  Do you recognize this path as

7   the area you traveled on in order to recover the firearm?

8   A    Yes.

9   Q    Let me show you, finally, SJ-40.  Is that a photograph of

10  the firearm in its position in which it was recovered after the

11  debris had been moved?

12  A    Yes, it is.

13  Q    And did you take these photographs?

14  A    Yes, I did.

15  Q    Okay.  When the firearm was eventually picked up and

16  packaged and sent on for further analysis, did you do that?

17  A    Yes, I did.

18  Q    You were the one who actually picked it up and put it in a

19  package and sent it on its way?

20  A    Yes, I did.

21  Q    Okay.  And did you use a gloved hand or gloves on your hands

22  in order to retrieve the firearm?

23  A    Yes.  Before I handled the weapon I did put gloves on.

24  Q    Okay.  That's, I assume, standard procedure?

25  A    Yes.

1   Q    When the firearm was taken back, I assume it was taken back

2   to the Crime Lab here in Baltimore?

3   A    Yes.

4   Q    Was it then taken out of that packaging and photographed

5   again?

6   A    Yes.

7   Q    I'm going to show you Government's Exhibit SJ-42.  Is that a

8   picture of the firearm after it was removed back at the

9   laboratory?

10  A    Yes.

11  Q    Okay.  And Government's Exhibit SJ-43.  Is that a picture of

12  the firearm after it was removed from the other side, that shows

13  five spent projectiles and one live round?

14  A    Yes.

15  Q    Did you take this photograph?

16  A    Yes, I did.

17  Q    Did you recover these six items from the firearm?

18  A    Yes, I did.

19  Q    And can you describe those rounds for the ladies and

20  gentlemen, please, of the jury?  What are these five items?

21  A    The five similar items are spent cartridge casings that were

22  still inside the weapon.

23  Q    And this?

24  A    And the one is a live round that has yet to be fired.

25  Q    Okay.  Did you attempt to obtain latent fingerprints from

1    this item?

2    A    Yes, I did.

3    Q    And were you able to do so?

4    A    No, I was not.

5    Q    Did you then submit the firearm and the cartridge casings

6    and the live round?

7    A    Yes, I did.

8    Q    To the Firearms Unit of your police, of the Baltimore Police

9    Department for further analysis of this weapon?

10    A    Oh, it was submitted to our Evidence Handling Unit and then

11    was passed on from there to the Firearms Unit.

12    Q    Okay.  Finally, I'm going to show you Government's Exhibit

13    SJ-41.  Do you recognize the item either by the tag, the CC

14    number, or the packaging?

15    A    Yes.

16    Q    Is that the firearm you recovered?

17    A    Yes, it is.

18    Q    And does it look today to be in about the same condition,

19    particularly the metal finish, does it look to be in about the

20    same position as the day you recovered it back in January of '07?

21    A    Yes.

22    Q    That's all I have, Your Honor.

23             THE COURT:  Mr. Murtha.

24             CROSS EXAMINATION

25    BY MR. MURTHA:

1   Q    Thank you, Your Honor.  Good afternoon, sir.

2   A    Good afternoon.

3   Q    This is the photograph that you took when directed to the

4   location where the weapon was in the park, is that right?

5   A    Yes.

6   Q    And there's a picture before anybody touched it, at least to

7   the best of your knowledge, correct?

8   A    Yes.

9   Q    And then this appears to be a picture after -- were you the

10  individual that actually just brushed off whatever debris, and I

11  call it debris, but whatever branches or leaves were on top of

12  it, and just brushed it off and then sort of took a picture, is

13  that right?

14  A    Yes.

15  Q    In fact, all you had to do was brush things off?  There were

16  things on top of it.  Nothing had grown through where the trigger

17  area was.  Nothing had grown over the gun or the barrel or in any

18  way had grown around the gun that actually kept it on the ground,

19  not being able to be removed, isn't that right?

20  A    I can't say for certain if anything grew through it.  But I

21  didn't have any difficulty removing whatever debris was on top of

22  it.

23  Q    Literally, you just had to brush off some things in order to

24  actually, one, be in a position where you could take an

25  unobstructed view or unobstructed picture of the weapon, is that

1    right?  I mean, you didn't have to pull some vines out and take a

2    pair of scissors and cut some broad leaf grass that had encased

3    itself around the barrel or anything like that, had you?  I mean,

4    you just brushed things off and then took the picture?

5    A    I don't recall it being extremely difficult to remove the

6    items.  But it's difficult for me to say if there was anything

7    that grew through it and anything like that.

8    Q    I see that there's a picture of before, and I'll call this

9    during, bu there's no picture that was taken after the gun was

10   remove from the area to see if there was an impression left in

11   the ground where the gun was recovered from, isn't that right?

12   A    That's right.

13   Q    And no one directed you to actually take a picture of the

14   ground area after the gun had been lifted off of the ground,

15   isn't that right?

16   A    No.

17   Q    And you were, you had actually prepared a report.  And it

18   was Detective High who has given you direction in regard to the

19   photographing and the removal of the weapon, is that right?

20   A    Yes.

21   Q    After you recovered the weapon, you indicate that this is a

22   picture of it as it existed.  You didn't clean it in any way, is

23   that correct?

24   A    No, I didn't.

25   Q    In fact, it appears that it's in a condition that it doesn't

1  appear to have any dirt encrusted in any area of the gun, is that

2  right?  And if you recall or don't recall, based on your

3  independent recollection and your viewing this picture, is it

4  your recollection that there was no dirt that had to be scraped

5  off of the gun or off of the pistol grip in any way in order for

6  you to get a picture of the gun?

7  A    Nothing needed to be taken away.  But in my handling of the

8  weapon, I have to try to maintain its integrity in the form that

9  I get it.  So anything that falls off of it in handling

10  incidentally.  But I can't intentionally remove anything from it.

11  Q    And you didn't in this case, is that correct?

12  A    No.

13  Q    May I approach?

14         THE COURT:  Of course.

15  Q    In regard to the gun -- if I can step back.  This was, it

16  was face up, is that correct?  This was the side that was facing

17  up?

18  A    Yes.

19  Q    In fact, it's where the revolver doesn't unfold.  On this

20  side it was down on the ground, is that correct?

21  A    Yes.

22  Q    Looks like this is, and your indication is this is the

23  condition it was in at the time you recovered it, is that right?

24  A    Aside from, you know, the dirt drying and some of it

25  probably falling off, but --

1    Q    But there's a little bit of dirt on the pistol grip.

2    Doesn't appear that there was any dirt or any kind of vegetative

3    growth that had to be removed from the gun itself, is that right?

4    A    Not anything noticeable, no.

5    Q    Do you have your report with you today?

6    A    Yes, I do.

7    Q    And you had indicated in your answers on direct examination

8    that you attempted, and it was, actually, the question was, Did

9    you process these items for latent prints?  And in response to

10   that question you said yes, but you weren't specific in regard to

11   what you actually processed.  Was it the gun itself?

12   A    The gun and the items that were removed from the gun.

13   Q    And these are the cartridge casings that were either, were

14   spent, meaning that they had been used, and there was one live

15   round, is that correct?

16   A    Yes.

17   Q    When you say you processed them, do you know where on the

18   actual cartridge casing itself you actually try to obtain prints

19   from?

20   A    The smooth cylindrical area around the casing.

21   Q    Now, if I can just ask you a question.  I know you're a

22   technician.  But when a person loads a revolver, they actually

23   have to put the bullets into the cylinder, is that right?

24   A    That's right.

25   Q    And then one by one.  A person could pick it up like this,

1    right?

2    A    Uh-huh.

3    Q    And put it in.  But they would, have you ever seen a person

4    load a revolver and use their thumb to press it into the actual

5    revolver itself?

6    A    Yes.

7    Q    Did you -- and that is the top of the cartridge casing that

8    would be exposed to the back end, is that right?

9    A    Yes.

10   Q    In fact, that would be what would be exposed at the end of

11   the cylinder, is that correct?

12   A    That's correct.

13   Q    Did you attempt to recover any fingerprints off of the top

14   of the cartridge casing where a person might leave a thumb print

15   as they pushed the cartridge into the cylinder?

16   A    No.

17   Q    Who directed you in regard to the processing of the

18   cartridge casings?  Was it your decision or was it the decision

19   of an investigating officer who was responsible for the criminal

20   investigation?

21   A    It was mine.

22   Q    And did anybody who was involved in the investigation ask

23   you to follow up or to do some additional processing to determine

24   whether or not any potential latent print could be recovered from

25   the top of the cartridge casing?

1   A    No.

2   Q    And in regard to the actual processing for latents on the

3   smooth surface of the cartridge casing that you did process, you

4   were not able to recover any latent prints that were suitable to

5   be used for comparison?  You weren't able to recover any, is that

6   right?

7   A    That's correct, I was not.

8   Q    Court's indulgence, Your Honor.

9         In regard to the other, any other processing of the

10  gun, you've been involved for quite a number of years in

11  obtaining physical evidence and trying to obtain samples of, in

12  order for further processing, biological samples, is that right?

13  A    Yes.

14  Q    And have you been involved in criminal investigations where

15  guns have been used in the investigation, where you're asked to

16  see if there's any blood or potential blood on the gun itself?

17  A    Yes.

18  Q    And did anybody ask you to see if you could inspect the gun

19  to determine whether or not you, or to take a swab of any part of

20  the gun?

21  A    No.

22  Q    In this case?

23  A    No.

24  Q    And was there, was the only person that was directing you to

25  do anything in regard to the weapon that was recovered in this

1   case Detective High?  Was he the only person?

2   A    I recall there being other people at the scene, I guess

3   assisting with the search.  But he was the one that I talked to

4   directly in regards to recovering the weapon.

5   Q    What would it have entailed to swab the top of the gun to

6   see if there could be any biological sample that may have been

7   transferred as a result of a discharge and blow back of either

8   tissue or blood on to the gun itself?  What would be involved in

9   that as far as processing is concerned?  What would you have had

10  to do?

11  A    I would just take a sterile swab and apply some water to the

12  tip of it and swab it over the area.

13  Q    It's a pretty simple process, isn't it?

14  A    Yes.

15  Q    And you were never instructed to try to obtain any kind of

16  sample off the gun or to swab the gun to determine whether or not

17  there were any remnants of blood or any potential DNA that could

18  be located on the gun, is that correct?

19  A    That's correct.

20  Q    Court's indulgence, Your Honor.  No further questions, Your

21  Honor.

22          THE COURT:  Anything further?

23          MS. DWYER:  No, Your Honor.

24          THE COURT:  Thank you very much.  Next witness.

25          MS. DWYER:  Recall James Wagster.

1          MR. MURTHA:  Your Honor, may we just approach very

2    briefly?

3          THE COURT:  Of course.

4          (Bench conference on the record:)

5          MR. MURTHA:  Rather than do it all over again, when Mr.

6    Wagster --

7          THE COURT:  Same objection?

8          MR. MURTHA:  Rather than voir dire him, I'm just going

9    to object.

10         THE COURT:  Same objection.

11         MR. PROCTOR:  Judge, while we're at the bench, the

12   first time we observed those photos of the gun recovery was today

13   and we certainly don't have any report from Officer Nickoles.

14   That's not in dispute.  But we would ask the government check its

15   files and reports of Officer Nickoles and provide us by e-mail,

16   CD, color copy, whatever he's used.  Thank you.

17         (End of bench conference.)

18     JAMES WAGSTER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

19         THE COURT:  You're still under oath, sir.  And subject

20   to the same objection, you can still testify as an expert.

21         DIRECT EXAMINATION

22   BY MS. DWYER:

23   Q    Mr. Wagster, you testified previously.  Trying to keep

24   things in order here so we brought you back.

25         Mr. Wagster, did there come a time when you received

1    into your laboratory for your examination items that were

2    submitted to you from the detective involved in the investigation

3    of the murder of Shannon Jemmison under the Complaint Number 05G,

4    or 6I5876, bullet fragments that were removed from Mr. Jemmison's

5    body for you to analyze?

6    A    Yes, ma'am.

7    Q    I'm going to show you what we've marked as Government's

8    SJ-22.  Do you recognize those items?  Or do you recognize the

9    envelope that the items are in?

10   A    Yes, I do.  It has the same property number on it.

11   Q    Okay.  And what were those items, please?

12   A    There was two fired bullets.

13   Q    Okay.  And did you label them as we talked about, I guess,

14   last week, with that Q and then different numbers behind it?

15   A    Yes, ma'am.

16   Q    Q stands, again, for questioned?

17   A    Yes, ma'am.

18   Q    And did you label them Q-1B for bullet and Q-2B for bullet?

19   A    Yes, I did.

20   Q    Okay.  What can you tell us about those two bullets, please?

21   A    They were caliber .38/.357.  They had lands and grooves of

22   05 right.  And I could not match them together.

23   Q    And what does that mean, you could not match them together?

24   A    I couldn't determine that they were both fired from the same

25   firearm.

1   Q    Why not?

2   A    Both of them have some mutilation and distortion.

3   Q    And what was the mutilation and distortion caused by, if you

4   know?

5   A    Whatever they hit.

6   Q    Could that be the body of Shannon Jemmison?

7   A    Yes, ma'am.

8   Q    Okay.  Bones inside his body, etc.?

9   A    Yes, ma'am.

10  Q    Okay.  Did there come a time later, in 2007, when you

11  received a firearm that is Government's Exhibit -- well, first of

12  all, let me ask you this.  Those types of caliber, .38/.357, what

13  can you tell us about that ammunition?  What type of firearm can

14  fire it?

15  A    It's generally revolver ammunition.

16  Q    Okay.  Going to show you Government's Exhibit SJ-41.  Did

17  you examine this firearm at some point?

18  A    Yes, ma'am.

19  Q    Is that firearm a revolver?

20  A    Yes, it is.

21  Q    Does that firearm, because it's a revolver, does it eject

22  its shells after they've been fired or do they remain inside the

23  firearm?

24  A    They remain inside the firearm until you eject them

25  yourself.

1    Q    And did that firearm come to you with projectiles that you

2    also examined?

3    A    It came with five cartridge cases and one live cartridge.

4    Q    Going to show you Government's Exhibit SJ-43.  Is this a

5    photograph of the item with the five, five casings and one live

6    bullet?

7    A    It looks to be.  I didn't take that photograph.

8    Q    Okay.  Okay.  We've heard testimony about that.  But five

9    spent casings, right?

10   A    Yes, ma'am.

11   Q    And that means already fired?

12   A    Correct.

13   Q    And one live round?

14   A    Yes, ma'am.

15   Q    What can you tell us about those?  First of all, did you

16   labor then in the same fashion as Q --

17   A    Yes, ma'am.  Q-1 through 5 and the live one was Q-L1.

18   Q    Q what?

19   A    Q-L1.

20   Q    And L for live?

21   A    Yes, ma'am.

22   Q    Okay.  What can you tell us about those six pieces of

23   evidence?

24   A    They were all Winchester brand.  They were caliber .357

25   magnum.  And the live ammunition was loaded with a semi-jacketed

1    hollow point bullet.

2    Q    Okay.  And did you later examine the fragments that were

3    removed from Mr. Jemmison's body, Q-1B and Q-2B?

4    A    Yes, ma'am.

5    Q    Did you later compare them to this firearm, and based on

6    your expertise, were you able to determine whether or not Q-1B or

7    Q-2B was fired from this firearm?

8    A    Q-2B was fired from the firearm.  I couldn't identify Q-1B

9    as being fired from that firearm.

10   Q    Why could you not determine whether Q-1B was fired?

11   A    Q-1B I couldn't determine.

12   Q    Why not?

13   A    Because it had damage to it.

14   Q    And the damage prevented you from making a comparison?

15   A    Yes, ma'am.

16   Q    And the caliber of Q-1B and Q-2B which you told the ladies

17   and gentlemen was .38/.357 or .38/.357, is that the same caliber

18   of the projectiles and the live round that was recovered inside

19   the firearm?

20   A    If they were .357, it would be a .38, they would be a

21   different caliber.

22   Q    Okay.  Why can't you tell whether it's .357 or .38 from the

23   rounds taken from Mr. Jemmison's body?

24   A    Most of the jacketed bullets, semi-jacketed bullets, they

25   load the same bullet in a .38 or .357.  The difference is in the

1    length of the cartridge case and not the bullet.

2    Q    Okay.  Were there marks?  You talked earlier last week about

3    the lands and grooves and the marks that are left behind on a

4    projectile.  Were there marks on the projectiles that were taken

5    from Mr. Jemmison's body that allowed you to come up with the

6    expert opinion that at least one of them was fired from this

7    firearm?

8    A    Q-2B, yes, ma'am.

9    Q    It possessed those marks?

10   A    Yes, ma'am.

11   Q    Court's indulgence.  That's all I have, Your Honor.  Thank

12   you, Mr. Wagster.

13           THE COURT:  Any questions?  Mr. Murtha.

14           CROSS EXAMINATION

15   BY MR. MURTHA:

16   Q    Thank you, Your Honor.  Good afternoon, Mr. Wagster.

17   A    Afternoon, sir.

18   Q    Do you have the weapon right in front of you?

19   A    Yes, sir, I do.

20   Q    Can you just look at it for a moment?  It's the gun that you

21   actually test-fired and used as a basis for your testimony today,

22   is that right?

23   A    Yes, sir.

24   Q    You didn't clean it before you actually test-fired it, did

25   you?

1   A    I cleaned the barrel and the breech face on it.

2   Q    It didn't have a whole lot of mud in the barrel or the

3   breech face, did it?

4   A    When I got it, I don't remember it having a lot of mud in

5   it.  Most of it was on the surface of the gun.

6   Q    So you were given it by, it was actually placed in a secure

7   area.  Some crime scene tech, assuming you didn't have any

8   communication with him, some crime scene tech actually recovers

9   it, puts it in a storage locker for a later time when you

10  actually do your comparison and testing, is that correct?

11  A    Yes, sir.

12  Q    So if the person who recovered it says what it looks like

13  today is in the condition it was at the time that they recovered

14  it, he probably didn't do anything to it, either, before giving

15  it to you, is that right?

16  A    Yes, sir.

17  Q    And you had originally been given two bullet fragments to

18  look at and see if they came from the same weapon.  And those

19  were the ones that you were not able to initially determine

20  whether Q-1B and Q-2B could be identified or actually eliminated

21  as having been fired with the same unknown firearm.  That was in

22  September of 2005, is that correct?

23  A    Yes, sir.

24  Q    And then you were asked in January of 2007 to then take a

25  look at the other items which you've testified to concerning

1    whether or not they came from the same firearm, is that correct?

2    A    Yes, sir.

3    Q    And you prepared a report.  And you've identified that they

4    were, it's a .357 magnum, is that right?

5    A    Yes, sir.

6    Q    And you just testified as to land and grooves.  And I know

7    that the ladies and gentlemen of the jury just last week heard

8    you testify that lands and grooves are the marks that are left in

9    the process of the manufacturing of the actual weapon, is that

10   correct?

11   A    Yes, sir.

12   Q    And it's because the manufacturers bore a hole into the

13   metal, which ultimately becomes the barrel from which the bullet

14   is discharged, is that correct?

15   A    Yes, sir.

16   Q    Lands and grooves are specifically called class markings, is

17   that correct?

18   A    Yes, sir.

19   Q    And class markings are markings that are similar to all

20   weapons that may be made by the manufacturer that made that .357

21   magnum, is that correct?

22   A    Yes, sir.

23   Q    Are there, is it called subclass -- I'm not trying to be

24   smart.  But there's a subset category of other markings that may

25   be specific to that weapon, is that correct?

1    A    Yes, sir.

2    Q    In your examination of this weapon, did you make any

3    determination in regard to any subclass markings that were

4    associated with the projectile or mutilated projectiles that you

5    examined in this case?

6    A    No, sir, I didn't.

7    Q    So your determination in regard to making the comparison was

8    largely based on the class markings that are, that are consistent

9    with the .357 -- is it a Winchester in this case or is it a Smith

10   & Wesson?  I forget.

11   A    The caliber is .357 magnum.  The actual cartridge cases were

12   Winchester.

13   Q    Okay.  But your testimony is in large part based upon the

14   class markings that are consistent with the manufacturing of the

15   weapon, is that correct?

16   A    Part.  Part of it, yes, sir.

17   Q    Now, do you know how many 300, how many .357 magnums may be

18   in the possession of the population of the citizens of Baltimore,

19   Maryland?

20   A    Probably a lot.

21   Q    So there could be a lot of similarities in regard to class

22   markings in .357 magnums, isn't that right?

23   A    Any of them that are five right, yes, sir.

24   Q    So there could be more than one .357 magnum that has a five

25   right class marking that might be out there amongst the

1    population of citizens of Baltimore, isn't that right?

2    A    Yes, sir.

3    Q    Court's indulgence.  No further questions, Your Honor.  I'm

4    sorry.

5              MR. VAN HOVEN:  May I have a moment, Your Honor?

6              (Pause in Proceedings.)

7              CROSS EXAMINATION

8    BY MR. VAN HOVEN:

9    Q    Mr. Wagster, good afternoon, sir.

10   A    Good afternoon.

11   Q    Regarding that weapon that's in front of you, were you

12   asked, were you asked to compare that weapon with evidence from

13   any other shootings?

14   A    No, sir.

15   Q    Did Detective Baier ask you to compare that weapon to

16   another murder?

17   A    If he did, I have no paperwork on it.

18   Q    Just to be sure, if I may show you.  You've got all the

19   different CC numbers and things you've been testifying about?

20   A    Not with me.  I only have this report with me today.

21   Q    Mr. Wagster, let me show this to you.  If you don't mind me

22   standing over your shoulder.

23   A    No, sir.

24   Q    I didn't make an extra copy of this.  Is that report that

25   you were asked to make a comparison of, if you can just look at

1   the CC numbers to see if it's the same weapon.

2   A    This is a different gun.  It's supposed to be a .38 special

3   Smith & Wesson.

4   Q    Right.  But when you look at the CC numbers, is it the same

5   CC number as the --

6   A    I believe this was one of the CC numbers I testified to last

7   week.  The gun number here he has as 07H203.  This particular

8   firearm's 07A0045.

9   Q    Right.

10  A    I believe this CC Number, 63K12078, was one of last week's,

11  that I testified to last week, not 5876.

12  Q    Are any of the CC numbers on the, we'll call it the Jemmison

13  case where this gun was in reference to, are they on that report?

14  Do you see it?

15  A    I do not see any, sir.  This one's 073H10644.  Those

16  property numbers are 06 -- let me doublecheck.  These are 05's.

17  Q    Okay.  Thank you, sir.  Just so I'm clear on this thing.  I

18  showed you this report is regarding a .38 special?

19  A    Yes, sir.

20  Q    Do you recall ever examining a .38 special on this case or

21  the case you testified about last week?

22  A    I may have.  I know there were several other firearms I

23  looked at that were negative.  I do not have the CC numbers with

24  me.

25  Q    Thank you, sir.  No other questions, Your Honor.

1          THE COURT:  Ms. Dwyer.

2          REDIRECT EXAMINATION

3     BY MS. DWYER:

4     Q    Yes.  Mr. Wagster, I want to just go back to Q-2B, the

5     projectile that was recovered from Mr. Jemmison that you matched

6     to the firearm that is Government's Exhibit SJ-41.  What, and

7     based on Mr. Murtha's questions to you, what made you, what

8     evidence did you find on the projectile from Mr. Jemmison and the

9     firearm that you have in front of you, what evidence did you have

10    that made you determine in your expert opinion that firearm fired

11    the bullet in Mr. Jemmison's body?

12    A    There were microscopic markings on the bullets, the lands

13    and grooves, that when I test-fired the gun, I took the test

14    bullets, compared them under the comparison microscope against

15    our evidence bullets.  And there was, I was able to conclude that

16    Q-2B was fired with that gun.  However, Q-1B had too much damage

17    on it for me to make that conclusion.

18    Q    And did you use the microscope that we, that Mr. Murtha

19    asked you a lot of questions about last week, the cross section

20    microscope?

21    A    Yes, ma'am.  Comparison.

22    Q    Okay.  And were you able to then line up a microscopic

23    photograph of the bullet --

24              MR. MURTHA:  Objection.  Just the leading nature.

25              THE COURT:  Overruled.  Go ahead.

1    BY MS. DWYER:

2    Q    Did you line up the microscopic photograph of the bullet

3    from Mr. Jemmison's body to the bullet you fired from that

4    firearm?

5    A    I line up the actual bullets and then they're photographed.

6    Q    And were you able to determine that the markings were the

7    same?

8    A    Yes.

9    Q    And was that based upon your training and expertise?

10   A    Yes, ma'am.

11   Q    And was it your expert opinion that they were fired from the

12   same firearm?

13   A    Yes, ma'am.

14   Q    And finally, you fired this firearm, did you not?

15   A    Yes, I did.

16   Q    It worked?  It was operable?

17   A    Yes, ma'am.

18   Q    That's all I have, Your Honor.

19         THE COURT:  Anything further?  Mr. Murtha.

20         RECROSS EXAMINATION

21   BY MR. MURTHA:

22   Q    Very briefly.  You didn't display to the ladies and

23   gentlemen of the jury any photo micrographs of the cross, or for

24   the split screen microscope that you've indicated that you used,

25   right?

1   A    No, sir.

2   Q    And again, the markings that you have testified to

3   specifically relate to the class markings of the revolver type

4   that you were looking at, is that correct?

5   A    The class markings are the 05 right.  The subclass would be

6   some heavy manufacturing marks that are transposed.  And then you

7   have the microscopic marks, which is what I used to make the

8   final determination.

9   Q    Things that may affect the ability to make a match include

10  thing such as rust, correct?

11  A    Correct.

12  Q    And in fact, in your report that you prepared as a result of

13  examining this, you indicate that the weapon did have rust on it,

14  correct?

15  A    Yes, sir.

16  Q    Another thing that might be able, might affect the ability

17  to compare a projectile that may have been discharged from a

18  weapon is dirt, is that correct?

19  A    Yes, sir.

20  Q    And in fact, you indicated that in this case there was dirt

21  that was, may have been recovered from the barrel when you

22  actually cleaned it, is that correct?

23  A    Yes, sir.

24  Q    And ultimately you don't know how long or whatever happened

25  to the weapon from the time that it may have been used in

1    September, 2005 to the time that you were asked to look at it in

2    2007, is that correct?

3    A    That's correct.

4    Q    You don't know whether or not that gun may have been

5    discharged no times or was discharged a hundred times, isn't that

6    correct?

7    A    That's correct.

8    Q    And so one of the other things that might affect the ability

9    to do a comparative analysis is whether or not a weapon had been

10   used because that would change the subclass markings, is that

11   correct?

12   A    It could, yes, sir.

13   Q    Because every time a bullet is projected through the barrel

14   and it spins, it might actually leave a different subclass

15   marking or affect, not -- it might affect the subclass marking,

16   is that correct?

17   A    Yes, sir.

18   Q    So there's a lot of things that could affect the actual item

19   that you're reviewing compared to the item that you looked at,

20   you're looking at to compare it to, is that correct?

21   A    Yes, sir.

22   Q    And in the end, it's your subjective interpretation of what

23   you're looking at without any kind of measurements that you're

24   noting, other than the 5 right that you had indicated, there's no

25   other subclass markings that you've wrote down and recorded in a

1   report, isn't that correct?

2   A    Correct.

3   Q    And we don't have any photo micrographs to actually show the

4   ladies and gentlemen of the jury what you're actually speaking

5   about when you put them together?

6   A    I do.  They've just never been showed to anybody.

7   Q    Okay.  And in regard to any other kind of measurements that

8   may or may not have been used, you have no objective standard in

9   regard to measuring the thing that you're looking at.  It's

10  really all essentially eyeballing it and making the call, isn't

11  that correct?

12  A    Yes, sir.

13  Q    No further questions, Your Honor.

14           THE COURT:  Thank you very much.  Next witness.

15           MS. DWYER:  Your Honor, may we approach quickly?

16           THE COURT:  Sure.

17           (Bench conference on the record:)

18           MS. DWYER:  Judge, We're going to call Mr. Love and we

19  needed a little break to bring him up.

20           The other thing the government wanted to object to and

21  ask to be taken care of, I guess, is the exhibit.  This morning

22  the five-foot-two inch cardboard cut out was standing and now

23  it's got a jacket on it.  And we think that's --

24           MR. SAUNDERS:  I'll take the jacket off.

25           THE COURT:  During the break, take it off.  Actually,

1    leave it on the side.  It's a rainy day.

2              MS. DWYER:  Thank you very much.

3              (End of bench conference.)

4              THE COURT:  We'll take a short break and then we're

5    ready whenever anybody else is.

6              (Recess.)

7              THE COURT:  Get the jury.  Get the witness.

8              (Jury enters the courtroom.)

9              THE CLERK:  Jurors all present.

10             THE COURT:  Please be seated.  Next witness.

11             MR. MANLEY:  Yes, Your Honor.  The government calls Mr.

12   Tracy Love to the stand.

13             THE CLERK:  Mr. Love, would you stand and raise your

14   right hand?

15                TRACY LOVE, GOVERNMENT'S WITNESS, SWORN

16             THE WITNESS:  Yes.

17             THE CLERK:  Please be seated.  Sir, if you would, I

18   need you to adjust that microphone to yourself.  State your name

19   and then spell your name for the record.

20             THE WITNESS:  Tracy Love.  T-R-A-C-Y.  L-O-V-E.

21             THE CLERK:  Thank you.

22             DIRECT EXAMINATION

23   BY MR. MANLEY:

24   Q    Mr. Love, good afternoon to you, sir.

25   A    Good afternoon.

1    Q    Mr. Love, how old are you?

2    A    24.

3    Q    And Mr. Love, did you plead guilty in this case?

4    A    Yes.

5    Q    And as part of your plea agreement, did you agree to

6    cooperate with the United States?

7    A    Yes.

8    Q    Is that right?

9    A    For -- yes.

10   Q    Okay.  Mr. Love, we're going to get to your plea agreement

11   in a moment.  But did there come a time when you worked for

12   Melvin Gilbert's organization?

13   A    Yes.

14   Q    And what type of drugs did you sell?

15   A    Heroin and cocaine.

16   Q    Now, for the heroin, was there any particular name for the

17   heroin?

18   A    Special.

19   Q    And for the cocaine, was there any particular name for the

20   cocaine?

21   A    Green, it was green tops.

22   Q    But besides green tops, did it have like a special name?

23   A    No.  No.

24   Q    Okay.  Now, during the time when you were working for

25   Melvin's organization, did you overhear discussions between

1    Melvin Gilbert and an individual by the name of Bo?

2    A    Yes.

3    Q    And who is Bo?

4    A    His cousin.

5    Q    Do you know his real name?

6    A    Randy McClean.

7    Q    Did there ever come a time when Melvin talked about firing

8    Bo?

9    A    Yes.

10   Q    Could you describe to the jury what the circumstances of

11   Melvin Gilbert saying that he was going to fire Bo?

12   A    Say it again.

13   Q    Just describe what Melvin said.

14   A    He going to fire him for not doing his job.

15   Q    Did he ever say anything about a quota?

16   A    Yeah.  He didn't make the quota for that day so he going to

17   get fired if he don't keep making that quota.

18   Q    Was Melvin, what was his reaction?  Was it happy?  Sad?

19   Angry?  Mad?  What?

20   A    Mad.

21   Q    Did he use any words besides he's going fire him, did he use

22   any bad words to describe Bo?

23   A    Faggot, bitch.

24   Q    Did there ever come a time when you saw Melvin smack a

25   junkie?

1    A    Yes.

2    Q    First of all, describe to the jury what a junkie is.

3    A    A junkie is a fiend, somebody that gets high.

4    Q    And you saw Melvin smack a junkie?

5    A    Yes.

6    Q    Do you know why Melvin smacked a junkie?

7    A    He, the dude ran off with some --

8    Q    Describe what you saw.  What did Melvin do?  What did the

9    fiend do?

10   A    Well, the fiend took some drugs, and Melvin smacked him up.

11   Q    And Melvin smacked him up?

12   A    Yes.

13   Q    And what happened to the fiend after Melvin smacked him up?

14   A    The fiend kept working.

15   Q    Did the fiend continue working for the organization?

16   A    Yes.

17   Q    Now, during this time when you're working for Melvin's

18   organization, did he ever bring testers?

19   A    Yes.

20   Q    Describe to the jury what a tester is.

21   A    A tester is like free drugs that you give to the fiends to

22   let them know that your drugs is good.

23   Q    And for those testers that Melvin brought, were they a

24   particular drug?

25   A    Cigarettes, drugs, dope, coke.

1    Q    And were these testers given out?

2    A    Yes.

3    Q    Now, have you ever ridden around in a car with Melvin during

4    your time when working with Melvin?

5    A    Yes.

6    Q    And what type of cars have you ridden in with Melvin?

7    A    Cherokee.

8    Q    Anything else that you remember?

9    A    His old girl car.  I forget what kind of car it was, though.

10   Q    Now you say "old girl."  Whose old girl?

11   A    Melvin's.

12   Q    Do you know that girl's name?

13   A    Treecy.

14   Q    Now, let's stick on Treecy for a minute.  What did you see

15   Treecy doing for the organization?

16   A    I seen her cap up before.  She capped up for us before.

17   Q    And when you say "capped up for you guys", what does,

18   describe to the jury what capping up is.

19   A    It's putting the dope in the little capsules, like the gel

20   caps.

21   Q    And this was Melvin's girlfriend Treecy who did that?

22   A    Yes.

23   Q    Were there other people besides Treecy who was capping up?

24   A    Yes, but I don't know them.

25   Q    Now, I was asking you about riding around in cars with

1    Melvin.  Did there come a time when you went to various spots

2    with Melvin?

3    A    Went to -- around the neighborhood?

4    Q    Yes.

5    A    Yes.

6    Q    Did Melvin ever do any call outs while he was riding around

7    with you?

8    A    To let them know that we're out.

9    Q    And what does it mean when you let them know that we're out?

10   A    Just let them know that the product is out.  It's out on the

11   streets.

12   Q    And who would Melvin be talking to when he was letting

13   people know that the product was out on the streets?

14   A    Junkies, other fiends, other people that get high.

15   Q    Do you know an individual by the name of Maurice?

16   A    Yes.

17   Q    Did Melvin's organization use Maurice's house?

18   A    Yes.

19   Q    And what did he use Maurice's house for?

20   A    Stash house.

21   Q    Where was Maurice's -- where was the stash house used by the

22   organization?

23   A    On Cokesbury.

24   Q    Did you also use another location at 708 Bartlett Street?

25   A    Yes.

1  Q    Now, during the time when you were working with Melvin's

2  organization, were there various streets in the area that you

3  guys used to sell on?

4  A    Yes.

5  Q    Describe some of those streets that you used to sell on.

6  A    Homewood Avenue, Bartlett, and Cokesbury.

7  Q    Now, when were you actually locked up in the case?

8  A    In 2004.

9  Q    And you're currently in custody right now, is that right?

10 A    Yes.

11 Q    Now, since the time that you've been in custody, do you know

12 the players that were involved and the things that happened with

13 regard to the selling of drugs after you went into custody?

14 A    No.

15 Q    During the time when you were working for Melvin's

16 organization, did you have access to guns?

17           MR. TUMINELLI:  Judge, can we approach?

18           THE COURT:  Yes.

19           (Bench conference on the record:)

20           MR. TUMINELLI:  Judge, my objection is to the repeated

21 reference to Melvin Gilbert's organization.  There has been

22 testimony in this case from Mr. McClean, for one, that various

23 people were selling drugs out there.  The repeated reference to

24 the Melvin Gilbert organization suggests that Mr. Gilbert is

25 already convicted of a conspiracy as charged in the indictment,

1    the conspiracy charged in the indictment.

2            I would ask that the Court instruct, instruct the

3    government, if they want to refer to conduct or things that were

4    done for Mr. Gilbert, that it be, what did you do for Mr.

5    Gilbert, what did you do for the people that you were working

6    with?  But the repeated reference to organization, I think,

7    unfairly portrays the notion that, that the conspiracy charged in

8    the indictment was already established.

9            MR. MANLEY:  Your Honor, I'm not really trying to

10   establish his organization.  This witness has given roughly five

11   examples so far of how Melvin Gilbert was going to fire Bo, how

12   Melvin was mad at him for not meeting his quota, how Melvin

13   smacked this junkie, how Melvin gave out testers.

14           THE COURT:  You can continue to use, you can continue

15   but I'll say something.  Of course, it's up to the jury to

16   determine whether it's Melvin's --

17           MR. TUMINELLI:  Yeah.  And I would just say, Judge,

18   what Mr. Manley just said here at the bench, I wouldn't object

19   to.  If he elicited those kinds of answers.  But it's when he

20   plugs in the word "organization" each time that he asks the

21   questions.  But if you would instruct the jury.

22           MR. MANLEY:  Judge, I would ask that you not instruct

23   the jury.

24           THE COURT:  No.  I'm going to tell them it's up to them

25   to determine, that you are free to use the term Melvin Gilbert's

1    organization.  Of course, it's up to them to determine if it is

2    Melvin Gilbert's.

3           MR. MANLEY:  And I'm fine with not using the word.  But

4    I don't want the jury to think that it's wrong --

5           THE COURT:  No.  I was going to say --

6           MR. MANLEY:  I would just simply, I don't think it

7    needs to be told --

8           MR. TUMINELLI:  Thank you very much.

9           THE COURT:  Whichever you prefer.

10          MR. MANLEY:  We're moving on to other people.

11          MR. TUMINELLI:  Thank you, Judge.

12          (End of bench conference.)

13   BY MR. MANLEY:

14   Q    Mr. Love, let me ask you a question about, about an

15   individual by the name of Miami.  Do you recognize Miami?

16   A    Yes.

17   Q    And Judge, we haven't had identified Melvin Gilbert or

18   Miami.

19          THE COURT:  Why don't you identify both?

20   Q    If you could identify Melvin Gilbert in the courtroom.

21   A    (Witness points.)

22   Q    And what is he wearing?

23   A    The purple and blue --

24          MR. TUMINELLI:  We stipulate that he's identified

25   Melvin Gilbert.

1    Q     And if you could identify Miami.

2    A     The Muslim set on or whatever he got on.

3    Q     Is it the white --

4    A     The white Muslim set.

5    Q     Thank you.  Thank you.  Who introduced you to Miami?

6    A     Mel.

7    Q     And where did you see Miami for the first time?

8    A     Over in jail.

9    Q     And did you have a discussion with Miami about a shooting of

10   an individual by the name of Dale?

11   A     Yes.

12   Q     And what did Miami tell you initially about the shooting of

13   Dale?

14   A     He shot him and he was sorry that he didn't kill him.

15   Q     Did there ever come a time when he talked to you about who

16   he did the shooting for?

17   A     No.

18   Q     Did you ever have any discussion with him with regard to how

19   that may have affected you?

20   A     Yes.

21   Q     And what did you say to him?

22   A     I told him that it brung heat on us, you know, what did he

23   do it for.  We didn't ask him to do that.  We don't know him.

24   Q     At the time when you met Miami, you already were in jail, is

25   that right?

1   A    Yes.

2   Q    And did you have a discussion with Miami concerning a

3   shooting of Shamrock?

4   A    Yes.

5   Q    And what did Miami tell you about the shooting of Shamrock?

6   A    He told me that the dude Nitty pay him $4000 to kill the

7   dude Shamrock for somebody that was in the Rice case.

8   Q    Did Miami tell you what gun he used to kill Shamrock?

9   A    He said he used a .38.

10  Q    Is that a revolver or --

11  A    Revolver.  Revolver.

12  Q    Did he tell you where the shooting happened?

13  A    I think Reisterstown or Park Heights area.

14  Q    At any particular location?

15  A    It was at a car wash.

16  Q    Did he tell you how many times he shot Shamrock?

17  A    Yeah.  He told me he shot him six times in the face.

18  Q    Did you have any discussion with Miami about the shooting of

19  an individual by the name of Spike?

20  A    Yes.

21  Q    And what did Miami tell you about shooting Spike?

22  A    He told me, he told me he shot him because they was fussing

23  about him doing it to Dale.  Spike was mad what he did to Dale,

24  as far as getting us in trouble, that we didn't know nothing

25  about it.

1    Q    Did Miami tell you what he did to Spike before he shot him?

2    A    Yes.

3    Q    And what was that?

4    A    He said that he got Damo to lure him out of the house and

5    they drove to area, a dark area.  He told both of them get out of

6    the car.  Then he, when he got out of the car, he grabbed him by

7    his dreads.  Then he pistol-whipped him, like hit him in the

8    head, pistol-whipped him, and then he shot him two times.

9         See, Dinkins didn't know that was my friend so as far

10   as how his mother put it out this like I was the one that got it

11   done, so he didn't know.  So he just played right into the role

12   and just told me everything.  So I just kept with his debt.

13   Q    And were you guys in the same facility when you guys had

14   this conversation?

15   A    Yes.

16   Q    And what facility is that?

17   A    The jail.

18   Q    Did he tell you about going out to Virginia with Damo?

19   A    Yes.

20   Q    Did he tell you why Miami went out to Virginia with Damo?

21   A    Yes.  They go and sell crack cocaine and buy guns.  And he

22   told me that the gun that he killed, that he shot Dale with was

23   the same gun that he killed Spike with.

24   Q    And that's what you heard directly from Miami's mouth, is

25   that right?

1   A    Yes.

2   Q    Just a minute, Judge.  Just a minute, Your Honor.  Just a

3   couple of other questions, sir.  Let me mark this for

4   identification purposes.  Mark for identification purposes as

5   SH-21.  Do you recognize what SH-21 is?

6   A    Yes.

7   Q    And what is that?

8   A    That's a plea agreement.

9   Q    And there's a name of Alan R.L. Bussard.  Is that your

10  attorney?

11  A    Yes.

12  Q    And did you meet with your attorney today?

13  A    Yes.

14  Q    Is he in the courtroom today?

15  A    Yes.

16  Q    And as part of your plea agreement, did you plead guilty to

17  a drug conspiracy in this case?

18  A    Yes.

19  Q    Now, in addition to pleading guilty to a drug conspiracy,

20  did you plead guilty to aiding and abetting possession and

21  discharge of a firearm in furtherance of a drug trafficking crime

22  resulting in death?

23  A    Yes.

24  Q    And was that for the murder of James Wise?

25  A    Yes.

1    Q    Now, did you shoot James Wise?

2    A    No, sir.

3    Q    Who shot James Wise?

4    A    My brother did.

5    Q    And what's your brother's name?

6    A    Tamall Parker.

7    Q    Does he have a nickname?

8    A    Ma-Ma.

9    Q    And what's your nickname?

10   A    Boo-Boo.

11   Q    Now, you said that you did not shoot James Wise but your

12   brother shot him, is that right?

13   A    Yes.

14   Q    But as part of your plea agreement, did you also acknowledge

15   that you pointed out James Wise to your brother?

16   A    Yes.

17   Q    And you knew when pointing him out that your brother was

18   going to shoot him, is that right?

19   A    Yes.

20   Q    And you've already pled guilty to that count as well as the

21   drug count in this case, is that right?

22   A    Yes.

23   Q    Now, as part of this plea agreement, it states the defendant

24   acknowledges that no other agreements, promises, undertakings or

25   understandings between the defendant and this office.  Did I read

1    that correctly?

2    A    Yes.

3    Q    And is that your understanding?

4    A    Yes.

5    Q    Now, you're testifying today pursuant to this cooperation

6    agreement.  And you're going to be sentenced by a judge.  Do you

7    understand that?

8    A    Yes.

9    Q    Sitting here right now, do you have, sitting here right now,

10   do you have an understanding of exactly what that judge is going

11   to sentence you to?

12   A    No.

13   Q    Is it your understanding that you can cooperate, the

14   government will share that information with the judge, but

15   ultimately it's up to the judge to determine what your sentence

16   is?

17   A    Yes.

18   Q    And you have an attorney who's present here to argue on your

19   behalf, is that right?

20   A    Yes.

21   Q    Now, going back to the drugs in this case.  You've told us a

22   number of things about Melvin Gilbert.  Let me just ask you

23   generally.  How much money on a good day would you sell in

24   heroin, on a particular day?

25   A    About 15 to 20,000.

1    Q     What about on a bad day?

2    A     About 5,000.

3    Q     And with regard to the cocaine, how much money would you

4    make on a good day?

5    A     About 10,000.

6    Q     And I believe I asked you this earlier, but just so there's

7    no confusion here.  You got arrested in 2004, is that right?

8    A     Yes.

9    Q     Were you aware of Mr. Gilbert being arrested in 2003?

10   A     Yes.

11   Q     And did you work with Mr. Gilbert and others before he got

12   arrested?

13   A     Yes.

14   Q     Were you in jail when Mr. Gilbert came home from that

15   charge?

16   A     Yes.

17   Q     And you've been in jail since 2004?

18   A     Yes.

19   Q     Nothing further, Your Honor.

20          THE COURT:  Mr. Proctor.

21          MR. PROCTOR:  Thank you, Judge.  Mr. Manley, can I have

22   SH-21, please?

23          THE COURT:  Ladies and gentlemen, probably, I should

24   tell you.  On things like, under the local rules, to save time,

25   if one defense counsel, they select themselves, will take the

1    lead in cross examining, but on things of common interest, only

2    one person examines.  For example, about the plea agreement,

3    that, obviously, is something which everybody's interested in on

4    everybody's side.  But only one defense lawyer really asks about

5    that.

6              If you wondered about that thing.  It's a time saving

7    device.

8              MR. PROCTOR:  Thank you, Judge.  Although I don't think

9    anyone's ever accused me of saving time before.

10             THE COURT:  It's not so much that you're going to save

11   time.  But since other people aren't going to ask about it,

12   that's what's going to save the time.

13             CROSS EXAMINATION

14   BY MR. PROCTOR:

15   Q    I got it.  This is your plea agreement, right?

16   A    Yes.

17   Q    And this is a letter addressed to your lawyers from -- I

18   can't remember which prosecutor signed it -- Ms. Dwyer, right?

19   A    Yes.

20   Q    And the date of that letter is?

21   A    October 21st, 2008.

22   Q    Okay.  And the date which you had to accept or reject the

23   plea agreement was?  If I could point your attention to the

24   fourth line down.

25   A    Oh, October the 21st, 2008.

1   Q    Okay.  So basically, the same day the letter was written was

2   the day you had to accept or reject it, right?

3   A    Yes.

4            MR. MANLEY:  Objection, Your Honor.

5   Q    That's what it states, Judge.

6            MR. MANLEY:  No. He said the same date the letter was

7   written it has to be accepted or rejected.  But he's already

8   answered the question.

9   BY MR. PROCTOR:

10  Q    Well, maybe not -- you signed this plea agreement the same

11  day you got it, right?

12  A    Yes.  Yeah.

13  Q    Okay.  And that was accepted that day or else, is the way

14  it's written, right?

15  A    Or else?  What you mean by that?  I don't understand.

16  Q    Or else the prosecution's going to withdraw it.  It states,

17  If this offer has not been accepted by October 21st, it will be

18  deemed withdrawn.

19  A    Yes.

20  Q    And the reason that you had a day take it or leave it was

21  because you were on the verge of trial, right?

22  A    Yes.

23  Q    Now, your trial was scheduled, I don't remember the exact

24  date, beginning November, something like that?

25  A    I think like the end of November, like the end.

1    Q    Okay.  It was within a few weeks of trial that you signed

2    your plea agreement, right?

3    A    Yes.

4    Q    And your lawyer, Mr. Bussard, being the good, conscientious

5    person that I know him to be -- feel free to object, counsel --

6    I'm sure he sat down and went through the evidence against you,

7    right?

8    A    Yes.

9    Q    And I don't want to talk about what you two talked about.  I

10   don't need to go there.  But in order for you to make a decision

11   about whether to plead or whether to go to trial, he would have

12   explained the evidence?

13   A    Yes.

14   Q    And he probably came over to the jail and brought a big

15   notebook that thick and sat down and you two went through it

16   together?

17   A    No.

18   Q    Did Mr. Treem do that?

19   A    No.

20   Q    Okay.  So, but he made you aware of what the likely evidence

21   would be if you went to trial, right?

22   A    Yes.

23   Q    Here's my question.  You testified that Nitty paid $4000?

24   A    Yes.

25   Q    That was in the discovery, right?

1    A    Not in my discovery, no.  Not as I know of, no.

2    Q    As you sit here today, you're not aware that Nitty had

3    already given a statement months, if not years, earlier saying

4    that?

5    A    No.  I don't know Nitty.  No.

6    Q    I'm not asking if you know Nitty.

7    A    Oh, no.  No.

8    Q    If your lawyer had a copy and went through it with you?

9    A    Oh, no.  No.  No.

10   Q    Now, your plea agreement, you pled to conspiracy with intent

11   to distribute 5 kilograms or more of coke or, and/or 50 grams or

12   more of crack.  Does that sound right?

13   A    Yes.

14   Q    But, in fact, you sold a whole lot more than that, right?

15   A    No.

16   Q    You never -- throughout your involvement in selling drugs,

17   it's your testimony here today that you didn't, you have not sold

18   in total more than the 50 grams of crack?

19   A    No.

20   Q    And that's as truthful as every other answer you gave here

21   today?

22   A    Yes.

23   Q    Okay.  Well, let's talk about that.  You said you made how

24   much a day selling heroin?

25   A    On a good day, it was 20,000.

1    Q    Okay.  And what do you call them, gel caps?

2    A    Yes.

3    Q    How much does a gel cap go for?

4    A    $10.

5    Q    So if my math is right, that's 2000 gel caps in a day?

6    A    Yes.

7    Q    And a pack's a hundred?

8    A    Say 25.  So 50's.

9    Q    Okay.  So --

10   A    Two 50's or $5 packs.

11   Q    We go to law school because we're scared of math.  But

12   suffice it to say that's a whole lot of packs?

13   A    That's a lot of packs, yes.

14   Q    Okay.  What about cocaine?  How much did you make on a good

15   day selling that?

16   A    10,000.

17   Q    Okay.  And same routine.  Green tops, ten bucks a pop?

18   A    No.  That's five.

19   Q    Five?

20   A    Yes.

21   Q    So that's 2,000 green tops in a day on a good day?

22   A    Yes.

23   Q    And that's many, many packs?

24   A    Yes.

25   Q    And the shop, how long was it open for?

1   A    Well, I got in it, it was, I was in it for three months.

2   Q    Okay.

3   A    I don't know how long --

4   Q    Seven days a week?  Can I have a moment, Judge?  Seven days

5   a week?

6   A    Yes.

7   Q    You also pled guilty to discharging a firearm, right?

8   A    Yes.

9   Q    And let's get back.  I'm sorry I forgot to ask this.  Your

10  conspiracy to distribute, you're aware that that carries a ten

11  year mandatory minimum, right?

12  A    Yes.

13  Q    And you're also aware that it goes all the way up to life?

14  A    Yes.

15  Q    And the same thing for discharging a firearm.  That carries

16  life, death, or any number of years that any judge feels is

17  appropriate, right?

18  A    Yes.

19  Q    And are you also aware of a thing call the sentencing

20  guidelines?

21  A    Yes.

22  Q    Did Mr. Bussard sit down and go through a table with you and

23  explain kind of what the sentencing guidelines mean?

24  A    Yes.

25  Q    Did that sound familiar?  So if you'd gone to trial and

1   lost, you would have been looking at guidelines of life

2   imprisonment to life imprisonment, right?

3   A    Yes.

4   Q    So here you are a few weeks before trial.  You've got one

5   day to accept or reject a plea.  And if you say no and you go to

6   trial and you lose, you're looking at life in jail, right?

7   A    Yes.

8   Q    Tell the jury who Mr. Harper is.

9   A    Mr. Who?

10  Q    Harper.  September 14th, 2003.

11  A    Nickname?  Got a nickname?

12  Q    Stink.  Stink, I believe.  No, that's Crosby.  I don't

13  remember.  Stink is his son.  Does that ring any bells?

14  A    Stink.  I know that name.  Stink.

15  Q    Yeah.  And you know the name because you shot him six times,

16  right?

17  A    No.

18  Q    Okay.  Who shot him six times?

19  A    Who shot him six times?  My brother shot him six times.

20  Q    Okay.  And what was your role in the whole thing?

21  A    I have no role.

22  Q    So how do you know your brother shot him six times?

23  A    My brother pled guilty to that, shooting him six times.  I

24  was charged with it in state court and I got found not guilty.

25  They came in and said it's a, he picked the wrong person out.

1    That's what he came in and said, he picked the wrong person out

2    in the photo array.

3    Q     When you say "he", you mean Mr. Crosby?

4    A     Mr. Crosby and his mother came there.

5    Q     Okay.  But your brother killed him or your brother killed

6    his dad, right?

7    A     Killed his father?

8    Q     Yeah.

9    A     Which one is that?  You say he shot Crosby.

10   Q     Who shot Crosby?

11   A     My brother shot Crosby.

12   Q     And you're aware in the same event that Crosby got shot, his

13   dad got killed?

14   A     Yes.

15   Q     So your brother killed his dad, right?

16   A     No --

17   Q     Was there more than one shooter, to your knowledge?

18   A     Yes.  They said it was more than one shooter, yes.

19   Q     And let's talk about Mr. Wise.  Who shot him?

20   A     My brother.

21   Q     And what was your role in the whole matter?

22   A     I just, he ran past me and I, and asked me did someone run

23   past me.  And I said, Yeah, and pointed at which way they ran.

24   That's was my involvement.  So that's why I got charged with

25   aiding and abetting.

1    Q    And when you pointed at him, you knew your brother was going

2    to kill him, right, or at least try to?

3    A    I knew something was wrong, yes.  Yes.  I knew -- yes.

4    Q    And if someone else, say, Doris Dickerson, came into court

5    and said you were there, she would be lying?

6              MR. MANLEY:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    BY MR. PROCTOR:

9    Q    Is it your testimony you were not there when Mr. Wise was

10   shot?

11   A    I was not there, no.

12   Q    Isn't it also true that you, in relation to that murder, had

13   your mother provide a false alibi for you?

14   A    No.

15   Q    You didn't have your mother say, Oh, the time Mr. Wise got

16   killed, he was at the hair salon with me?

17   A    No.

18   Q    Working on my bald spot?

19   A    Not as I recall, no.

20   Q    You don't recall your mother saying --

21             MR. MANLEY:  Objection, Your Honor.

22             THE COURT:  Sustained.

23   Q    You don't recall -- you remember --

24   A    That was a long time ago.  That was a long time ago.

25   Q    Right.  And you've shot so many people it's hard to keep

1    track.

2              MR. MANLEY:  Objection, Your Honor.

3              THE COURT:  Come on.  Come on.  Cut it out.

4    Q    I'll withdraw it, Judge.  So as you sit here today, you

5    don't know whether you had your mother cover for you by saying

6    you were getting your hair cut when Mr. Wise was killed?

7              MR. MANLEY:  Objection.  Asked and answered.

8              THE COURT:  That's true.  But one more time.

9    Q    You can answer the question.

10   A    No.

11   Q    No, it didn't happen or, no, you just don't recall?

12             MR. MANLEY:  Objection.

13   A    I don't --

14             THE COURT:  Sustained.  Sustained.

15   Q    Now, you signed, and I believe the testimony was replete, a

16   cooperation agreement, right?

17   A    A cooperation plea?

18   Q    Yeah.

19   A    Yes.

20   Q    Promised to do certain things, such as assist the U.S.

21   Attorney's Office, right?

22   A    To, nobody ever promised me nothing, no.

23   Q    No, you promised.  No one promised you anything.  You

24   promised.  If they asked you to --

25   A    To tell the truth.

1    Q    Correct.

2    A    Yes.  Nothing but the truth.

3    Q    My question is, who decides whether you're telling the truth

4    or not?

5              MR. MANLEY:  Objection, Your Honor.

6              THE COURT:  Rephrase the question.

7    BY MR. PROCTOR:

8    Q    Okay.  Do you know what a 5K is?

9    A    No.

10   Q    Have you ever heard the term "substantial assistance?"

11   A    No.

12   Q    Let me show you your plea agreement.  Actually, this doesn't

13   have the cooperation part on it.  Do you remember every word of

14   everything that was written on your plea agreement?

15   A    Every word?  No, I won't be able to remember every word.

16   Q    Do you think it might refresh your recollection if I showed

17   you the sealed supplement to the plea agreement?  I'm going to

18   show you the signed supplement and ask you if you would read

19   Paragraph Four, that starts on the second page and carries over

20   to the third.  And just look up when you're done, sir.

21             Just read it to yourself.  Don't read it into the

22   record.

23   A    Say it again.

24   Q    See where it says number four right here and carries on to

25   the bottom of there.  If you can read that to yourself, not out

1   loud.  You done?

2   A    Yes.

3   Q    Okay.  So again, the question is, who decides if you've

4   helped the government?

5   A    Who decides?

6   Q    Who decides if you've rendered substantial assistance?

7   A    The, the U.S. Attorney and the judge.

8   Q    Well, the U.S. Attorney's Office has to make the

9   recommendation, right?

10             THE COURT:  Approach the bench.

11             (Bench conference on the record.)

12             THE COURT:  Remind you, to get under the mandatory

13   guideline, yes.  Under the guidelines, no.  As I've always said,

14   if anybody's having a rearraignment before me, the 3553, even if

15   the government doesn't make a recommendation I can take it into

16   account.  I go on to say that I will probably be guided by what

17   the government says.  But in my view that's not right.

18             MR. PROCTOR:  I recall you saying that in one of my

19   cases.  Thank you, Judge.

20             MR. MANLEY:  Judge, are we moving away from this topic?

21             THE COURT:  Well, no.  No.  He's just got to rephrase

22   it.

23             MR. PROCTOR:  I'm going to rephrase it because I'm

24   going to go back and ask -- I don't want to put you on the spot.

25   Going to ask --

1          THE COURT:  No.  No.

2          MR. MANLEY:  If you're going to ask further, if he's

3     going to ask, if he's going to quote about substantial

4     assistance, I'm going to ask him about the judge's role in

5     determining whether --

6          THE COURT:  Yes.

7          MR. PROCTOR:  The judge's role because you've indicated

8     --

9          MR. MANLEY:  The judge's role.

10         (End of bench conference.)

11    BY MR. PROCTOR:

12    Q    Sir, I'm sorry.  I forgot where we were at, so let me ask a

13    new question.  At least in respect to the first charge of the

14    indictment, you're looking at a ten year mandatory minimum,

15    right?

16    A    Yes.

17    Q    And the only way you get under that ten year mandatory

18    minimum is a motion made by the United States Attorney's Office

19    telling the judge that you substantially assisted them, right?

20    A    Yes.

21    Q    And that's their decision and their decision alone.  No one

22    can make them do it, right?

23    A    Yes.

24    Q    And you waived your right to appeal, correct?

25    A    Yes.

1  Q    So basically, if the government isn't happy with what you

2  say here today, you're stuck with it, right?

3  A    Yes.  Also, I know is --

4       MR. MANLEY:  Objection.

5  Q    Was there an objection, Judge?  I thought I heard one.

6       MR. MANLEY:  This was an objection to form.  But if

7  he's willing --

8       THE COURT:  I didn't hear the objection.  Go ahead.

9  BY MR. PROCTOR:

10 Q    Sorry.  Please answer.

11 A    All I know it's up to the judge.

12 Q    The sentencing's up to the judge?

13 A    Yes.

14 Q    But it's up to the United States Attorney's Office to make a

15 recommendation that you helped them, right?

16 A    No.  That's all I know, that I pleaded guilty.  I'm at level

17 40.  That's all I know is I'm at life right now.  I don't know

18 who put in a motion or none of that stuff.  No, I don't know.

19 Q    Okay.  But obviously, like everybody else who comes into the

20 court, you're hoping to get as little time as possible, right?

21 A    Yes.

22 Q    And obviously, you're hoping that being here today will help

23 in that regard, right?

24 A    Yes.

25 Q    You're hoping as a consequence of testifying here today that

1   you save years, if not decades, in jail, right?

2   A    Yes.

3   Q    Do you also recall, the day you signed your cooperation

4   agreement you promised not to break the law going forward?  Does

5   that sound familiar?

6   A    No.

7   Q    Well, the government didn't say, sign a plea agreement and

8   then go assault a bunch of people, right?

9   A    No, they never said that.

10  Q    As part of your cooperation, you promised to testify

11  truthfully and to keep your nose clean?

12  A    No.

13  Q    As you sit here today, are you aware that it is a breach of

14  your plea agreement to break the law?

15  A    Yes.

16  Q    So if the government were to find out that you broke the

17  law, they would be absolved from their responsibility under the

18  plea agreement?  Does that sound right?

19  A    Yes.

20  Q    You did that, right?

21  A    What you mean?

22  Q    Just recently broken the law, haven't you?

23  A    No.

24  Q    Is it against the law to have a cell phone in a jail?

25  A    No.

1    Q    It's not against the law to have a cell phone in jail?

2    A    No.

3    Q    Everyone's got one?

4    A    Yes.

5    Q    Okay.

6    A    Your client got one.

7    Q    Well, Mr. Love, I appreciate that fortuitous comment.  We're

8    talking about you at the moment, sir.

9              MR. MANLEY:  Judge, can we approach?

10             THE COURT:  No.  No.  But I'm not striking anything.

11   Q    Yes or no, did you get 150 days in the hole at jail for

12   being caught with a cell phone?

13   A    Yes.

14   Q    Back in May, '04, you were shot, right?

15   A    May, '04?  I got shot, yes, but I don't remember the date.

16   Q    You don't remember the exact date?

17   A    No.

18   Q    And the police came up to you and said, What happened, more

19   or less?

20   A    Yes.

21   Q    You got shot in the hip, right?  Does that sound familiar?

22   A    Yes.

23   Q    You gave them a false name, right?

24   A    Yes.

25   Q    You refused to tell them what happened, right?

1    A    Yes.

2    Q    And I'm sorry I'm jumping around a little.  You've

3    attributed lots of statements to Mr. Dinkins.  After you shot,

4    after someone who wasn't you shot Mr. Wise --

5              MR. MANLEY:  Objection, Your Honor.  Clearly misstates.

6              THE COURT:  Beg your pardon?  Right.  Rephrase it.  I

7    didn't capture it.

8    BY MR. PROCTOR:

9    Q    Okay.  After Mr. Wise was shot, isn't it true that you

10   shouted at the top of your lungs in the middle of the street in

11   broad daylight, I'm tired of this shit, I shot this one, someone

12   else going to have to start doing the shooting around here?

13   A    No.

14   Q    You never said that?

15   A    No.

16   Q    Sure about that?

17   A    Yes.

18   Q    All right.  Back in 2002, did you participate in a shooting

19   when a Mr. Tadgauane -- and I'll spell that for the court

20   reporter -- T-A-D-G-A-U-A-N-E, Taylor, Ricky Moore, and Novell

21   Taylor were shot on Cokesbury.

22   A    I got locked up for it.  I got -- not guilty.  I got locked

23   up for it.  I got accused for it and beat it in trial.  Not

24   guilty.

25   Q    Beat it at trial because you didn't do it or because --

1  A    Because I didn't do it.

2          MR. MANLEY:  Your Honor, may we approach?

3          THE COURT:  I hope that's the last time for that.

4  BY MR. PROCTOR:

5  Q    It is, Judge.  Well, let me ask you this.  Who was accused

6  with you?

7          MR. MANLEY:  Objection, Your Honor.

8          THE COURT:  Sustained.

9          MR. PROCTOR:  Judge --

10          THE COURT:  Approach the bench.

11          (Bench conference on the record:)

12          THE COURT:  I assume your objection was to being

13  acquitted conduct.

14          MR. MANLEY:  Exactly.  He cannot bring up acquitted

15  conduct.  This is not --

16          THE COURT:  No.  No.  No.

17          MR. PROCTOR:  My point is his codefendant in that was

18  Michael Bryant and Mr. Dinkins.  So I'm allowed to ask who his

19  codefendant was.  I'm not going to ask if Michael Bryant shot him

20  or killed him.

21          THE COURT:  So what?  So what?

22          MR. PROCTOR:  There's bias.

23          THE COURT:  To who?

24          MR. PROCTOR:  To this witness.  His relationship with

25  Mr. Bryant.

1          THE COURT:  Because they're codefendants?

2          MR. PROCTOR:  They've known each other.

3          THE COURT:  You can ask him that.

4          MR. MANLEY:  Ask him if he's known him.

5          (End of bench conference.)

6   BY MR. PROCTOR:

7   Q    Just a couple more questions, you'll be pleased to know.

8   You talked about Mr. Dinkins and his statements that you

9   attribute to him in relation, in relation to shooting John

10  Dowery.  But isn't it true that you called Mr. Dowery on two

11  separate occasions and threatened him while in jail?

12  A    No.

13  Q    You ever hear the story of the scorpion and the turtle?

14  A    No.

15         MR. MANLEY:  Objection.

16         THE COURT:  Sustained.

17         MR. PROCTOR:  Withdrawn.  That's all I have.

18         CROSS EXAMINATION

19  BY MR. TUMINELLI:

20  Q    Good afternoon, Mr. Love.  Mr. Love, when you, you said you

21  were out for the three months when drugs were being sold?

22  A    Yes.

23  Q    Your personal involvement in those drugs being sold, was it

24  on Bartlett Avenue?

25  A    You say my personal --

1    Q    When you were involved.

2    A    Oh, Bartlett, Homewood, and Cokesbury.

3    Q    That drugs were --

4    A    Being sold, yes.

5    Q    When was, could you recall exactly?

6    A    When was it?

7    Q    When was it?

8    A    August, 2003.

9    Q    August, 2003?

10   A    Yes.

11   Q    And are you aware -- you started in August, 2003?

12   A    Yes.

13   Q    Were you, do you recall if Melvin Gilbert was arrested on

14   October 16th, 2003, when there was that raid?

15   A    Yes.

16   Q    Okay.  So between August and October 16th, that would have

17   been the period you were talking about?

18   A    Yes.

19   Q    Where Melvin -- and that would have been the only time you

20   were out there with Melvin?

21   A    Yes.

22   Q    Okay.  So just to put your testimony in context.  You're

23   talking about a several month period where you say you were

24   involved?

25   A    Yes.

1   Q    And during that period was the only time you were involved

2   with Melvin involving selling the drugs in that area, right?

3   A    Yes.

4   Q    Okay.  Now, you know, you know Blade, Randy McClean?

5   A    Yes.

6   Q    Okay.  Randy McClean was selling cocaine out there, right?

7   A    Yes.

8   Q    Who was he selling it with?

9   A    A lot of people.  Me, my brother.  It was a lot of people.

10  Q    All right.  So you were involved to some extent with selling

11  cocaine with Randy McClean, right?

12  A    Yes.

13  Q    Okay.  And am I correct that money from the cocaine sales

14  was going directly to Mr. McClean and to you?

15  A    No.  No.

16  Q    Who was getting the money for the cocaine sales?

17  A    Well, McClean was getting the money for the heroin and the

18  cocaine.  So I don't know.

19  Q    Do you know, do you know if Randy McClean was keeping the

20  money that came from the cocaine sales and Melvin was getting the

21  money from the heroin?

22  A    No.

23  Q    You don't know that?

24  A    (Nods negatively._

25  Q    If Randy McClean said --

1          MR. MANLEY:  Objection, Your Honor.

2     Q    Strike that.  It's withdrawn.  How about your brother?  Was

3     your brother selling crack out there?

4     A    Crack?  No.  Wasn't selling no crack, no.

5     Q    Your brother never sold crack along Bartlett?

6     A    No.

7     Q    Okay.  Is it your testimony that during that several month

8     period that -- let me ask you.  Do you have any knowledge that

9     the money that was being, that was received for the sale of

10    cocaine was actually going to Melvin Gilbert?  Do you have any

11    information with regard to that?

12    A    Do I know that he was getting the money?  No.

13    Q    You believed, though, that he was get money from heroin,

14    right?

15    A    Yes.

16    Q    Okay.  But you don't know that for certain about the

17    cocaine, in terms of Melvin --

18    A    I just know it was all going in one spot.  All of it was

19    going to one place.

20    Q    Okay.  All right.  That's fair.  Now, you asked, you were

21    asked by Mr. Manley -- well, you said that Mr. Dinkins told you

22    that he shot Dale, John Dowery?

23    A    Yes.

24    Q    And you recall Mr. Manley asking you -- well, let me strike

25    that.  You didn't ask, you say you didn't ask him to do that,

1    right?  You didn't ask Mr. Dinkins to shoot anybody?

2    A    No.

3    Q    And you were asked, who, do you know who would have asked

4    Mr. Dinkins and you said no, correct?

5    A    Yes.

6    Q    So you don't know, if it happened, you don't know why that

7    happened in terms of whether, if he did it, why he did it?

8    A    What he told me.  That's all I know.

9    Q    What he told you?

10   A    Yes.

11   Q    But he didn't tell you who it was being done for, correct?

12   A    No.  No.

13   Q    Now, with regard to that Jemmison murder --

14   A    Yes.

15   Q    -- you say that Mr. Dinkins said that someone named Nitty

16   paid him $4000 to do that?

17   A    Yes.

18   Q    Do you know if Nitty's real name is Frank Batts?

19   A    Yes.

20   Q    It is?  And do you know -- well, let me ask you this.  Isn't

21   it true that Frank Batts was selling drugs in the Park

22   Heights/Pimlico area?  That was where he was selling drugs,

23   right?  Mr. Batts?

24   A    I don't know.

25   Q    Okay.  Well, you know he wasn't selling drugs around

1    Bartlett, right?

2    A    Not when I was home, no.  No.

3    Q    Okay.  And is it fair to say you have no information that --

4    let me phrase this properly.  Do you know where Mr. Jemmison was

5    murdered?

6    A    In a car wash.

7    Q    In northwest Baltimore?

8    A    Yes.

9    Q    Around Reisterstown Road and Quantico?

10   A    Right.

11   Q    Okay.  Now, when you were involved with Mr. Gilbert and you

12   were driving around, you two didn't go driving out to that car

13   wash, did you?

14   A    No.

15   Q    Okay.  You've never been out there, have you?

16   A    No.

17   Q    Okay.  With regard to your plea agreement, you actually did

18   plead, you pled to two things, didn't you?  One was the drug

19   conspiracy and the other was the use of a handgun in relation to

20   a drug, a drug offense resulting in death.  Wasn't that the

21   second charge you pled guilty to?

22   A    Yes.

23   Q    And you know, do you not, that that charge, that specific

24   charge --

25              MR. MANLEY:  Objection, Your Honor.  We've had, this is

1    the second attorney.

2    Q    No, no, no, no.  I'm not asking about that.

3         THE COURT:  Okay.

4    Q    You know that that charge exposed you to a possible death

5    sentence, right?  A murder.

6    A    Yes.  Yeah.

7    Q    Okay.  And the government has never filed a notice on you

8    that they were considering a death sentence against you, right?

9         MR. MANLEY:  Objection, Your Honor.

10        THE COURT:  Sustained.

11   Q    You are not facing a death sentence, are you?

12        MR. MANLEY:  Objection, Your Honor.

13        THE COURT:  Sustained.  This really is, this is local

14   rule.  This is why we don't do this.  If somebody wanted to go

15   into this, they should have.

16        MR. TUMINELLI:  Judge, this isn't for impeachment

17   purposes.

18        MR. MANLEY:  But it's factually inaccurate, Judge, with

19   regard to the charges.

20        MR. TUMINELLI:  Your Honor, could we please hear why

21   it's factually inaccurate?

22        MR. MANLEY:  I will tell the judge at the bench if you

23   judge wanted me to.

24        THE COURT:  It's not in front of the jury.  Go ahead

25   now.  Go ahead.

1    BY MR. TUMINELLI:

2    Q    It's not factually.  And the Court can take judicial notice

3    that that particular charge carries a possible death sentence.

4              THE COURT:  I don't know anything.  Let me hear.

5              MR. TUMINELLI:  I'm asking you to take --

6              THE COURT:  Fortunately, I just listen to the evidence.

7    But you can ask another question.

8              MR. TUMINELLI:  But I'm asking you, based upon what --

9              THE COURT:  Ask the question.  I don't know what -- I'm

10   not, the older I get, the more I know that I don't know.

11   BY MR. TUMINELLI:

12   Q    When you spoke to your attorney, you actually had two

13   attorneys, right?

14   A    Yes.

15   Q    You had, you know, Mr. Bussard, and a fellow named Joshua

16   Treem, right?

17   A    Yes.

18   Q    And when you, when you were charged in this case, that

19   offense, which is 18 USC Section 920 -- 922(j) --

20   A    Yes.

21   Q    -- I believe, you understood, didn't you, when you spoke to

22   your attorneys, before you entered the plea agreement, that that

23   particular charge, it's not mandatory, but it carried a possible

24   life, I mean a possible death sentence?

25   A    Well, before I went through all that, already took the death

1    penalty off of me way before, ahead of time.

2    Q    They took the death penalty off of you?

3    A    When they went for the motion.  You know how it go.  They

4    put the motion in.  You fight for your client.  They take the

5    death penalty off of him.

6    Q    So is it fair to say, you understood at some point, when you

7    say they took it off of you, you were at some point exposed to a

8    possible death sentence?

9              MR. MANLEY:  Objection, Your Honor.

10             THE COURT:  This is before the plea agreement.

11   BY MR. TUMINELLI:

12   Q    Before the plea, before the plea?

13   A    Before the plea, and  --

14             THE COURT:  Before the plea agreement.  It was not part

15   of the plea agreement.

16             MR. TUMINELLI:  All right.  Before the plea, after the

17   plea, at some point --

18             MR. MANLEY:  No.  No.  Judge, it's not before or after.

19             MR. TUMINELLI:  I agree, I stipulate.

20             THE COURT:  Okay.  Okay.  Before the plea agreement.

21             MR. TUMINELLI:  Before the plea.

22             THE COURT:  Agreement.

23             MR. MANLEY:  And let me just object, Your Honor.

24   Because the insinuation is that for some reason, because of his

25   testimony, the death penalty was taken off the table.

1          THE WITNESS:  That's not what --

2          THE COURT:  That's not the case.

3          MR. MANLEY:  That's not the case.

4          MR. TUMINELLI:  That is not the implication.  The

5     implication --

6          THE COURT:  Well, you all argue it later.  But the fact

7     of the matter is, before the plea agreement was ever entered

8     into, he was not facing the death penalty.

9          THE WITNESS:  Not facing the death penalty, no.

10         THE COURT:  Is that accurate?

11         MR. MANLEY:  That is accurate, yes, Your Honor.  Thank

12    you.

13    BY MR. TUMINELLI:

14    Q    In any event, today, when you ever get sentenced, the worst

15    sentence you could possibly get is a life sentence, right?

16    A    The worst?

17    Q    The worst you could possibly get.

18    A    Yes.

19    Q    Okay.  Now, with regard to the murder of Mr. Wise, what

20    exactly was your role in that?

21    A    Pointing him out.

22    Q    And that's all you did?

23    A    Yes.  That's all.

24    Q    The offense that you pled guilty to --

25    A    Yes.

1    Q    -- the use of the handgun resulting in death?

2    A    Yes.

3    Q    That was, that charge did refer to the James Wise murder,

4    right?

5    A    Yes.

6    Q    Okay.  Do you recall signing with your attorney what's

7    called a Statement of Facts, and Attachment A, which was part of

8    your plea agreement?

9    A    Yes.

10   Q    Am I correct that those facts were an agreement between you

11   and the United States government as to what the facts were

12   supporting your guilty plea?  Do you remember that?

13   A    Yes.

14   Q    Okay.  You and Mr. Bussard and Mr. Treem all went over the

15   Statement of Facts before you agreed to sign, sign that plea

16   agreement?

17   A    Yes.

18   Q    And you say that all you did was point out James Wise to

19   your brother, right?

20   A    Yes.

21   Q    Okay.  Well, let me read something to you and see if this

22   refreshes your memory.  On or about October 13th, 2004, the

23   defendant -- that's you, right?  Is that right?

24   A    That name right there?  No.

25   Q    No.  No.  No.  No.  Says the defendant, along with Tamall

1    Parker.

2    A    You ain't say that.

3    Q    You're the defendant and Tamall is your brother?

4    A    I can read, too.  I mean, it's right here.

5         MR. MANLEY:  Your Honor, let me object for two reasons.

6    One, we've already had one defense counsel go through the plea

7    agreement.  Two, the defendant has not indicated that he needed

8    his memory refreshed in any way.  The Statement of Facts as

9    written is the Statement of Facts.  There are multiple paragraphs

10   to the Statement of Facts.

11        MR. TUMINELLI:  I'm impeaching him, Mr. Manley.

12        THE COURT:  You're impeaching him by the plea

13   agreement.  You're not supposed to do that.  That's the very

14   purpose of having the rule.

15        MR. TUMINELLI:  Judge, this is -- can we approach?

16        THE COURT:  You just said -- no.  That's the purpose of

17   the rule.  I'll let you do it.  If it's done one more time in

18   this trial, I'm going to have a flat rule.  You're doing it.

19        MR. TUMINELLI:  Judge --

20        THE COURT:  I've ruled.  I don't want to hear anything

21   more.  And I'm telling you I'm going to let you do it on this but

22   if anybody tries to do this one more time, we have a rule and

23   there's a reason for the rule.  And you just said you're

24   impeaching and you're impeaching based upon the plea agreement.

25   BY MR. TUMINELLI:

1   Q    All right.  I won't say another word.  On or about October

2   13th, 2004, the defendant, along with Tamall Parker, AKA Mo-Mo,

3   AKA Ma-Ma, AKA Mar-Mar, AKA Mal-Mal, did knowingly possess and

4   discharge a firearm in furtherance of a drug trafficking crime,

5   did knowingly cause the death of a person through the use of a

6   firearm, which killing was murder as defined in 18 USC, Section

7   1111, in that the defendant willfully, deliberately, maliciously

8   and with premeditation murdered a human being, to wit, James

9   Wise, in an effort to retaliate against Wise, who minutes earlier

10  had robbed a dealer working for the Special heroin organization.

11       The next paragraph.  In order are locate Wise after --

12  A    Can you move it up, please?

13  Q    I'm sorry.

14       THE COURT:  It's very interesting, ladies and

15  gentlemen.  This is not in evidence so you won't have it.  But if

16  Mr. Tuminelli wants to do this, he can.  But I don't want it done

17  again.

18  Q    In order to locate Wise after the robbery, the defendant

19  assisted Parker.  The defendant is you?

20  A    Yes.

21  Q    Correct?

22  A    Yes.

23  Q    Assisted Parker by identifying James Wise and others after

24  they had robbed the organization.  The defendant knew that he was

25  assisting Parker in locating individuals who Parker was going to

1    shoot.  As part of the conspiracy, the defendant protect, the

2    drug organization possessed firearms to protect the organization,

3    retaliate, and retaliate against individuals who robbed the

4    organization.

5            The defendant knew that by identifying James Wise and

6    his location, he was assisting Parker, who he knew would shoot

7    and kill Wise.  After Parker shot Wise, Parker informed the

8    defendant that he had done so.  Several witnesses were in the

9    area of the shooting.

10           THE COURT:  Now wait a second.  Take that off and

11   approach the bench.

12   Q    I took it off.

13           THE COURT:  And approach the bench.

14           (Bench conference on the record:)

15           THE COURT:  You just showed something to the jury

16   that's not in evidence, that absolutely is consistent with what

17   he said.  It's not inconsistent at all.

18           MR. TUMINELLI:  Judge, he said all he did was point out

19   the man.

20           THE COURT:  He said he identified him.  This is

21   ridiculous.  It's aiding and abetting, you know as well as I do.

22   That was wrong and I don't want it done again.

23           MR. TUMINELLI:  Judge, just for the record, it says in

24   that, what I just read to him --

25           THE COURT:  Identified him.

1          MR. TUMINELLI:  And that he knew that --

2          THE COURT:  On the stand he said he knew.

3          MR. TUMINELLI:  He told, he said that all did he was

4     point him out.

5          THE COURT:  He said he knew at the time it was going to

6     result in bad stuff happening.  That is absolutely wrong.

7          MR. TUMINELLI:  Your Honor, I didn't do it

8     intentionally.  I apologize.

9          (End of bench conference.)

10          MR. TUMINELLI:  Thank you, Judge.  I have no further

11     questions.

12          THE COURT:  Anything from the far left here?  Mr.

13     Saunders?

14          MR. SAUNDERS:  No.

15          THE COURT:  Mr. Brown?

16          MR. BROWN:  No, Your Honor.

17          MR. MANLEY:  Your Honor, the government has no redirect

18     whatsoever.

19          THE COURT:  All right.  Thank you.  And I guess we

20     ought to break for the day.  Unless --

21          MR. MANLEY:  Finished for day.

22          THE COURT:  See everybody at 9:30 on Monday morning.

23     Sorry for the short week.  But don't talk about the case to

24     anybody.  Don't read anything about the case.  And have a very --

25     and don't do any research.  Don't drive through any

1    neighborhoods.  Don't go on the Internet.  Don't do anything

2    except enjoy yourselves and live your own lives until I see you

3    at 9:30 on Monday morning.  Thank you.

4              (Conclusion of Proceedings.)

1                              INDEX

2

3                                                      PAGE
   WITNESS: DETECTIVE WILLIAM NICKOLES
4  DIRECT EXAMINATION BY MS. DWYER                      3
   CROSS EXAMINATION BY MR. MURTHA                     10

5

   WITNESS: AKIL KASUMBA MUHANGI
6  DIRECT EXAMINATION BY MS. DWYER                     18
   CROSS EXAMINATION BY MR. MURTHA                     22

7

   WITNESS: JAMES WAGSTER
8  DIRECT EXAMINATION BY MS. DWYER                     30
   CROSS EXAMINATION BY MR. MURTHA                     35
9  CROSS EXAMINATION BY MR. VAN HOVEN                  39
   REDIRECT EXAMINATION BY MS. DWYER                   41
10 RECROSS EXAMINATION BY MR. MURTHA                   42

11 WITNESS: TRACY LOVE
   DIRECT EXAMINATION BY MR. MANLEY                    46
12 CROSS EXAMINATION BY MR. PROCTOR                    62
   CROSS EXAMINATION BY MR. TUMINELLI                  80

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2


3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. James

5   Dinkins, et al., Case Number(s) JFM-06-0309, on May 26, 2009.

6          I further certify that the foregoing pages constitute

7   the official transcript of proceedings as transcribed by me to

8   the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10  signature this _____ day of _____, 2009.

11

12

13

14          _____

15          Mary M. Zajac,
            Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**$**

**$10** [1] - 66:4
**$4000** [3] - 56:6, 64:23, 84:16

**'**

**'04** [2] - 77:14, 77:15
**'07** [1] - 22:20

**0**

**05** [2] - 31:22, 43:5
**05's** [1] - 40:16
**05G** [1] - 31:3
**06** [1] - 40:16
**073H10644** [1] - 40:15
**07A0045** [1] - 40:15
**07H203** [1] - 40:7

**1**

**10** [1] - 96:4
**10,000** [2] - 61:5, 66:16
**101** [1] - 1:23
**1111** [1] - 92:7
**13th** [2] - 90:22, 92:2
**14th** [1] - 68:10
**15** [2] - 8:19, 60:25
**150** [1] - 77:11
**16th** [2] - 81:14, 81:16
**17** [1] - 3:7
**18** [4] - 13:20, 87:19, 92:6, 96:6

**2**

**2** [1] - 2:1
**2,000** [1] - 66:21
**20** [1] - 8:19
**20,000** [2] - 60:25, 65:25
**2000** [1] - 66:5
**2002** [1] - 78:18
**2003** [6] - 61:9, 68:10, 81:8, 81:9, 81:11, 81:14
**2004** [5] - 52:8, 61:7, 61:17, 90:22, 92:2
**2005** [3] - 11:10, 36:22, 44:1
**2007** [9] - 3:11, 11:7, 15:25, 17:3, 18:19, 19:17, 32:10, 36:24, 44:2
**2008** [2] - 62:21, 62:25
**2009** [3] - 1:10, 97:5,

97:10
**21201** [1] - 1:24
**21st** [2] - 62:21, 62:25, 63:17
**22** [1] - 96:6
**24** [1] - 47:2
**25** [1] - 66:8
**26** [1] - 1:10, 97:5
**2nd** [4] - 3:11, 15:24, 18:19, 19:17

**3**

**3** [1] - 96:4
**30** [1] - 96:8
**300** [1] - 38:17
**35** [1] - 96:8
**3515** [1] - 1:23
**3553** [1] - 73:14
**357** [11] - 33:24, 34:20, 34:22, 34:25, 37:4, 37:20, 38:9, 38:11, 38:17, 38:22, 38:24
**38** [7] - 34:20, 34:22, 34:25, 40:2, 40:18, 40:20, 56:9
**38/.357** [4] - 31:21, 32:12, 34:17
**39** [1] - 96:9

**4**

**40** [1] - 75:17
**41** [1] - 96:9
**42** [1] - 96:10
**46** [1] - 96:11

**5**

**5** [4] - 33:17, 44:24, 65:11, 66:10
**5,000** [1] - 61:2
**50** [2] - 65:11, 65:18
**50's** [2] - 66:8, 66:10
**5876** [1] - 40:11
**5K** [1] - 72:8

**6**

**62** [1] - 96:12
**63K12078** [1] - 40:10
**6I5876** [1] - 31:4

**7**

**708** [1] - 51:24

**8**

**80** [1] - 96:12

**9**

**920** [1] - 87:19
**922(j** [1] - 87:19
**9:30** [2] - 94:22, 95:3

**A**

**A-K-I-L** [1] - 18:2
**abetting** [3] - 58:20, 69:25, 93:21
**ability** [3] - 43:9, 43:16, 44:8
**able** [14] - 3:24, 5:1, 12:23, 22:3, 23:19, 28:4, 28:5, 34:6, 36:19, 41:15, 41:22, 42:6, 43:16, 72:15
**absolutely** [2] - 93:16, 94:6
**absolved** [1] - 76:17
**abundance** [1] - 12:1
**accept** [3] - 62:22, 63:2, 68:5
**accepted** [3] - 63:7, 63:13, 63:17
**access** [1] - 52:16
**account** [1] - 73:16
**accurate** [3] - 89:10, 89:11, 97:8
**accurately** [1] - 19:14
**accused** [3] - 62:9, 78:23, 79:5
**acknowledge** [1] - 59:14
**acknowledges** [1] - 59:24
**acquitted** [2] - 79:13, 79:14
**activity** [2] - 15:5, 16:13
**actual** [9] - 6:9, 13:5, 26:18, 27:4, 28:2, 37:9, 38:11, 42:5, 44:18
**addition** [1] - 58:19
**additional** [1] - 27:23
**addressed** [1] - 62:17
**adjust** [2] - 17:23, 46:18
**Administration** [2] - 3:3, 3:9
**affect** [6] - 43:9, 43:16, 44:8, 44:15, 44:18
**affected** [1] - 55:19
**affixed** [1] - 97:9
**AFTERNOON** [1] - 1:10
**afternoon** [10] - 10:4,

10:5, 23:1, 23:2, 35:16, 39:9, 39:10, 46:24, 46:25, 80:20
**Afternoon** [1] - 35:17
**Agent** [2] - 2:19, 17:7
**agent** [1] - 10:7
**ago** [2] - 70:24
**agree** [2] - 47:5, 88:19
**agreed** [1] - 90:15
**agreement** [35] - 2:3, 47:5, 47:10, 58:8, 58:16, 59:14, 59:23, 60:6, 62:2, 62:15, 62:23, 63:10, 64:2, 65:10, 71:16, 72:12, 72:14, 72:17, 76:4, 76:7, 76:14, 76:18, 85:17, 87:22, 88:10, 88:14, 88:15, 88:20, 89:7, 90:8, 90:10, 90:16, 91:7, 91:13, 91:24
**Agreement** [1] - 88:22
**agreements** [1] - 59:24
**ahead** [6] - 4:18, 41:25, 75:8, 86:24, 86:25, 88:1
**aiding** [3] - 58:20, 69:25, 93:21
**ain't** [1] - 91:2
**AKA** [2] - 92:2, 92:3
**AKIL** [2] - 17:21, 96:5
**Akil** [1] - 18:1
**AL** [1] - 1:6
**al** [1] - 97:5
**Alan** [1] - 58:9
**alibi** [1] - 70:13
**allowed** [2] - 35:5, 79:18
**alone** [1] - 74:21
**alongside** [1] - 4:7
**AMERICA** [1] - 1:4
**ammunition** [3] - 32:13, 32:15, 33:25
**analysis** [4] - 9:21, 20:16, 22:9, 44:9
**analyze** [1] - 31:5
**Angry** [1] - 48:19
**answer** [2] - 65:20, 71:9, 75:10
**answered** [2] - 63:8, 71:7
**answers** [2] - 26:7, 53:19
**apologize** [2] - 10:14, 94:8
**appeal** [1] - 74:24
**appear** [2] - 25:1, 26:2
**Appearances** [1] - 1:14
**apply** [1] - 29:11
**appreciate** [1] - 77:7
**Approach** [2] - 73:10, 79:10

**approach** [9] - 25:13, 30:1, 45:15, 52:17, 77:9, 79:2, 91:15, 93:11, 93:13
**appropriate** [1] - 67:17
**Arcangelo** [1] - 1:17
**area** [47] - 3:22, 4:1, 4:8, 4:11, 4:20, 4:21, 4:24, 5:16, 5:18, 6:14, 6:23, 8:4, 8:7, 8:16, 11:21, 12:4, 12:9, 13:1, 14:14, 14:18, 14:21, 15:8, 15:18, 15:19, 15:22, 16:1, 19:19, 19:20, 20:2, 20:6, 20:7, 23:17, 24:10, 24:14, 25:1, 26:20, 29:12, 36:7, 52:2, 56:13, 57:5, 82:2, 82:22, 93:9
**argue** [2] - 60:18, 89:6
**array** [1] - 69:2
**arrest** [1] - 15:14
**arrested** [4] - 61:7, 61:9, 61:12, 81:13
**arrived** [3] - 8:6, 12:25, 18:22
**arriving** [1] - 12:21
**Aside** [1] - 25:24
**assault** [1] - 76:8
**assessment** [1] - 10:22
**assigned** [2] - 3:2, 3:8
**assist** [4] - 14:3, 14:7, 18:19, 71:20
**assistance** [4] - 3:22, 72:10, 73:6, 74:4
**Assisted** [1] - 92:23
**assisted** [2] - 74:19, 92:19
**assisting** [3] - 29:3, 92:25, 93:6
**associated** [5] - 10:10, 10:16, 16:6, 16:12, 38:4
**assume** [4] - 10:16, 20:24, 21:1, 79:12
**assuming** [1] - 36:7
**Attachment** [1] - 90:7
**attempt** [2] - 21:25, 27:13
**attempted** [1] - 26:8
**attention** [1] - 62:23
**Attorney** [1] - 73:7
**attorney** [6] - 58:10, 58:12, 60:18, 86:1, 87:12, 90:6
**Attorney's** [4] - 71:21, 73:8, 74:18, 75:14
**attorneys** [1] - 87:13, 87:22
**attribute** [1] - 80:9
**attributed** [1] - 78:3
**August** [4] - 81:8, 81:9,

81:11, 81:16
  **available** [3] - 14:7, 14:9
  **Avenue** [12] - 3:14, 4:3, 4:13, 4:23, 6:4, 6:15, 8:6, 9:9, 19:23, 19:25, 52:6, 80:24
  **aware** [9] - 61:9, 64:20, 65:2, 67:10, 67:13, 67:19, 69:12, 76:13, 81:11

**B**

  **bad** [3] - 48:22, 61:1, 94:6
  **Baier** [1] - 39:15
  **bald** [1] - 70:18
  **ball** [3] - 5:23, 5:24, 5:25
  **Baltimore** [15] - 1:11, 1:24, 3:1, 3:13, 8:24, 9:1, 9:20, 13:7, 13:24, 18:9, 21:2, 22:8, 38:18, 39:1, 85:7
  **barrel** [7] - 23:17, 24:3, 36:1, 36:2, 37:13, 43:21, 44:13
  **Bartlett** [6] - 51:24, 52:6, 80:24, 81:2, 83:5, 85:1
  **based** [14] - 3:17, 7:23, 8:13, 8:16, 15:16, 17:2, 25:2, 34:5, 38:8, 38:13, 41:7, 42:9, 87:8, 91:24
  **basis** [1] - 35:21
  **Batts** [4] - 15:14, 84:18, 84:21, 84:23
  **beat** [1] - 78:23
  **Beat** [1] - 78:25
  **becomes** [1] - 37:13
  **Beg** [1] - 78:6
  **began** [1] - 8:20
  **begin** [1] - 4:25
  **beginning** [2] - 2:11, 63:24
  **begins** [2] - 6:13, 8:7
  **Behalf** [4] - 1:15, 1:16, 1:18, 1:19
  **behalf** [2] - 14:13, 60:19
  **behind** [2] - 31:14, 35:3
  **bells** [1] - 68:13
  **Bench** [6] - 30:4, 45:17, 52:19, 73:11, 79:11, 93:14
  **bench** [13] - 30:11, 30:17, 46:3, 53:18, 54:12, 73:10, 74:10, 79:10, 80:5, 86:22,

93:11, 93:13, 94:9
  **best** [1] - 23:7
  **between** [4] - 47:25, 59:25, 81:16, 90:10
  **Between** [1] - 4:19
  **bias** [1] - 79:22
  **big** [1] - 64:14
  **biological** [3] - 13:17, 28:12, 29:6
  **bit** [3] - 16:3, 16:4, 26:1
  **bitch** [1] - 48:23
  **Blade** [1] - 82:4
  **blood** [5] - 13:17, 28:16, 29:8, 29:17
  **blow** [1] - 29:7
  **blue** [1] - 54:23
  **Bo** [6] - 48:1, 48:3, 48:8, 48:11, 48:22, 53:11
  **body** [8] - 31:5, 32:6, 32:8, 34:3, 34:23, 35:5, 41:11, 42:3
  **Bones** [1] - 32:8
  **Boo** [2] - 59:10
  **Boo-Boo** [1] - 59:10
  **bore** [1] - 37:12
  **bottom** [2] - 6:5, 72:25
  **branches** [4] - 12:4, 12:6, 19:16, 23:11
  **brand** [1] - 33:24
  **breach** [6] - 45:19, 45:25, 46:4, 76:4, 76:14, 94:20
  **breech** [2] - 36:1, 36:3
  **Brian** [1] - 17:7
  **briefly** [2] - 30:2, 42:22
  **bring** [3] - 45:19, 49:18, 79:14
  **broad** [2] - 24:2, 78:11
  **broke** [1] - 76:16
  **broken** [1] - 76:22
  **brother** [19] - 59:4, 59:12, 59:15, 59:17, 68:19, 68:22, 68:23, 69:5, 69:11, 69:15, 69:20, 70:1, 82:9, 83:2, 83:3, 83:5, 90:19, 91:3
  **brother's** [1] - 59:5
  **brought** [4] - 12:14, 30:24, 49:23, 64:14
  **Brown** [2] - 1:20, 94:15
  **BROWN** [1] - 94:16
  **brung** [1] - 55:22
  **brush** [2] - 23:15, 23:23
  **brushed** [3] - 23:10, 23:12, 24:4
  **Bryant** [3] - 79:18, 79:19, 79:25
  **bu** [1] - 24:9
  **bucks** [1] - 66:17

  **bullet** [14] - 31:4, 31:18, 33:6, 34:1, 34:25, 35:1, 36:17, 37:13, 41:11, 41:23, 42:2, 42:3, 44:13
  **bullets** [10] - 6:9, 26:23, 31:12, 31:20, 34:24, 41:12, 41:14, 41:15, 42:5
  **bunch** [1] - 76:8
  **bushes** [1] - 11:22
  **Bussard** [5] - 58:9, 64:4, 67:22, 87:15, 90:14
  **buy** [1] - 57:21
  **BY** [39] - 3:5, 10:3, 18:6, 22:25, 30:22, 35:15, 39:8, 41:3, 42:1, 42:21, 46:23, 54:13, 62:14, 63:9, 70:8, 72:7, 74:11, 75:9, 78:8, 79:4, 80:6, 80:19, 87:1, 87:11, 88:11, 89:13, 91:25, 96:4, 96:4, 96:6, 96:6, 96:8, 96:8, 96:9, 96:9, 96:10, 96:11, 96:12, 96:12

**C**

  **caliber** [7] - 31:21, 32:12, 33:24, 34:16, 34:17, 34:21, 38:11
  **cannot** [1] - 79:14
  **cap** [2] - 50:16, 66:3
  **capped** [2] - 50:16, 50:17
  **capping** [2] - 50:18, 50:23
  **caps** [3] - 50:20, 66:1, 66:5
  **capsules** [1] - 50:19
  **capture** [1] - 78:7
  **Car** [1] - 5:7
  **car** [10] - 5:9, 11:5, 50:3, 50:9, 56:15, 57:6, 85:6, 85:12
  **cardboard** [1] - 45:22
  **care** [1] - 45:21
  **carried** [1] - 87:23
  **carries** [5] - 67:10, 67:15, 72:19, 72:24, 87:3
  **cars** [2] - 50:6, 50:25
  **cartridge** [15] - 9:15, 21:21, 22:5, 26:13, 26:18, 27:7, 27:14, 27:15, 27:18, 27:25, 28:3, 33:3, 35:1, 38:11
  **Case** [1] - 97:5
  **case** [23] - 11:24, 25:11, 28:22, 29:1, 35:1, 38:5, 38:9, 40:13, 40:20,

40:21, 43:20, 47:3, 52:7, 52:22, 56:7, 58:17, 59:21, 60:21, 87:18, 89:2, 89:3, 94:23, 94:24
  **CASE** [1] - 1:5
  **cases** [4] - 9:16, 33:3, 38:11, 73:19
  **casing** [6] - 26:18, 26:20, 27:7, 27:14, 27:25, 28:3
  **casings** [6] - 21:21, 22:5, 26:13, 27:18, 33:5, 33:9
  **category** [1] - 37:24
  **caught** [1] - 77:12
  **caused** [1] - 32:3
  **CC** [9] - 22:13, 39:19, 40:1, 40:4, 40:5, 40:6, 40:10, 40:12, 40:23
  **CD** [1] - 30:16
  **cell** [3] - 76:24, 77:1, 77:12
  **certain** [3] - 23:20, 71:20, 83:16
  **certainly** [1] - 30:13
  **CERTIFICATE** [1] - 97:1
  **certify** [2] - 97:3, 97:6
  **change** [1] - 44:10
  **charge** [9] - 61:15, 74:13, 85:21, 85:23, 85:24, 86:4, 87:3, 87:23, 90:3
  **charged** [6] - 52:25, 53:1, 53:7, 68:24, 69:24, 87:18
  **charges** [1] - 86:19
  **check** [1] - 30:14
  **Cherokee** [1] - 50:7
  **chose** [1] - 15:3
  **Cigarettes** [1] - 49:25
  **circumstances** [1] - 48:10
  **citizens** [2] - 38:18, 39:1
  **City** [3] - 13:7, 13:24, 18:9
  **class** [8] - 37:16, 37:19, 38:8, 38:14, 38:21, 38:25, 43:3, 43:5
  **clean** [3] - 24:22, 35:24, 76:11
  **cleaned** [2] - 36:1, 43:22
  **clear** [1] - 40:17
  **Clearly** [1] - 78:5
  **CLERK** [10] - 2:16, 2:20, 2:23, 17:20, 17:23, 18:4, 46:9, 46:13, 46:17, 46:21
  **client** [2] - 77:6, 88:4

  **climate** [1] - 11:21
  **close** [2] - 5:20, 20:6
  **close-up** [1] - 20:6
  **closer** [1] - 8:9
  **clothing** [1] - 18:16
  **cocaine** [14] - 47:15, 47:19, 47:20, 57:21, 61:3, 66:14, 82:6, 82:11, 82:13, 82:16, 82:18, 82:20, 83:10, 83:17
  **codefendant** [2] - 79:17, 79:19
  **codefendants** [1] - 80:1
  **coke** [2] - 49:25, 65:11
  **Cokesbury** [4] - 51:23, 52:6, 78:21, 81:2
  **collection** [1] - 18:15
  **color** [1] - 30:16
  **colors** [1] - 6:8
  **coming** [2] - 8:11, 16:24
  **comment** [1] - 77:7
  **common** [1] - 62:1
  **commonly** [1] - 4:22
  **communication** [1] - 36:8
  **comparative** [1] - 44:9
  **compare** [5] - 34:5, 39:12, 39:15, 43:17, 44:20
  **compared** [2] - 41:14, 44:19
  **comparison** [6] - 28:5, 34:14, 36:10, 38:7, 39:25, 41:14
  **Comparison** [1] - 41:21
  **Complaint** [1] - 31:3
  **complete** [1] - 97:8
  **concerned** [3] - 12:17, 13:12, 29:9
  **concerning** [2] - 36:25, 56:2
  **conclude** [1] - 41:15
  **Conclusion** [1] - 95:4
  **conclusion** [1] - 41:13
  **condition** [5] - 9:11, 22:18, 24:25, 25:23, 36:13
  **conduct** [2] - 53:3, 79:13, 79:15
  **conducted** [1] - 13:16
  **conference** [12] - 30:4, 30:17, 45:17, 46:3, 52:19, 54:12, 73:11, 74:10, 79:11, 80:5, 93:14, 94:9
  **confusion** [1] - 61:7
  **conscientious** [1] - 64:4
  **consequence** [1] - 75:25

considering [1] - 86:8
consistent [4] - 12:10, 38:8, 38:14, 93:16
conspiracy [9] - 52:25, 53:1, 53:7, 58:17, 58:19, 65:10, 67:10, 85:19, 93:1
constitute [1] - 97:6
contacted [1] - 9:2
context [1] - 81:22
continue [3] - 49:15, 53:14
continued [1] - 8:8
control [1] - 13:11
conversation [1] - 57:14
convicted [1] - 52:25
cooperate [2] - 47:6, 60:13
cooperation [6] - 60:5, 71:16, 71:17, 72:13, 76:3, 76:10
copy [4] - 19:2, 30:16, 39:24, 65:8
corner [3] - 5:9, 5:20, 5:21
correct [74] - 4:7, 4:15, 4:17, 5:14, 5:22, 6:25, 10:9, 10:18, 11:4, 11:5, 11:8, 11:18, 12:2, 12:5, 12:6, 12:20, 13:5, 13:6, 13:9, 13:17, 13:18, 13:22, 13:23, 14:4, 14:8, 14:15, 14:16, 14:19, 14:20, 14:23, 15:6, 15:9, 16:13, 16:14, 17:4, 23:7, 24:23, 25:11, 25:16, 25:20, 26:15, 27:11, 27:12, 28:7, 29:18, 29:19, 36:10, 36:22, 37:1, 37:10, 37:14, 37:17, 37:21, 37:25, 38:15, 43:4, 43:10, 43:14, 43:18, 43:22, 44:2, 44:3, 44:6, 44:7, 44:11, 44:16, 44:20, 45:1, 45:11, 74:24, 82:13, 84:4, 84:11, 90:10
Correct [7] - 10:23, 14:6, 33:12, 43:11, 45:2, 72:1, 92:21
correctly [1] - 60:1
counsel [4] - 2:4, 61:25, 64:5, 91:6
count [2] - 59:20, 59:21
countless [1] - 8:17
couple [2] - 58:3, 80:7
course [5] - 15:13, 25:14, 30:3, 53:15, 54:1
COURT [90] - 1:1, 2:2, 2:5, 2:7, 2:14, 10:1,

17:11, 17:13, 17:16, 17:19, 22:23, 25:14, 29:22, 29:24, 30:3, 30:7, 30:10, 30:19, 35:13, 41:1, 41:25, 42:19, 45:14, 45:16, 45:25, 46:4, 46:7, 46:10, 52:18, 53:14, 53:24, 54:5, 54:9, 54:19, 61:20, 61:23, 62:10, 70:7, 70:22, 71:3, 71:8, 71:14, 72:6, 73:10, 73:12, 73:21, 74:1, 74:6, 75:8, 77:10, 78:6, 79:3, 79:8, 79:10, 79:12, 79:16, 79:21, 79:23, 80:1, 80:3, 80:16, 86:3, 86:10, 86:13, 86:24, 87:4, 87:6, 87:9, 88:10, 88:14, 88:20, 88:22, 89:2, 89:6, 89:10, 91:12, 91:16, 91:20, 92:14, 93:10, 93:13, 93:15, 93:20, 93:25, 94:2, 94:5, 94:12, 94:15, 94:19, 94:22
Court [3] - 53:2, 87:2, 97:15
court [5] - 16:25, 68:24, 70:4, 75:20, 78:19
Court's [6] - 9:23, 16:18, 28:8, 29:20, 35:11, 39:3
Courthouse [1] - 1:23
courtroom [4] - 2:15, 46:8, 54:20, 58:14
cousin [1] - 48:4
cover [1] - 71:5
covering [1] - 11:25
crack [6] - 57:21, 65:12, 65:18, 83:3, 83:4, 83:5
Crack [1] - 83:4
crime [6] - 8:13, 18:15, 36:7, 36:8, 58:21, 92:4
Crime [6] - 9:2, 9:8, 13:7, 13:8, 16:17, 18:10, 18:14, 21:2
CRIMINAL [1] - 1:5
criminal [5] - 10:11, 10:16, 16:13, 27:19, 28:14
Crosby [7] - 68:12, 69:3, 69:4, 69:9, 69:10, 69:11, 69:12
cross [3] - 41:19, 42:23, 62:1
CROSS [12] - 10:2, 22:24, 35:14, 39:7, 62:13, 80:18, 96:4, 96:6, 96:8, 96:9, 96:12, 96:12
crosses [1] - 4:12

custody [3] - 52:9, 52:11, 52:13
cut [3] - 24:2, 45:22, 71:6
Cut [1] - 71:3
cuts [2] - 4:12, 5:19
cylinder [3] - 26:23, 27:11, 27:15
cylindrical [1] - 26:20

# D

dad [3] - 69:6, 69:13, 69:15
Dale [6] - 55:10, 55:13, 56:23, 57:22, 83:22
damage [3] - 34:13, 34:14, 41:16
Damo [3] - 57:4, 57:18, 57:20
dark [1] - 57:5
date [6] - 62:20, 62:22, 63:6, 63:24, 77:15, 77:16
daylight [1] - 78:11
days [3] - 67:4, 77:11
dealer [1] - 92:10
death [7] - 58:22, 67:16, 85:20, 86:4, 86:8, 86:11, 87:3, 87:24, 87:25, 88:2, 88:5, 88:8, 88:25, 89:8, 89:9, 90:1, 92:5
Debra [1] - 1:16
debris [4] - 20:11, 23:10, 23:11, 23:21
debt [1] - 57:12
decades [1] - 76:1
decides [4] - 72:3, 73:3, 73:5, 73:6
decision [6] - 14:12, 27:18, 64:10, 74:21
deemed [1] - 63:18
defendant [14] - 59:23, 59:25, 90:23, 90:25, 91:3, 91:7, 92:2, 92:7, 92:18, 92:19, 92:24, 93:1, 93:5, 93:8
Defendant [3] - 1:16, 1:18, 1:19
Defendants [1] - 1:7
defense [4] - 17:15, 61:25, 62:4, 91:6
defined [1] - 92:6
deliberately [1] - 92:7
department [4] - 14:10
Department [8] - 3:2, 8:24, 9:1, 9:20, 13:8, 13:24, 18:9, 22:9
depicted [1] - 12:22

Describe [3] - 49:8, 49:20, 52:5
describe [8] - 6:1, 7:21, 21:19, 48:10, 48:13, 48:22, 49:2, 50:18
described [1] - 3:18
DETECTIVE [2] - 2:21, 96:3
Detective [7] - 3:11, 9:24, 10:4, 16:19, 24:18, 29:1, 39:15
detective [2] - 3:1, 31:2
detectives [1] - 18:23
determination [3] - 38:3, 38:7, 43:8
determine [15] - 13:16, 27:23, 28:19, 29:16, 31:24, 34:6, 34:10, 34:11, 36:19, 41:10, 42:6, 53:16, 53:25, 54:1, 60:15
determining [1] - 74:5
device [1] - 62:7
diamond [3] - 5:23, 5:24, 5:25
Dickerson [1] - 70:4
difference [1] - 34:25
different [5] - 31:14, 34:21, 39:19, 40:2, 44:14
difficult [3] - 13:4, 24:5, 24:6
difficulty [1] - 23:21
DINKINS [1] - 1:6
Dinkins [10] - 1:18, 57:9, 78:3, 79:18, 80:8, 83:21, 84:1, 84:4, 84:15, 97:5
dire [1] - 30:8
DIRECT [8] - 3:4, 18:5, 30:21, 46:22, 96:4, 96:6, 96:8, 96:11
direct [3] - 12:17, 15:17, 26:7
directed [5] - 12:7, 13:7, 23:3, 24:13, 27:17
directing [1] - 28:24
direction [1] - 24:18
directly [4] - 12:19, 29:4, 57:24, 82:14
dirt [9] - 6:3, 8:5, 25:1, 25:4, 25:24, 26:1, 26:2, 43:18, 43:20
discharge [3] - 29:7, 58:21, 92:4
discharged [4] - 37:14, 43:17, 44:5
discharging [2] - 67:7, 67:15
discovery [2] - 64:25, 65:1

discussion [4] - 55:9, 55:18, 56:2, 56:18
discussions [1] - 47:25
display [1] - 42:22
dispose [1] - 16:5
disposing [1] - 8:14
dispute [1] - 30:14
disregard [1] - 7:6
distortion [2] - 32:2, 32:3
distribute [2] - 65:11, 67:10
DISTRICT [2] - 1:1, 1:1
Division [1] - 15:11
DIVISION [1] - 1:2
DNA [1] - 29:17
documentation [1] - 18:15
dogs [3] - 14:2, 14:7, 14:11
done [11] - 13:21, 17:15, 53:4, 57:11, 72:20, 73:1, 84:11, 91:17, 92:16, 93:8, 93:22
dope [2] - 49:25, 50:19
Doris [1] - 70:4
doublecheck [1] - 40:16
Dowery [3] - 80:10, 83:22
down [9] - 5:9, 8:22, 19:12, 25:20, 44:25, 62:24, 64:6, 64:15, 67:22
dreads [1] - 57:7
drive [1] - 94:25
driving [2] - 85:12
drove [1] - 57:5
Drug [2] - 3:2, 3:9
drug [14] - 15:5, 15:20, 16:6, 16:8, 49:24, 58:17, 58:19, 58:21, 59:21, 85:18, 85:20, 92:4, 93:2
drugs [17] - 15:21, 47:14, 49:10, 49:21, 49:22, 49:25, 52:13, 52:23, 60:21, 65:16, 80:21, 80:23, 81:3, 82:2, 84:21, 84:22, 84:25
drying [1] - 25:24
dude [3] - 49:7, 56:6, 56:7
during [8] - 14:17, 24:9, 47:24, 49:17, 50:3, 52:1, 82:1, 83:7
During [3] - 15:22, 45:25, 52:15
duties [1] - 18:13
Dwyer [4] - 1:16, 2:17, 41:1, 62:18
DWYER [19] - 2:18, 3:5,

15:16, 17:12, 17:14, 17:17, 18:6, 29:23, 29:25, 30:22, 41:3, 42:1, 45:15, 45:18, 46:2, 96:4, 96:6, 96:8, 96:9

# E

**e-mail** [1] - 30:15
**easier** [1] - 19:3
**east** [1] - 14:24
**effort** [2] - 3:19, 92:9
**efforts** [1] - 8:2
**eight** [1] - 3:10
**either** [6] - 15:3, 15:20, 22:13, 26:13, 29:7, 36:14
**eject** [2] - 32:21, 32:24
**elicited** [1] - 53:19
**eliminated** [1] - 36:20
**employed** [1] - 18:8
**empty** [1] - 9:16
**encased** [1] - 24:2
**encrusted** [1] - 25:1
**end** [5] - 27:8, 27:10, 44:22, 63:25
**End** [6] - 30:17, 46:3, 54:12, 74:10, 80:5, 94:9
**enforcement** [5] - 3:12, 3:17, 10:7, 10:19, 17:5
**Enforcement** [2] - 3:2, 3:9
**enjoy** [1] - 95:2
**entailed** [1] - 29:5
**entered** [3] - 8:15, 87:22, 89:7
**enters** [2] - 2:15, 46:8
**envelope** [1] - 31:9
**Esquire** [8] - 1:15, 1:16, 1:17, 1:17, 1:18, 1:19, 1:20, 1:20
**essentially** [1] - 45:10
**establish** [1] - 53:10
**established** [1] - 53:8
**estimate** [1] - 8:21
**ET** [1] - 1:6
**et** [1] - 97:5
**etc** [2] - 18:17, 32:8
**event** [2] - 69:12, 89:14
**eventually** [3] - 3:25, 8:2, 20:15
**Evidence** [1] - 22:10
**evidence** [16] - 7:9, 14:3, 18:16, 19:12, 28:11, 33:23, 39:12, 41:8, 41:9, 41:15, 64:6, 64:12, 64:20, 87:6, 92:15, 93:16
**exact** [3] - 7:23, 63:23, 77:16

**Exactly** [1] - 79:14
**exactly** [5] - 12:18, 19:22, 60:10, 81:5, 89:20
**exam** [1] - 15:17
**examination** [3] - 26:7, 31:1, 38:2
**EXAMINATION** [24] - 3:4, 10:2, 18:5, 22:24, 30:21, 35:14, 39:7, 41:2, 42:20, 46:22, 62:13, 80:18, 96:4, 96:4, 96:6, 96:6, 96:8, 96:8, 96:9, 96:9, 96:10, 96:11, 96:12, 96:12
**examine** [2] - 32:17, 34:2
**examined** [2] - 33:2, 38:5
**examines** [1] - 62:2
**examining** [3] - 40:20, 43:13, 62:1
**example** [1] - 62:2
**examples** [1] - 53:11
**except** [1] - 95:2
**excuse** [1] - 19:11
**Exhibit** [18] - 3:23, 5:13, 6:6, 6:18, 7:1, 7:7, 7:14, 18:25, 19:4, 19:24, 20:5, 21:7, 21:11, 22:12, 32:11, 32:16, 33:4, 41:6
**exhibit** [2] - 19:5, 45:21
**existed** [1] - 24:22
**experience** [1] - 16:2
**expert** [4] - 30:20, 35:6, 41:10, 42:11
**expertise** [2] - 34:6, 42:9
**explain** [1] - 67:23
**explained** [1] - 64:12
**exposed** [4] - 27:8, 27:10, 86:4, 88:7
**extent** [1] - 82:10
**extra** [1] - 39:24
**extremely** [1] - 24:5
**eyeballing** [1] - 45:10

# F

**face** [4] - 25:16, 36:1, 36:3, 56:17
**facility** [2] - 57:13, 57:16
**facing** [4] - 25:16, 86:11, 89:8, 89:9
**fact** [12] - 11:9, 14:21, 15:8, 15:19, 23:15, 24:25, 25:19, 27:10, 43:12, 43:20, 65:14, 89:6
**Facts** [5] - 90:7, 90:15,

91:8, 91:9, 91:10
**facts** [2] - 90:10, 90:11
**factually** [3] - 86:18, 86:21, 87:2
**Faggot** [1] - 48:23
**fair** [4] - 10:22, 83:20, 85:3, 88:6
**fallen** [1] - 12:4
**falling** [1] - 25:25
**falls** [1] - 25:9
**false** [2] - 70:13, 77:23
**familiar** [6] - 11:9, 14:18, 15:19, 67:25, 76:5, 77:21
**familiarity** [1] - 12:8
**far** [7] - 12:17, 13:11, 29:9, 53:11, 56:24, 57:9, 94:12
**fashion** [1] - 33:16
**father** [1] - 69:7
**feet** [1] - 8:19
**fellow** [1] - 87:15
**fence** [3] - 6:14, 6:16, 8:7
**few** [2] - 64:1, 68:4
**fiend** [4] - 49:3, 49:9, 49:10, 49:13, 49:14, 49:15
**fiends** [2] - 49:21, 51:14
**fight** [1] - 88:4
**figure** [1] - 2:10
**figured** [1] - 8:13
**filed** [1] - 86:7
**files** [1] - 30:15
**final** [1] - 43:8
**Finally** [1] - 22:12
**finally** [2] - 20:9, 42:14
**fine** [2] - 2:5, 54:3
**fingerprints** [4] - 13:19, 18:16, 21:25, 27:13
**finish** [1] - 22:19
**Finished** [1] - 94:21
**fire** [5] - 32:14, 48:11, 48:14, 48:21, 53:11
**firearm** [52] - 3:13, 3:19, 3:24, 5:1, 7:24, 8:3, 9:14, 9:15, 9:19, 18:19, 18:22, 19:8, 19:19, 20:3, 20:7, 20:10, 20:15, 20:22, 21:1, 21:8, 21:12, 21:17, 22:5, 22:16, 31:25, 32:11, 32:13, 32:17, 32:19, 32:21, 32:23, 32:24, 33:1, 34:5, 34:7, 34:8, 34:9, 34:19, 35:7, 36:21, 37:1, 41:6, 41:9, 41:10, 42:4, 42:12, 42:14, 58:21, 67:7, 67:15, 92:4, 92:6
**firearm's** [1] - 40:8

**Firearms** [2] - 22:8, 22:11
**firearms** [3] - 18:16, 40:22, 93:2
**fired** [20] - 21:24, 31:12, 31:24, 32:22, 33:11, 34:7, 34:8, 34:9, 34:10, 35:6, 35:21, 35:24, 36:21, 41:10, 41:13, 41:16, 42:3, 42:11, 42:14, 48:17
**firing** [1] - 48:7
**first** [8] - 3:21, 5:3, 18:2, 19:17, 30:12, 32:11, 55:7, 74:13
**First** [5] - 7:7, 8:4, 18:1, 33:15, 49:2
**Five** [1] - 66:19
**five** [15] - 8:21, 9:16, 13:2, 21:13, 21:20, 21:21, 33:3, 33:5, 33:8, 38:23, 38:24, 45:22, 53:10, 66:18
**five-foot-two** [1] - 45:22
**flat** [1] - 91:18
**foliage** [4] - 7:17, 8:10, 11:24, 12:3
**follow** [1] - 27:23
**foot** [3] - 15:25, 16:3, 45:22
**FOR** [1] - 1:1
**force** [2] - 3:3, 3:8
**foregoing** [1] - 97:6
**forget** [2] - 38:10, 50:9
**forgot** [2] - 67:9, 74:12
**form** [2] - 25:8, 75:6
**forth** [1] - 8:11
**fortuitous** [1] - 77:7
**Fortunately** [1] - 87:6
**forward** [2] - 17:19, 76:4
**four** [5] - 8:21, 12:21, 12:25, 13:2, 72:24
**Four** [2] - 18:12, 72:19
**fourth** [1] - 62:24
**fragments** [2] - 31:4, 34:2, 36:17
**Frank** [3] - 15:14, 84:18, 84:21
**Frederick** [1] - 1:12
**free** [3] - 49:21, 53:25, 64:5
**friend** [1] - 57:9
**front** [4] - 35:18, 39:11, 41:9, 86:24
**furtherance** [2] - 58:21, 92:4
**fussing** [1] - 56:22

# G

**Gary** [1] - 1:18
**gel** [4] - 50:19, 66:1, 66:3, 66:5
**generally** [2] - 32:15, 60:23
**gentlemen** [14] - 3:21, 3:24, 6:10, 7:22, 8:1, 18:7, 19:15, 21:20, 34:17, 37:7, 42:23, 45:4, 61:23, 92:15
**German** [1] - 17:8
**Gilbert** [18] - 1:16, 48:1, 48:11, 52:24, 53:4, 53:5, 53:11, 54:17, 54:20, 54:25, 60:22, 61:9, 61:11, 61:14, 81:13, 83:10, 85:11
**Gilbert's** [4] - 47:12, 52:21, 53:25, 54:2
**girl** [2] - 50:9, 50:10
**girl's** [1] - 50:12
**girlfriend** [1] - 50:21
**given** [6] - 24:18, 36:6, 36:17, 50:1, 53:10, 65:3
**gloved** [1] - 20:21
**gloves** [2] - 20:21, 20:23
**Goods** [1] - 1:19
**government** [18] - 2:18, 17:14, 17:17, 19:11, 30:14, 45:20, 46:11, 53:3, 60:14, 73:4, 73:15, 73:17, 75:1, 76:7, 76:16, 86:7, 90:11, 94:17
**Government** [1] - 1:15
**Government's** [19] - 3:23, 5:13, 6:6, 6:18, 7:1, 7:6, 7:14, 18:25, 19:4, 19:24, 20:5, 21:7, 21:11, 22:12, 32:11, 32:16, 33:4, 41:6
**GOVERNMENT'S** [4] - 2:21, 17:21, 30:18, 46:15
**grabbed** [1] - 57:6
**grams** [2] - 65:11, 65:18
**grass** [6] - 4:1, 4:8, 4:19, 4:24, 5:18, 24:2
**Green** [2] - 47:21, 66:17
**green** [3] - 47:21, 47:22, 66:21
**grew** [2] - 23:20, 24:7
**grip** [2] - 25:5, 26:1
**grooves** [6] - 31:21, 35:3, 37:6, 37:8, 37:16, 41:13
**ground** [5] - 23:18, 24:11, 24:14, 25:20

**grown** [3] - 23:16, 23:17, 23:18
**growth** [1] - 26:3
**guess** [4] - 29:2, 31:13, 45:21, 94:19
**guided** [1] - 73:16
**guideline** [1] - 73:13
**guidelines** [4] - 67:20, 67:23, 68:1, 73:13
**guilty** [14] - 47:3, 58:16, 58:19, 58:20, 59:20, 67:7, 68:23, 68:24, 75:16, 78:22, 78:24, 85:21, 89:24, 90:12
**gun** [50] - 9:10, 10:20, 10:25, 11:1, 12:23, 13:3, 13:8, 13:12, 13:17, 14:14, 16:11, 16:16, 16:17, 19:15, 23:17, 23:18, 24:9, 24:11, 24:14, 25:1, 25:5, 25:6, 25:15, 26:3, 26:11, 26:12, 28:10, 28:16, 28:18, 28:20, 29:5, 29:8, 29:16, 29:18, 30:12, 35:20, 36:5, 40:2, 40:7, 40:13, 41:13, 41:16, 44:4, 56:8, 57:22, 57:23
**guns** [3] - 28:15, 52:16, 57:21
**guys** [4] - 50:17, 52:3, 57:13

## H

**hair** [2] - 70:16, 71:6
**halfway** [3] - 4:21, 4:24, 8:19
**hand** [8] - 2:20, 4:21, 4:25, 6:5, 8:20, 17:20, 20:21, 46:14
**handed** [2] - 8:18, 12:10
**handgun** [11] - 7:4, 7:12, 7:16, 8:14, 8:15, 8:22, 8:23, 9:3, 9:7, 85:19, 90:1
**handled** [1] - 20:23
**handling** [2] - 25:7, 25:9
**Handling** [1] - 22:10
**hands** [1] - 20:21
**hang** [1] - 16:4
**happy** [2] - 48:18, 75:1
**hard** [1] - 70:25
**Harper** [2] - 68:8, 68:10
**head** [1] - 57:8
**headed** [1] - 6:14
**hear** [5] - 75:8, 80:13, 86:20, 87:4, 91:20

**heard** [5] - 33:8, 37:7, 57:24, 72:10, 75:5
**heat** [1] - 55:22
**heavily** [1] - 14:18
**heavy** [1] - 43:6
**Heights** [1] - 56:13
**Heights/Pimlico** [1] - 84:22
**help** [2] - 8:24, 75:22
**helped** [2] - 73:4, 75:15
**hereby** [1] - 97:3
**hereunto** [1] - 97:9
**Heroin** [1] - 47:15
**heroin** [8] - 47:16, 47:17, 60:24, 65:24, 82:17, 82:21, 83:13, 92:10
**High** [3] - 17:7, 24:18, 29:1
**high** [3] - 16:5, 49:3, 51:14
**hip** [1] - 77:21
**hit** [2] - 32:5, 57:7
**hold** [1] - 9:17
**holding** [1] - 7:4
**holds** [1] - 9:18
**hole** [2] - 37:12, 77:11
**hollow** [1] - 34:1
**home** [2] - 61:14, 85:2
**Homewood** [2] - 52:6, 81:2
**homicide** [1] - 3:15
**Honor** [48] - 2:3, 2:12, 2:18, 9:23, 10:4, 16:18, 17:10, 17:12, 17:17, 22:22, 23:1, 28:8, 29:20, 29:21, 29:23, 30:1, 35:11, 35:16, 39:3, 39:5, 40:25, 42:18, 45:13, 45:15, 46:11, 53:9, 58:2, 61:19, 63:4, 70:6, 70:21, 71:2, 72:5, 78:5, 79:2, 79:7, 83:1, 85:25, 86:9, 86:12, 86:20, 88:9, 88:23, 89:11, 91:5, 94:7, 94:16, 94:17
**Honorable** [1] - 1:12
**hope** [1] - 79:3
**hoping** [3] - 75:20, 75:22, 75:25
**house** [5] - 51:17, 51:19, 51:20, 51:21, 57:4
**houses** [2] - 6:24, 6:25
**HOVEN** [3] - 39:5, 39:8, 96:9
**Hoven** [1] - 1:17
**human** [1] - 92:8
**hundred** [2] - 44:5, 66:7

## I

**ID** [1] - 7:4
**idea** [1] - 11:12
**identification** [2] - 58:4
**identified** [5] - 36:20, 37:3, 54:17, 54:24, 93:20
**Identified** [1] - 93:25
**identify** [5] - 7:9, 34:8, 54:19, 54:20, 55:1
**identifying** [2] - 92:23, 93:5
**impeaching** [4] - 91:11, 91:12, 91:24
**impeachment** [1] - 86:16
**implication** [2] - 89:4, 89:5
**impression** [1] - 24:10
**imprisonment** [2] - 68:2
**IN** [1] - 1:1
**inaccurate** [2] - 86:18, 86:21
**inch** [1] - 45:22
**incidentally** [1] - 25:10
**include** [1] - 43:9
**including** [2] - 16:5, 18:16
**inconsistent** [1] - 93:17
**independent** [2] - 17:2, 25:3
**INDEX** [1] - 96:1
**indicate** [2] - 24:21, 43:13
**indicated** [7] - 10:6, 26:7, 42:24, 43:20, 44:24, 74:7, 91:7
**indication** [1] - 25:22
**indictment** [4] - 52:25, 53:1, 53:8, 74:14
**individual** [6] - 23:10, 48:1, 51:15, 54:15, 55:10, 56:19
**individuals** [2] - 92:25, 93:3
**indulgence** [6] - 9:23, 16:18, 28:8, 29:20, 35:11, 39:3
**information** [11] - 3:12, 3:17, 7:23, 10:6, 10:20, 12:12, 12:13, 60:14, 83:11, 85:3
**informed** [1] - 93:7
**inside** [5] - 21:22, 32:8, 32:22, 32:24, 34:18
**insinuation** [1] - 88:24
**inspect** [1] - 28:18
**instruct** [1] - 53:2, 53:21, 53:22

**instructed** [1] - 29:15
**integrity** [1] - 25:8
**intent** [1] - 65:10
**intentionally** [2] - 25:10, 94:8
**interactions** [1] - 8:17
**interest** [1] - 62:1
**interested** [1] - 62:3
**interesting** [1] - 92:14
**Internet** [1] - 95:1
**interpretation** [1] - 44:22
**intersection** [1] - 5:4
**introduced** [1] - 55:5
**investigated** [1] - 11:10
**investigating** [1] - 27:19
**investigation** [7] - 10:11, 10:16, 13:11, 27:20, 27:22, 28:15, 31:2
**investigations** [2] - 15:13, 28:14
**investigator** [1] - 15:14
**involved** [12] - 15:20, 27:22, 28:10, 28:14, 29:8, 31:2, 52:12, 81:1, 81:24, 82:1, 82:10, 85:11
**involvement** [4] - 16:20, 65:16, 69:24, 80:23
**involving** [1] - 82:2
**item** [6] - 9:6, 22:1, 22:13, 33:5, 44:18, 44:19
**items** [12] - 18:16, 21:17, 21:20, 21:21, 24:6, 26:9, 26:12, 31:1, 31:8, 31:9, 31:11, 36:25
**itself** [8] - 19:23, 24:3, 26:3, 26:11, 26:18, 27:5, 28:16, 29:8

## J

**jacket** [2] - 45:23, 45:24
**jacketed** [3] - 33:25, 34:24
**jail** [12] - 55:8, 55:24, 57:17, 61:14, 61:17, 64:14, 68:6, 76:1, 76:24, 77:1, 77:11, 80:11
**JAMES** [3] - 1:6, 30:18, 96:7
**James** [12] - 29:25, 58:24, 59:1, 59:3, 59:11, 59:15, 90:3, 90:18, 92:8, 92:23, 93:5, 97:4
**January** [8] - 3:11, 11:7, 11:17, 15:24, 18:19, 19:17, 22:20, 36:24

**Jemmison** [9] - 3:15, 5:7, 31:3, 32:6, 40:12, 41:5, 41:8, 84:13, 85:4
**Jemmison's** [6] - 31:4, 34:3, 34:23, 35:5, 41:11, 42:3
**JFM-06-0309** [2] - 1:6, 97:5
**job** [1] - 48:14
**John** [2] - 80:9, 83:22
**Jonathan** [1] - 1:17
**Joseph** [1] - 1:19
**Joshua** [1] - 87:15
**judge** [1] - 60:6, 60:10, 60:14, 60:15, 67:16, 73:7, 74:19, 75:11, 75:12, 86:22, 86:23
**Judge** [31] - 1:12, 2:6, 2:13, 30:11, 45:18, 52:17, 52:20, 53:17, 53:22, 54:11, 54:17, 58:2, 61:21, 62:8, 63:5, 67:4, 71:4, 73:19, 73:20, 75:5, 77:9, 79:5, 79:9, 86:16, 86:18, 88:18, 91:15, 91:19, 93:18, 93:23, 94:10
**judge's** [3] - 74:4, 74:7, 74:9
**judicial** [1] - 87:2
**jumping** [1] - 78:2
**junkie** [6] - 48:25, 49:2, 49:3, 49:4, 49:6, 53:13
**Junkies** [1] - 51:14
**Jurors** [2] - 2:16, 46:9
**Jury** [1] - 1:13, 2:15, 46:8
**jury** [22] - 2:2, 2:7, 2:9, 6:10, 7:22, 19:15, 21:20, 37:7, 42:23, 45:4, 46:7, 48:10, 49:2, 49:20, 50:18, 53:15, 53:21, 53:23, 54:4, 68:8, 86:24, 93:15
**Justin** [1] - 1:20

## K

**K-9** [4] - 13:25, 14:2, 14:14, 14:16
**KASUMBA** [3] - 17:21, 18:2, 96:5
**Kasumba** [1] - 18:1
**keep** [4] - 30:23, 48:17, 70:25, 76:11
**keeping** [1] - 82:19
**kept** [3] - 23:18, 49:14, 57:12
**kill** [5] - 55:14, 56:6,

56:8, 70:2, 93:7
**Killed** [1] - 69:7
**killed** [9] - 57:22, 57:23, 69:5, 69:13, 69:15, 70:16, 71:6, 79:20
**killing** [1] - 92:6
**kilograms** [1] - 65:11
**kind** [7] - 5:23, 26:2, 29:15, 44:23, 45:7, 50:9, 67:23
**kinds** [1] - 53:19
**knowing** [1] - 14:13
**knowingly** [2] - 92:3, 92:5
**knowledge** [3] - 23:7, 69:17, 83:8
**known** [5] - 8:5, 19:20, 80:2, 80:4
**Kwame** [1] - 1:15

## L

**L-O-V-E** [1] - 46:20
**L1** [2] - 33:17, 33:19
**Lab** [5] - 9:2, 13:8, 16:17, 18:10, 21:2
**lab** [1] - 9:8
**label** [2] - 31:13, 31:18
**labor** [1] - 33:16
**laboratory** [2] - 21:9, 31:1
**Ladies** [1] - 61:23
**ladies** [13] - 3:21, 3:24, 6:10, 7:22, 8:1, 18:7, 19:14, 21:19, 34:16, 37:7, 42:22, 45:4, 92:14
**land** [1] - 37:6
**lands** [4] - 31:21, 35:3, 37:8, 41:12
**Lands** [1] - 37:16
**large** [1] - 38:13
**largely** [1] - 38:8
**Last** [1] - 18:2
**last** [9] - 31:14, 35:2, 37:7, 40:6, 40:10, 40:11, 40:21, 41:19, 79:3
**latent** [4] - 21:25, 26:9, 27:24, 28:4
**latents** [1] - 28:2
**law** [12] - 3:12, 3:17, 10:7, 10:19, 17:5, 66:11, 76:4, 76:14, 76:17, 76:22, 76:24, 77:1
**lawyer** [3] - 62:4, 64:4, 65:8
**lawyers** [1] - 62:17
**lead** [1] - 62:1
**leading** [2] - 6:23, 41:24
**leaf** [1] - 24:2

**least** [5] - 12:17, 23:6, 35:6, 70:2, 74:13
**leave** [5] - 2:4, 27:14, 44:14, 46:1, 63:20
**leaves** [5] - 11:21, 12:1, 12:4, 23:11
**Leaves** [1] - 12:6
**led** [1] - 10:7
**left** [4] - 24:10, 35:3, 37:8, 94:12
**length** [1] - 35:1
**less** [1] - 77:19
**letter** [4] - 62:17, 62:20, 63:1, 63:6
**letting** [1] - 51:12
**level** [1] - 75:16
**life** [8] - 67:13, 67:16, 68:1, 68:2, 68:6, 75:17, 87:24, 89:15
**lifted** [1] - 24:14
**likely** [1] - 64:20
**line** [12] - 4:12, 4:19, 5:16, 5:18, 5:19, 6:14, 9:8, 11:16, 41:22, 42:2, 42:5, 62:24
**listen** [1] - 87:6
**literally** [1] - 11:23
**Literally** [1] - 23:23
**live** [13] - 9:15, 21:13, 21:24, 22:6, 26:14, 33:3, 33:5, 33:13, 33:17, 33:20, 33:25, 34:18, 95:2
**lives** [1] - 95:2
**load** [2] - 27:4, 34:25
**loaded** [2] - 9:14, 33:25
**loads** [1] - 26:22
**local** [2] - 61:24, 86:13
**locate** [5] - 5:1, 14:5, 14:14, 92:11, 92:18
**located** [12] - 3:13, 3:25, 7:12, 8:22, 8:23, 9:7, 10:21, 12:18, 13:3, 16:11, 19:16, 29:18
**locating** [1] - 14:3, 14:7, 92:25
**location** [15] - 3:18, 5:6, 7:4, 7:17, 7:24, 10:24, 12:8, 12:14, 16:9, 18:18, 18:22, 23:4, 51:24, 56:14, 93:6
**locked** [3] - 52:7, 78:22
**locker** [1] - 36:9
**Lombard** [1] - 1:23
**look** [13] - 10:15, 16:24, 19:2, 19:4, 22:18, 22:19, 35:20, 36:18, 36:25, 39:25, 40:4, 44:1, 72:20
**looked** [4] - 8:8, 8:21, 40:23, 44:19
**looking** [20] - 6:2, 6:7,

6:12, 6:18, 6:21, 7:2, 7:7, 7:11, 7:12, 7:15, 11:1, 11:14, 16:12, 43:4, 44:20, 44:23, 45:9, 68:1, 68:6, 74:14
**Looks** [1] - 25:22
**looks** [2] - 33:7, 36:12
**lose** [1] - 68:6
**lost** [1] - 68:1
**loud** [1] - 73:1
**Love** [12] - 45:18, 46:12, 46:13, 46:20, 46:24, 47:1, 47:3, 47:10, 54:14, 77:7, 80:20
**LOVE** [2] - 46:15, 96:11
**lungs** [1] - 78:10
**lure** [1] - 57:4
**lying** [1] - 70:5

## M

**M-U-H-A-N-G-I** [1] - 18:3
**ma'am** [29] - 3:16, 4:3, 4:5, 4:10, 5:5, 5:11, 5:17, 5:25, 6:17, 9:12, 9:25, 31:6, 31:15, 31:17, 32:7, 32:9, 32:18, 33:10, 33:14, 33:17, 33:21, 34:4, 34:15, 35:8, 35:10, 41:21, 42:10, 42:13, 42:17
**Ma-Ma** [2] - 59:8, 92:3
**Mad** [2] - 48:19, 48:20
**mad** [2] - 53:12, 56:23
**magnum** [5] - 33:25, 37:4, 37:21, 38:11, 38:24
**magnums** [2] - 38:17, 38:22
**mail** [1] - 30:15
**maintain** [1] - 25:8
**Mal** [2] - 92:3
**Mal-Mal** [1] - 92:3
**maliciously** [1] - 92:7
**man** [1] - 93:19
**mandatory** [5] - 67:11, 73:12, 74:14, 74:17, 87:23
**MANLEY** [43] - 46:11, 46:23, 53:9, 53:22, 54:3, 54:6, 54:10, 54:13, 63:4, 63:6, 70:6, 70:21, 71:2, 71:7, 71:12, 72:5, 73:20, 74:2, 74:9, 75:4, 75:6, 77:9, 78:5, 79:2, 79:7, 79:14, 80:4, 80:15, 83:1, 85:25, 86:9, 86:12, 86:18, 86:22, 88:9, 88:18, 88:23, 89:3,

89:11, 91:5, 94:17, 94:21, 96:11
**Manley** [6] - 1:15, 53:18, 61:21, 83:21, 83:24, 91:11
**manner** [1] - 97:8
**manufacturer** [1] - 37:20
**manufacturers** [1] - 37:12
**manufacturing** [3] - 37:9, 38:14, 43:6
**map** [1] - 3:22
**Mar** [2] - 92:3
**Mar-Mar** [1] - 92:3
**Marjorie** [1] - 17:8
**mark** [1] - 58:3
**Mark** [1] - 58:4
**marked** [5] - 5:12, 9:5, 31:7
**marking** [3] - 38:25, 44:15
**markings** [15] - 37:16, 37:19, 37:24, 38:3, 38:8, 38:14, 38:22, 41:12, 42:6, 43:2, 43:3, 43:5, 44:10, 44:25
**marks** [7] - 35:2, 35:3, 35:4, 35:9, 37:8, 43:6, 43:7
**Mary** [3] - 1:22, 97:3, 97:14
**MARYLAND** [1] - 1:1
**Maryland** [4] - 1:11, 1:24, 3:14, 38:19
**match** [3] - 31:22, 31:23, 43:9
**matched** [1] - 41:5
**math** [2] - 66:5, 66:11
**matter** [4] - 69:21, 89:7, 97:4, 97:8
**Maurice** [1] - 51:15
**Maurice's** [3] - 51:17, 51:19, 51:21
**McClean** [9] - 48:6, 52:22, 82:4, 82:6, 82:11, 82:14, 82:17, 82:19, 82:25
**mean** [12] - 14:9, 16:9, 24:1, 24:3, 31:23, 51:9, 63:15, 67:23, 69:3, 76:21, 87:24, 91:4
**meaning** [1] - 26:14
**means** [1] - 33:11
**measurements** [2] - 44:23, 45:7
**measuring** [1] - 45:9
**meet** [1] - 58:12
**meeting** [1] - 53:12
**Mel** [1] - 55:6

**Melvin** [40] - 47:12, 48:1, 48:7, 48:11, 48:13, 48:18, 48:24, 49:4, 49:6, 49:8, 49:10, 49:11, 49:13, 49:23, 50:3, 50:4, 50:6, 51:1, 51:2, 51:6, 51:12, 52:21, 52:24, 53:11, 53:12, 53:13, 53:25, 54:2, 54:17, 54:20, 54:25, 60:22, 81:13, 81:19, 81:20, 82:2, 82:20, 83:10, 83:17
**Melvin's** [4] - 47:25, 49:17, 50:11, 50:21, 51:17, 52:1, 52:15, 53:16
**members** [1] - 8:23
**memory** [4] - 16:24, 90:22, 91:8
**met** [1] - 55:24
**metal** [2] - 22:19, 37:13
**Miami** [16] - 54:15, 54:18, 55:1, 55:5, 55:7, 55:9, 55:12, 55:24, 56:2, 56:5, 56:8, 56:18, 56:21, 57:1, 57:20
**Miami's** [1] - 57:24
**Michael** [2] - 79:18, 79:19
**micrographs** [2] - 42:23, 45:3
**microphone** [2] - 17:24, 46:18
**microscope** [4] - 41:14, 41:18, 41:20, 42:24
**microscopic** [4] - 41:12, 41:22, 42:2, 43:7
**middle** [1] - 78:10
**might** [10] - 10:20, 12:9, 27:14, 38:25, 43:16, 44:8, 44:14, 44:15, 72:16
**mind** [1] - 39:21
**mine** [1] - 27:21
**minimum** [3] - 67:11, 74:14, 74:18
**minute** [3] - 50:14, 58:2
**minutes** [5] - 8:21, 12:21, 12:25, 13:2, 92:9
**misstates** [1] - 78:5
**Mo** [2] - 92:2
**Mo-Mo** [1] - 92:2
**Mobile** [2] - 18:10, 18:14
**moment** [5] - 35:20, 39:5, 47:11, 67:4, 77:8
**Monday** [1] - 94:22, 95:3
**money** [10] - 60:23, 61:3, 82:13, 82:16, 82:17, 82:20, 82:21, 83:9, 83:12, 83:13

**month** [2] - 81:23, 83:7
**months** [4] - 13:20, 65:3, 67:1, 80:21
**Moore** [1] - 78:20
**morning** [3] - 45:21, 94:22, 95:3
**most** [1] - 8:17
**Most** [2] - 34:24, 36:5
**mother** [6] - 57:10, 69:4, 70:13, 70:15, 70:20, 71:5
**motion** [4] - 74:18, 75:18, 88:3, 88:4
**Motz** [1] - 1:12
**mouth** [1] - 57:24
**move** [1] - 92:12
**moved** [1] - 20:11
**moving** [2] - 54:10, 73:20
**MR** [117] - 2:3, 2:6, 2:11, 2:13, 10:3, 22:25, 30:1, 30:5, 30:8, 30:11, 35:15, 39:5, 39:8, 41:24, 42:21, 45:24, 46:11, 46:23, 52:17, 52:20, 53:9, 53:17, 53:22, 54:3, 54:6, 54:8, 54:10, 54:11, 54:13, 54:24, 61:21, 62:8, 62:14, 63:4, 63:6, 63:9, 70:6, 70:8, 70:21, 71:2, 71:7, 71:12, 72:5, 72:7, 73:18, 73:20, 73:23, 74:2, 74:7, 74:9, 74:11, 75:4, 75:6, 75:9, 77:9, 78:5, 78:8, 79:2, 79:4, 79:7, 79:9, 79:14, 79:17, 79:22, 79:24, 80:2, 80:4, 80:6, 80:15, 80:17, 80:19, 83:1, 85:25, 86:9, 86:12, 86:16, 86:18, 86:20, 86:22, 87:1, 87:5, 87:8, 87:11, 88:9, 88:11, 88:16, 88:18, 88:19, 88:21, 88:23, 89:3, 89:4, 89:11, 89:13, 91:5, 91:11, 91:15, 91:19, 91:25, 93:18, 93:23, 94:1, 94:3, 94:7, 94:10, 94:14, 94:16, 94:17, 94:21, 96:4, 96:6, 96:8, 96:9, 96:10, 96:11, 96:12, 96:12
**MS** [19] - 2:18, 3:5, 15:16, 17:12, 17:14, 17:17, 18:6, 29:23, 29:25, 30:22, 41:3, 42:1, 45:15, 45:18, 46:2, 96:4, 96:6, 96:8, 96:9
**mud** [2] - 36:2, 36:4

**Muhangi** [3] - 17:18, 18:1, 18:18
**MUHANGI** [2] - 17:21, 96:5
**multiple** [1] - 91:9
**murder** [3] - 31:3, 39:16, 58:24, 70:12, 84:13, 86:5, 89:19, 90:3, 92:6
**murdered** [3] - 5:7, 85:5, 92:8
**MURTHA** [12] - 10:3, 22:25, 30:1, 30:5, 30:8, 35:15, 41:24, 42:21, 96:4, 96:6, 96:8, 96:10
**Murtha** [6] - 1:19, 10:1, 22:23, 35:13, 41:18, 42:19
**Murtha's** [1] - 41:7
**Muslim** [2] - 55:2, 55:4
**mutilated** [1] - 38:4
**mutilation** [2] - 32:2, 32:3

## N

**N-I-C-K-O-L-E-S** [1] - 3:1
**name** [28] - 2:24, 2:25, 17:24, 18:1, 18:2, 19:23, 46:18, 46:19, 47:16, 47:19, 47:22, 48:1, 48:5, 50:12, 51:15, 54:15, 55:10, 56:19, 58:9, 59:5, 68:14, 68:15, 77:23, 84:18, 90:24
**named** [2] - 84:15, 87:15
**narcotics** [1] - 14:5
**Narcotics** [1] - 15:11
**nature** [3] - 11:21, 14:6, 41:24
**near** [1] - 19:20
**need** [3] - 2:4, 46:18, 64:10
**needed** [3] - 25:7, 45:19, 91:7
**needles** [1] - 16:5
**needs** [1] - 54:7
**negative** [1] - 40:23
**negatively** [1] - 82:24
**neighborhood** [3] - 4:23, 15:5, 51:3
**neighborhoods** [1] - 95:1
**never** [10] - 12:16, 14:12, 29:15, 45:6, 65:16, 76:9, 78:14, 83:5, 85:15, 86:7

**new** [1] - 74:13
**Next** [3] - 29:24, 45:14, 46:10
**next** [1] - 92:11
**nickname** [3] - 59:7, 59:9, 68:11
**Nickname** [1] - 68:11
**Nickoles** [7] - 2:19, 2:25, 3:11, 10:4, 16:19, 30:13, 30:15
**NICKOLES** [2] - 2:21, 96:3
**Nitty** [5] - 56:6, 64:23, 65:2, 65:5, 65:6, 84:15
**Nitty's** [1] - 84:18
**NO** [1] - 1:5
**nobody** [1] - 71:22
**none** [1] - 75:18
**NORTHERN** [1] - 1:2
**northwest** [1] - 85:7
**nose** [1] - 76:11
**notebook** [1] - 64:15
**nothing** [4] - 13:21, 13:23, 56:24, 71:22
**Nothing** [5] - 23:16, 23:17, 25:7, 61:19, 72:2
**notice** [2] - 86:7, 87:2
**noticeable** [1] - 26:4
**noting** [1] - 44:24
**notion** [1] - 53:7
**Novell** [1] - 78:20
**November** [2] - 63:24, 63:25
**Number** [2] - 31:3, 40:10
**number** [10] - 7:4, 19:5, 22:14, 28:10, 31:10, 40:5, 40:7, 60:22, 67:16, 72:24
**Number(s** [1] - 97:5
**numbers** [8] - 31:14, 39:19, 40:1, 40:4, 40:6, 40:12, 40:16, 40:23

## O

**oath** [1] - 30:19
**object** [6] - 30:9, 45:20, 53:18, 64:5, 88:23, 91:5
**Objection** [18] - 15:16, 41:24, 63:4, 70:6, 70:21, 71:2, 71:7, 71:12, 72:5, 75:4, 78:5, 79:7, 80:15, 83:1, 85:25, 86:9, 86:12, 88:9
**objection** [8] - 30:7, 30:10, 30:20, 52:20, 75:5, 75:6, 75:8, 79:12
**objective** [1] - 45:8

**observed** [4] - 12:23, 13:1, 19:15, 30:12
**obtain** [4] - 21:25, 26:18, 28:11, 29:15
**obtaining** [1] - 28:11
**Obviously** [1] - 8:11
**obviously** [5] - 5:10, 11:20, 62:3, 75:19, 75:22
**occasions** [1] - 80:11
**occurred** [3] - 8:13, 11:10, 17:3
**October** [7] - 62:21, 62:25, 63:17, 81:14, 81:16, 90:22, 92:1
**OF** [2] - 1:1, 1:4
**offense** [1] - 85:20, 87:19, 89:24
**offer** [1] - 63:17
**Office** [4] - 71:21, 73:8, 74:18, 75:14
**office** [1] - 99:25
**officer** [3] - 3:3, 3:6, 27:19
**Officer** [2] - 30:13, 30:15
**officers** [1] - 17:5
**official** [1] - 97:7
**Official** [1] - 97:15
**old** [5] - 5:25, 47:1, 50:9, 50:10
**older** [1] - 87:10
**once** [2] - 13:12, 16:15
**One** [2] - 85:18, 91:6
**one** [47] - 2:4, 9:15, 16:9, 16:10, 17:8, 17:9, 20:18, 21:13, 21:24, 23:24, 24:13, 26:14, 26:25, 29:3, 33:3, 33:5, 33:13, 33:17, 35:6, 38:24, 40:6, 40:10, 44:8, 52:22, 57:10, 61:25, 62:2, 62:4, 68:4, 69:9, 69:17, 69:18, 71:8, 71:23, 73:18, 74:21, 75:5, 77:3, 77:6, 78:11, 83:18, 83:19, 91:6, 91:17, 91:22
**one's** [1] - 40:15
**ones** [1] - 36:19
**open** [1] - 66:25
**opening** [3] - 4:12, 6:16, 8:6
**opens** [1] - 8:9
**operable** [1] - 42:16
**opinion** [3] - 35:6, 41:10, 42:11
**opportunity** [1] - 15:14
**order** [9] - 20:7, 20:22, 23:23, 25:5, 28:12, 30:24, 64:10, 92:11,

92:18
**organization** [20] - 47:12, 47:25, 49:15, 49:18, 50:15, 51:17, 51:22, 52:2, 52:16, 52:21, 52:24, 53:6, 53:10, 53:20, 54:1, 92:10, 92:24, 93:2, 93:4
**original** [1] - 7:13
**originally** [1] - 36:17
**ought** [1] - 94:20
**outs** [1] - 51:6
**overhear** [1] - 47:25
**Overruled** [1] - 41:25
**own** [1] - 95:2

## P

**p.m** [1] - 2:1
**pack's** [1] - 66:7
**package** [1] - 20:19
**packaged** [1] - 20:16
**packaging** [2] - 21:4, 22:14
**packs** [4] - 66:10, 66:12, 66:13, 66:23
**PAGE** [1] - 96:3
**page** [1] - 72:19
**pages** [1] - 97:9
**paid** [2] - 64:23, 84:16
**pair** [1] - 24:2
**paperwork** [1] - 39:17
**Paragraph** [1] - 72:19
**paragraph** [1] - 92:11
**paragraphs** [1] - 91:9
**paraphernalia** [1] - 16:7
**pardon** [1] - 78:6
**park** [20] - 4:1, 4:8, 4:19, 4:23, 5:10, 5:16, 6:13, 6:23, 8:5, 12:14, 12:15, 12:16, 12:22, 16:1, 16:5, 16:8, 19:23, 20:2, 23:4
**Park** [8] - 4:1, 6:4, 9:9, 15:18, 19:20, 19:21, 56:13, 84:21
**Parker** [7] - 59:6, 91:1, 92:2, 92:19, 92:23, 92:25, 93:6, 93:7
**Part** [2] - 38:16
**part** [12] - 18:13, 28:19, 38:13, 47:5, 58:16, 59:14, 59:23, 72:13, 76:10, 88:14, 90:7, 93:1
**participate** [1] - 78:18
**particular** [8] - 40:7, 47:16, 47:19, 49:24, 56:14, 60:24, 87:3, 87:23
**particularly** [1] - 22:19

**passed** [2] - 14:17, 22:11
**past** [3] - 15:7, 69:22, 69:23
**path** [11] - 5:19, 6:3, 6:21, 7:21, 7:22, 8:5, 14:18, 14:20, 16:9, 20:6
**Pause** [1] - 39:6
**pay** [1] - 56:6
**pen** [2] - 4:11, 6:3
**penalty** [6] - 88:1, 88:2, 88:5, 88:25, 89:8, 89:9
**people** [18] - 4:22, 8:17, 15:20, 16:4, 17:8, 29:2, 50:23, 51:13, 51:14, 52:23, 53:5, 54:10, 62:11, 70:25, 76:8, 82:9
**period** [6] - 14:17, 15:24, 81:17, 81:23, 82:1, 83:8
**person** [14] - 10:19, 17:9, 26:22, 26:25, 27:3, 27:14, 28:24, 29:1, 36:12, 62:2, 64:5, 68:25, 69:1, 92:5
**personal** [2] - 80:23, 80:25
**personally** [1] - 11:12
**persons** [1] - 14:5
**phone** [3] - 76:24, 77:1, 77:12
**photo** [3] - 42:23, 45:3, 69:2
**photograph** [17] - 5:13, 6:5, 6:22, 7:3, 7:12, 7:16, 9:3, 19:6, 19:8, 19:14, 20:9, 21:15, 23:3, 33:5, 33:7, 41:23, 42:2
**photographed** [2] - 21:4, 42:5
**photographing** [1] - 24:19
**photographs** [4] - 5:2, 19:1, 20:13
**photos** [2] - 6:9, 30:12
**phrase** [1] - 85:4
**physical** [2] - 14:3, 28:11
**physically** [1] - 16:15
**pick** [1] - 26:25
**picked** [4] - 20:15, 20:18, 68:25, 69:1
**picture** [14] - 13:4, 21:8, 21:11, 23:6, 23:9, 23:12, 23:25, 24:4, 24:8, 24:9, 24:13, 24:22, 25:3, 25:6
**pictures** [2] - 11:6, 11:17
**piece** [1] - 7:9
**pieces** [1] - 33:22

**pistol** [4] - 25:5, 26:1, 57:7, 57:8
**pistol-whipped** [2] - 57:7, 57:8
**placard** [3] - 7:9, 19:11, 19:12
**placards** [1] - 7:8
**place** [1] - 83:19
**placed** [1] - 36:6
**played** [1] - 57:11
**players** [1] - 52:12
**plea** [39] - 47:5, 47:10, 58:8, 58:16, 59:14, 59:23, 62:2, 62:15, 62:23, 63:10, 64:2, 65:10, 68:5, 71:17, 72:12, 72:14, 72:17, 76:7, 76:14, 76:18, 85:17, 87:22, 88:10, 88:12, 88:13, 88:14, 88:15, 88:16, 88:17, 88:20, 88:21, 89:7, 90:8, 90:12, 90:15, 91:6, 91:12, 91:24
**plead** [5] - 47:3, 58:16, 58:20, 64:11, 85:18
**pleaded** [1] - 75:16
**pleading** [1] - 58:19
**pleased** [1] - 80:7
**pled** [7] - 59:20, 65:10, 67:7, 68:23, 85:18, 85:21, 89:24
**plugs** [1] - 53:20
**point** [10] - 32:17, 34:1, 62:23, 79:17, 88:6, 88:7, 88:17, 90:18, 93:18, 94:4
**pointed** [2] - 59:15, 69:23, 70:1
**Pointing** [1] - 89:21
**pointing** [1] - 59:17
**points** [1] - 54:21
**police** [4] - 3:6, 14:10, 22:8, 77:18
**Police** [8] - 3:1, 8:24, 9:1, 9:20, 13:8, 13:24, 18:9, 22:8
**pop** [1] - 66:17
**population** [2] - 38:18, 39:1
**portrays** [1] - 53:7
**position** [3] - 20:10, 22:20, 23:24
**possess** [1] - 92:3
**possessed** [2] - 35:9, 93:2
**possession** [2] - 38:18, 58:20
**possible** [6] - 75:20, 86:4, 87:3, 87:23, 87:24, 88:8

**Possibly** [1] - 17:8
**possibly** [4] - 3:13, 3:14, 89:15, 89:17
**potential** [4] - 10:11, 17:24, 28:16, 29:17
**potentially** [1] - 10:12
**preceding** [1] - 15:24
**prefer** [1] - 54:9
**premeditation** [1] - 92:8
**prepare** [1] - 16:21
**prepared** [4] - 16:19, 24:17, 37:3, 43:12
**present** [4] - 2:16, 17:5, 46:9, 60:18
**press** [1] - 27:4
**pretty** [1] - 29:13
**prevented** [1] - 34:14
**PREVIOUSLY** [1] - 30:18
**previously** [1] - 30:23
**print** [2] - 27:14, 27:24
**prints** [3] - 26:9, 26:18, 28:4
**procedure** [1] - 20:24
**proceedings** [2] - 97:4, 97:7
**Proceedings** [3] - 2:1, 39:6, 95:4
**process** [4] - 26:9, 28:3, 29:13, 37:9
**processed** [2] - 26:11, 26:17
**processing** [6] - 27:17, 27:23, 28:2, 28:9, 28:12, 29:9
**Proctor** [2] - 1:18, 61:20
**PROCTOR** [22] - 30:11, 61:21, 62:8, 62:14, 63:9, 70:8, 72:7, 73:18, 73:23, 74:7, 74:11, 75:9, 78:8, 79:4, 79:9, 79:17, 79:22, 79:24, 80:2, 80:6, 80:17, 96:12
**product** [2] - 51:10, 51:13
**projected** [1] - 44:13
**projectile** [5] - 35:4, 38:4, 41:5, 41:8, 43:17
**projectiles** [5] - 21:13, 33:1, 34:18, 35:4, 38:4
**Promised** [1] - 71:20
**promised** [8] - 71:22, 71:23, 71:24, 76:4, 76:10
**promises** [1] - 59:24
**properly** [1] - 85:4
**property** [2] - 31:10, 40:16
**prosecution's** [1] - 63:16
**prosecutor** [1] - 62:18

**protect** [2] - 93:1, 93:2
**provide** [2] - 30:15, 70:13
**provided** [1] - 10:6
**proximity** [1] - 15:3
**pull** [1] - 24:1
**pulled** [1] - 7:17
**purple** [1] - 54:23
**purpose** [2] - 91:14, 91:16
**purposes** [2] - 58:4, 86:17
**pursuant** [2] - 2:3, 60:5
**pushed** [1] - 27:15
**put** [12] - 6:11, 19:11, 20:18, 20:23, 26:23, 27:3, 45:5, 57:10, 73:24, 75:18, 81:22, 88:4
**puts** [1] - 36:9
**putting** [1] - 50:19

## Q

**Q-1** [1] - 33:17
**Q-1B** [9] - 31:18, 34:3, 34:6, 34:8, 34:10, 34:11, 34:16, 36:20, 41:16
**Q-2B** [9] - 31:18, 34:3, 34:7, 34:8, 34:16, 35:8, 36:20, 41:4, 41:16
**Q-L1** [2] - 33:17, 33:19
**Quantico** [7] - 4:3, 4:6, 5:3, 5:7, 5:10, 11:3, 85:9
**questioned** [1] - 31:16
**questions** [13] - 17:10, 17:14, 29:20, 35:13, 39:3, 40:25, 41:7, 41:19, 45:13, 53:21, 58:3, 80:7, 94:11
**quick** [1] - 8:15
**quickly** [1] - 45:15
**quite** [4] - 15:8, 16:3, 16:4, 28:10
**quota** [4] - 48:15, 48:16, 48:17, 53:12
**quote** [1] - 74:3

## R

**R.L** [1] - 58:9
**radio** [1] - 9:1
**raid** [1] - 81:14
**railroad** [6] - 4:13, 4:20, 4:25, 8:9, 16:10
**rainy** [1] - 41:16
**Raise** [2] - 2:20, 17:20
**raise** [1] - 46:13
**ran** [3] - 49:7, 69:22,

69:23
**Randy** [6] - 48:6, 82:4, 82:6, 82:11, 82:19, 82:25
**Rather** [2] - 30:5, 30:8
**reaction** [1] - 48:18
**read** [9] - 59:25, 72:18, 72:21, 72:25, 90:21, 91:4, 93:24, 94:24
**ready** [1] - 46:5
**real** [2] - 48:5, 84:18
**really** [4] - 45:10, 53:9, 62:4, 86:13
**rearraignment** [1] - 73:14
**reason** [4] - 10:15, 63:20, 88:24, 91:23
**reasons** [1] - 91:5
**receive** [1] - 3:12
**received** [6] - 7:23, 12:13, 30:25, 32:11, 83:9
**recently** [1] - 76:22
**Recess** [1] - 46:6
**recognize** [8] - 9:6, 19:5, 20:6, 22:13, 31:8, 54:15, 58:5
**recollection** [4] - 17:3, 25:3, 25:4, 72:16
**recommendation** [3] - 73:9, 73:15, 75:15
**record** [11] - 2:24, 17:25, 30:4, 45:17, 46:19, 52:19, 72:22, 73:11, 79:11, 93:14, 93:23
**recorded** [2] - 44:25, 97:3
**recover** [15] - 8:2, 9:3, 9:4, 12:23, 13:8, 13:19, 16:15, 19:9, 20:3, 20:7, 21:17, 27:13, 28:4, 28:5
**recovered** [20] - 7:5, 9:8, 9:19, 11:16, 16:5, 16:17, 17:6, 20:10, 22:16, 22:20, 24:11, 24:21, 25:23, 27:24, 28:25, 34:18, 36:12, 36:13, 41:5, 43:21
**recovering** [1] - 29:4
**recovers** [1] - 36:8
**recovery** [2] - 18:19, 30:12
**RECROSS** [2] - 42:20, 96:10
**redirect** [1] - 94:17
**REDIRECT** [2] - 41:2, 96:9
**refer** [1] - 53:3, 90:3
**reference** [4] - 40:13, 52:21, 52:23, 53:6
**refresh** [2] - 16:24,

72:16
**refreshed** [1] - 91:8
**refreshes** [1] - 90:22
**refused** [1] - 77:25
**regard** [21] - 24:18, 25:15, 26:10, 27:17, 28:2, 28:9, 28:25, 38:3, 38:7, 38:21, 45:7, 45:9, 52:13, 55:18, 61:3, 75:23, 83:11, 84:13, 85:17, 86:19, 89:19
**Regarding** [1] - 39:1
**regarding** [2] - 19:16, 40:18
**regards** [2] - 12:15, 29:4
**regularly** [1] - 15:19
**Reisterstown** [5] - 4, 11:3, 14:21, 14:22, 15:3, 16:1, 56:13, 85:9
**reject** [3] - 62:22, 63:2, 68:5
**rejected** [1] - 63:7
**relate** [1] - 43:3
**related** [1] - 3:14
**relation** [4] - 70:12, 80:9, 85:19
**relationship** [2] - 10:25, 79:24
**relatively** [2] - 8:15, 9:10
**relevance** [1] - 15:16
**remain** [2] - 32:22, 32:24
**remember** [11] - 36:4, 50:8, 62:18, 63:23, 68:13, 70:23, 72:13, 72:15, 77:15, 77:16, 90:12
**Remind** [1] - 73:12
**remnants** [2] - 12:3, 29:17
**removal** [1] - 24:19
**remove** [3] - 24:5, 24:10, 25:10
**removed** [8] - 13:12, 21:8, 21:12, 23:19, 26:3, 26:12, 31:4, 34:3
**removing** [1] - 23:21
**rendered** [1] - 73:6
**repeated** [3] - 52:20, 52:23, 53:6
**rephrase** [3] - 10:13, 73:21, 73:23
**Rephrase** [2] - 72:6, 78:6
**replete** [1] - 71:15
**report** [13] - 16:19, 16:21, 16:22, 24:17, 26:5, 30:13, 37:3, 39:20,

39:24, 40:13, 40:18, 43:12, 45:1
**Reported** [1] - 1:22
**Reporter** [1] - 97:15
**reporter** [1] - 78:20
**REPORTER'S** [1] - 97:1
**reports** [1] - 30:15
**research** [1] - 94:25
**respect** [1] - 74:13
**respond** [3] - 9:2, 9:3, 18:15
**response** [1] - 26:9
**responsibilities** [1] - 18:13
**responsibility** [1] - 76:17
**responsible** [1] - 27:19
**result** [4] - 16:20, 29:7, 43:12, 94:6
**resulting** [1] - 58:22, 85:20, 90:1
**retaliate** [1] - 92:9, 93:3
**retrieval** [1] - 10:8
**retrieve** [1] - 20:22
**retrieved** [2] - 9:11, 9:13
**retrieving** [1] - 8:24, 16:20
**reviewing** [1] - 44:19
**revolver** [9] - 25:19, 26:22, 27:4, 27:5, 32:15, 32:19, 32:21, 43:3, 56:10
**Revolver** [2] - 56:11
**Rice** [1] - 56:7
**Ricky** [1] - 78:20
**rid** [1] - 8:15
**ridden** [2] - 50:3, 50:6
**ridiculous** [1] - 93:21
**riding** [2] - 50:25, 51:6
**right-hand** [4] - 4:21, 4:25, 6:5, 8:20
**ring** [1] - 68:13
**Road** [7] - 5:4, 11:3, 14:21, 14:22, 15:4, 16:1, 85:9
**robbed** [3] - 92:10, 92:24, 93:3
**robbery** [1] - 92:18
**role** [8] - 57:11, 68:20, 68:21, 69:21, 74:4, 74:7, 74:9, 89:20
**Room** [1] - 1:23
**rough** [1] - 8:21
**roughly** [1] - 53:10
**round** [6] - 21:13, 21:24, 22:6, 26:15, 33:13, 34:18
**rounds** [2] - 21:19, 34:23
**routine** [1] - 66:17

**RPR** [1] - 1:22
**rule** [6] - 86:14, 91:14, 91:17, 91:18, 91:22, 91:23
**ruled** [1] - 91:20
**rules** [1] - 61:24
**run** [1] - 69:22
**rust** [2] - 43:10, 43:13

## S

**Sad** [1] - 48:18
**sale** [1] - 83:9
**sales** [3] - 82:13, 82:16, 82:20
**salon** [1] - 70:16
**sample** [2] - 29:6, 29:16
**samples** [3] - 13:17, 28:11, 28:12
**sat** [2] - 64:6, 64:15
**SAUNDERS** [3] - 2:11, 45:24, 94:14
**Saunders** [2] - 1:20, 94:13
**save** [4] - 61:24, 62:10, 62:12, 76:1
**saving** [2] - 62:6, 62:9
**saw** [4] - 19:16, 48:24, 49:4, 49:8
**scared** [1] - 66:11
**scene** [4] - 12:22, 29:2, 36:7, 36:8
**scenes** [1] - 18:15
**scheduled** [1] - 63:23
**school** [1] - 66:11
**scissors** [1] - 24:2
**scorpion** [1] - 80:13
**scraped** [1] - 25:4
**screen** [3] - 6:11, 19:3, 42:24
**sealed** [1] - 72:17
**search** [2] - 8:20, 29:3
**searching** [2] - 13:2, 14:13
**seated** [5] - 2:16, 2:23, 17:23, 46:10, 46:17
**second** [5] - 18:2, 72:19, 85:21, 86:1, 93:10
**section** [2] - 4:7, 41:19
**Section** [2] - 87:19, 92:6
**secure** [1] - 36:6
**see** [26] - 2:4, 4:13, 5:3, 5:23, 5:24, 6:21, 7:18, 11:23, 13:4, 18:22, 19:3, 19:5, 19:24, 24:8, 24:10, 28:16, 28:18, 29:6, 36:18, 40:1, 40:14, 40:15, 50:14, 55:7,

90:21, 95:2
**See** [3] - 57:9, 72:24, 94:22
**seek** [1] - 10:7
**select** [1] - 61:25
**sell** [5] - 47:14, 52:3, 52:5, 57:21, 60:23
**selling** [14] - 52:13, 52:23, 65:16, 65:24, 66:15, 82:2, 82:6, 82:8, 82:10, 83:3, 83:4, 84:21, 84:22, 84:25
**semi** [2] - 33:25, 34:24
**semi-jacketed** [2] - 33:25, 34:24
**sent** [2] - 20:16, 20:19
**sentence** [10] - 60:11, 60:15, 86:5, 86:8, 86:11, 87:3, 87:24, 88:8, 89:15
**sentenced** [2] - 60:6, 89:14
**sentencing** [2] - 67:19, 67:23
**sentencing's** [1] - 75:12
**separate** [1] - 80:11
**September** [4] - 11:10, 36:22, 44:1, 68:10
**Sergeant** [1] - 17:7
**series** [1] - 19:1
**SESSION** [1] - 1:10
**set** [2] - 55:2, 55:4
**Seven** [1] - 67:4
**Several** [1] - 93:8
**several** [4] - 8:4, 40:22, 81:23, 83:7
**SH-21** [3] - 58:5, 61:22
**Shamrock** [5] - 56:3, 56:5, 56:7, 56:8, 56:16
**Shannon** [4] - 3:15, 5:7, 31:3, 32:6
**share** [1] - 60:14
**Shearer** [1] - 2:4
**shells** [1] - 32:22
**shit** [1] - 78:11
**shoot** [6] - 59:1, 59:11, 59:18, 84:1, 93:1, 93:6
**shooter** [2] - 69:17, 69:18
**shooting** [16] - 10:21, 10:24, 11:9, 55:9, 55:12, 55:16, 56:3, 56:5, 56:12, 56:18, 56:21, 68:23, 78:12, 78:18, 80:9, 93:9
**shootings** [1] - 39:13
**shop** [1] - 65:17
**short** [2] - 46:4, 94:23
**shot** [32] - 55:14, 56:16, 56:17, 56:22, 57:1, 57:8, 57:22, 59:3, 59:12,

68:15, 68:18, 68:19, 68:22, 69:9, 69:10, 69:11, 69:12, 69:19, 70:10, 70:25, 77:14, 77:15, 77:21, 78:3, 78:4, 78:9, 78:11, 78:21, 79:19, 83:22, 93:7
**shoulder** [1] - 39:22
**shouted** [1] - 78:10
**Show** [3] - 6:18, 7:14, 19:4
**show** [25] - 3:23, 3:24, 5:2, 5:3, 5:12, 6:6, 6:9, 7:1, 7:6, 9:5, 18:25, 19:14, 19:24, 20:5, 20:9, 21:7, 22:12, 31:7, 32:16, 33:4, 39:18, 39:21, 45:3, 72:12, 72:18
**showed** [4] - 40:18, 45:6, 72:16, 93:15
**shown** [2] - 11:6, 11:17
**shows** [1] - 21:12
**side** [10] - 4:21, 4:25, 6:5, 8:20, 16:10, 21:12, 25:16, 25:20, 46:1, 62:4
**sign** [1] - 76:7, 90:15
**signature** [1] - 97:10
**signed** [6] - 62:18, 63:10, 64:1, 71:15, 72:18, 76:3
**signing** [1] - 90:6
**similar** [2] - 21:21, 37:19
**similarities** [1] - 38:21
**simple** [1] - 29:13
**simply** [1] - 54:6
**sit** [4] - 65:2, 67:22, 71:4, 76:13
**sitting** [2] - 13:20, 60:9
**Sitting** [1] - 60:9
**Six** [1] - 9:17
**six** [10] - 9:18, 21:17, 33:22, 56:17, 68:15, 68:18, 68:19, 68:22, 68:23
**SJ** [1] - 19:4
**SJ-22** [1] - 31:8
**SJ-30** [2] - 3:23, 19:24
**SJ-31** [3] - 5:13, 7:20, 20:5
**SJ-32** [2] - 6:6, 6:10
**SJ-34** [1] - 6:18
**SJ-37** [1] - 7:1
**SJ-38** [2] - 7:7, 19:4
**SJ-40** [2] - 7:14, 20:9
**SJ-41** [4] - 9:5, 22:13, 32:16, 41:6
**SJ-42** [1] - 21:7
**SJ-43** [2] - 21:11, 33:4
**smack** [2] - 48:24, 49:4

smacked [5] - 49:6, 49:10, 49:11, 49:13, 53:13
smart [1] - 37:24
Smith [2] - 38:9, 40:3
smooth [2] - 26:20, 28:3
sold [6] - 65:14, 65:17, 80:21, 80:23, 81:4, 83:5
someone [10] - 8:14, 11:13, 12:10, 13:7, 16:16, 69:22, 70:4, 78:4, 78:11, 84:15
sometime [1] - 15:8
somewhere [1] - 6:19
son [1] - 68:13
Sorry [2] - 75:10, 94:23
sorry [8] - 4:18, 17:13, 39:4, 55:14, 67:9, 74:12, 78:2, 92:13
sort [1] - 23:12
sound [2] - 65:12, 67:25, 76:5, 76:18, 77:21
sources [2] - 3:12, 3:18
south [1] - 14:22
southeasterly [1] - 5:18
speaking [1] - 45:4
Special [2] - 2:19, 17:7, 47:18, 92:10
special [4] - 40:2, 40:18, 40:20, 47:22
specific [3] - 26:10, 37:25, 85:23
specifically [4] - 12:8, 12:16, 37:16, 43:3
spell [4] - 2:24, 17:24, 46:19, 78:19
spent [4] - 21:13, 21:21, 26:14, 33:9
Spike [5] - 56:19, 56:21, 56:23, 57:1, 57:23
spins [1] - 44:14
split [1] - 42:24
spot [3] - 70:18, 73:24, 83:18
spots [1] - 51:1
stack [1] - 6:19
stand [3] - 46:12, 46:13, 94:2
standard [2] - 20:24, 45:8
standing [3] - 7:3, 39:22, 45:22
stands [1] - 31:16
start [1] - 78:12
started [1] - 81:11
starts [2] - 5:16, 72:19
Stash [1] - 51:20
stash [1] - 51:21
state [4] - 2:23, 7:13,

17:24, 68:24
State [1] - 46:18
statement [1] - 65:3
Statement [5] - 90:7, 90:15, 91:8, 91:9, 91:10
statements [2] - 78:3, 80:8
STATES [2] - 1:1, 1:4
States [4] - 47:6, 74:18, 75:14, 90:11
states [3] - 59:23, 63:5, 63:16
stenographically [1] - 97:4
step [1] - 25:15
sterile [1] - 29:11
stick [1] - 50:14
still [3] - 21:22, 30:19, 30:20
Stink [3] - 68:12, 68:13, 68:14
stipulate [2] - 54:24, 88:19
stood [3] - 8:6, 9:2, 13:1
storage [1] - 36:9
story [1] - 80:13
Street [2] - 1:23, 51:24
street [3] - 16:10, 19:22, 78:10
streets [4] - 51:11, 51:13, 52:2, 52:5
Strike [1] - 83:2
strike [1] - 83:24
striking [1] - 77:10
stuck [1] - 75:2
stuff [2] - 75:18, 94:6
subclass [7] - 37:23, 38:3, 43:5, 44:10, 44:14, 44:15, 44:25
subject [2] - 10:11, 30:19
subjective [1] - 44:22
submit [1] - 22:5
submitted [3] - 9:20, 22:10, 31:2
subset [1] - 37:24
substantial [3] - 72:10, 73:6, 74:3
substantially [1] - 74:19
suffice [1] - 66:12
suggests [1] - 52:24
suitable [1] - 28:4
supplement [2] - 72:17, 72:18
supporting [1] - 90:12
supposed [2] - 40:2, 91:13
surface [2] - 28:3, 36:5

Sustained [8] - 70:7, 70:22, 71:14, 79:8, 80:16, 86:10, 86:13
swab [5] - 28:19, 29:5, 29:11, 29:12, 29:16
SWORN [4] - 2:21, 17:21, 30:18, 46:15

## T

T-R-A-C-Y [1] - 46:20
table [2] - 67:22, 88:25
Tadgauane [1] - 78:19
TADGAUANE [1] - 78:20
tag [1] - 22:13
Tamall [4] - 59:6, 90:25, 91:3, 92:2
task [2] - 3:3, 3:8
Taylor [2] - 78:20, 78:21
tech [2] - 36:7, 36:8
Technician [2] - 17:18, 18:18
technician [1] - 26:22
ten [4] - 66:17, 67:10, 74:14, 74:17
term [2] - 53:25, 72:10
terms [2] - 83:17, 84:7
test [4] - 35:21, 35:24, 41:13
test-fired [3] - 35:21, 35:24, 41:13
tester [2] - 49:20, 49:21
testers [4] - 49:18, 49:23, 50:1, 53:13
testified [8] - 30:23, 36:25, 37:6, 40:6, 40:11, 40:21, 43:2, 64:23
testify [3] - 30:20, 37:8, 76:10
testifying [3] - 39:19, 60:5, 75:25
testimony [13] - 12:7, 12:17, 17:2, 33:8, 35:21, 38:13, 52:22, 65:17, 70:9, 71:15, 81:22, 83:7, 88:25
testing [3] - 13:15, 13:21, 36:10
THE [110] - 1:1, 1:1, 2:2, 2:5, 2:7, 2:14, 2:16, 2:20, 2:22, 2:23, 2:25, 9:25, 10:1, 17:11, 17:13, 17:16, 17:19, 17:20, 17:22, 17:23, 18:1, 18:4, 22:23, 25:14, 29:22, 29:24, 30:3, 30:7, 30:10, 30:19, 35:13, 41:1, 41:25, 42:19, 45:14,

45:16, 45:25, 46:4, 46:7, 46:9, 46:10, 46:13, 46:16, 46:17, 46:20, 46:21, 52:18, 53:14, 53:24, 54:5, 54:9, 54:19, 61:20, 61:23, 62:10, 70:7, 70:22, 71:3, 71:8, 71:14, 72:6, 73:10, 73:12, 73:21, 74:1, 74:6, 79:8, 79:10, 79:12, 79:16, 79:21, 79:23, 80:1, 80:3, 80:16, 86:3, 86:10, 86:13, 86:24, 87:4, 87:6, 87:9, 88:10, 88:14, 88:20, 88:22, 89:1, 89:2, 89:6, 89:9, 89:10, 91:12, 91:16, 91:20, 92:14, 93:10, 93:13, 93:15, 93:20, 93:25, 94:2, 94:5, 94:12, 94:15, 94:19, 94:22
themselves [1] - 61:25
They've [2] - 45:6, 80:2
they've [1] - 32:22
thick [1] - 64:15
third [1] - 72:20
Thomas [1] - 1:20
threatened [1] - 80:11
three [6] - 8:21, 12:21, 12:25, 13:2, 67:1, 80:21
throughout [2] - 7:8, 65:16
throwing [1] - 12:10
thumb [2] - 27:4, 27:14
tip [1] - 29:12
tired [1] - 78:11
tissue [1] - 29:8
today [2] - 9:10, 16:22, 16:25, 22:18, 26:5, 30:12, 35:21, 36:13, 39:20, 58:12, 58:14, 60:5, 65:2, 65:17, 65:21, 71:4, 75:2, 75:22, 75:25, 76:13, 89:14
together [4] - 31:22, 31:23, 45:5, 64:16
took [2] - 23:3, 23:12, 24:4, 41:13, 49:10, 87:25, 88:2, 88:7, 93:12
top [10] - 6:10, 7:3, 23:11, 23:16, 23:21, 27:7, 27:13, 27:25, 29:5, 78:10
topic [1] - 73:20
tops [4] - 47:21, 47:22, 66:17, 66:21
total [1] - 65:18
touched [1] - 23:6
tough [1] - 6:8

Towanda [9] - 4:1, 4:3, 6:4, 9:9, 15:18, 19:20, 19:21, 19:23, 19:25
toward [2] - 6:14, 6:23
towards [1] - 4:13
track [1] - 71:1
tracks [7] - 4:13, 4:14, 4:20, 4:25, 8:9, 8:11, 16:10
Tracy [2] - 46:12, 46:20
TRACY [2] - 46:15, 96:11
traffic [2] - 15:25, 16:3
trafficking [2] - 58:21, 92:4
trail [11] - 4:21, 4:22, 5:1, 6:13, 6:22, 8:7, 8:9, 8:18, 8:20, 12:11
train [1] - 8:11
trained [1] - 14:3
training [1] - 42:9
transactions [1] - 15:20
transcribed [1] - 97:7
transcript [1] - 97:7
transferred [1] - 29:7
transposed [1] - 43:6
travel [4] - 4:23, 8:5, 16:9
traveled [4] - 6:16, 14:18, 15:25, 20:7
traveling [2] - 6:3
tree [2] - 5:18, 5:19
Treecy [5] - 50:13, 50:14, 50:15, 50:21, 50:23
Treem [2] - 64:18, 87:16, 90:14
trees [1] - 11:22
trial [12] - 7:8, 63:21, 63:23, 64:1, 64:11, 64:21, 67:25, 68:4, 68:6, 78:23, 78:25, 91:18
tries [1] - 91:22
trigger [1] - 23:16
trotted [1] - 12:11
trouble [1] - 56:24
true [5] - 70:12, 71:8, 78:9, 80:10, 84:21
truth [1] - 71:25, 72:2, 72:3
truthful [1] - 65:20
truthfully [1] - 76:11
try [6] - 8:14, 14:14, 25:8, 26:18, 29:15, 70:2
Trying [1] - 30:23
trying [2] - 28:11, 37:23, 53:9
Tuesday [1] - 1:10
TUMINELLI [33] - 2:3, 2:6, 2:13, 52:17, 52:20,

53:17, 54:8, 54:11, 54:24, 80:19, 86:16, 86:20, 87:1, 87:5, 87:8, 87:11, 88:11, 88:16, 88:19, 88:21, 89:4, 89:13, 91:11, 91:15, 91:19, 91:25, 93:18, 93:23, 94:1, 94:3, 94:7, 94:10, 96:12

**Tuminelli** [2] - 1:17, 92:16

**turtle** [1] - 80:13

**twigs** [1] - 19:16

**Two** [2] - 66:10, 91:7

**two** [13] - 17:8, 31:12, 31:20, 36:17, 45:22, 57:8, 64:9, 64:15, 80:10, 85:12, 85:18, 87:12, 91:5

**type** [5] - 5:24, 32:13, 43:3, 47:14, 50:6

**types** [2] - 14:10, 32:12

**typical** [1] - 7:8

## U

**U.S** [4] - 1:23, 71:20, 73:7, 73:8

**ultimately** [5] - 9:4, 9:19, 37:13, 43:24, 60:15

**under** [7] - 30:19, 31:3, 41:14, 61:24, 73:12, 74:17, 76:17

**Under** [1] - 73:13

**understandings** [1] - 59:25

**understood** [2] - 87:21, 88:6

**undertakings** [1] - 59:24

**unfairly** [1] - 53:7

**unfold** [1] - 25:19

**Unit** [6] - 9:2, 18:10, 18:14, 22:8, 22:10, 22:11

**unit** [1] - 13:25

**UNITED** [2] - 1:1, 1:4

**United** [4] - 47:6, 74:18, 75:14, 90:11

**unknown** [1] - 36:21

**Unless** [1] - 94:20

**unobstructed** [2] - 23:25

**up** [42] - 5:20, 6:14, 6:23, 8:5, 8:8, 8:9, 8:19, 20:6, 20:15, 20:18, 25:16, 25:17, 26:25, 27:23, 35:5, 41:22, 42:2, 42:5, 45:19, 49:10, 49:11, 49:13, 50:16, 50:17, 50:18, 50:23,

52:7, 53:15, 53:24, 54:1, 60:15, 67:13, 72:20, 75:11, 75:12, 75:14, 77:18, 78:22, 78:23, 79:14, 92:12

**USA** [1] - 97:4

**USC** [2] - 87:19, 92:6

**users** [1] - 16:8

**utilizing** [1] - 9:1

## V

**VAN** [3] - 39:5, 39:8, 96:9

**Van** [1] - 1:17

**variety** [1] - 16:6

**various** [3] - 51:1, 52:2, 52:22

**vegetative** [1] - 26:2

**verge** [1] - 63:21

**vials** [1] - 16:5

**view** [4] - 5:18, 6:13, 23:25, 73:17

**viewing** [1] - 25:3

**vines** [2] - 11:22, 24:1

**Virginia** [2] - 57:18, 57:20

**visually** [2] - 12:22, 12:23

**voir** [1] - 30:8

## W

**Wabash** [10] - 3:14, 4:13, 4:16, 4:23, 6:4, 6:15, 6:23, 6:24, 6:25, 8:6

**WAGSTER** [2] - 30:18, 96:7

**Wagster** [9] - 29:25, 30:6, 30:23, 30:25, 35:12, 35:16, 39:9, 39:21, 41:4

**wait** [1] - 93:10

**waived** [1] - 74:24

**walk** [1] - 8:18

**walked** [3] - 12:9, 12:11, 13:1

**Walked** [1] - 8:8

**wants** [1] - 92:16

**Wash** [1] - 5:7

**wash** [1] - 5:9, 11:5, 56:15, 85:6, 85:13

**water** [1] - 29:11

**weapon** [40] - 9:4, 10:8, 10:12, 10:15, 11:14, 11:16, 11:23, 11:25, 12:10, 12:18, 12:20,

13:5, 13:20, 16:20, 17:6, 20:23, 21:22, 22:9, 23:4, 23:25, 24:19, 24:21, 25:8, 28:25, 29:4, 35:18, 36:18, 37:9, 37:25, 38:2, 38:15, 39:11, 39:12, 39:15, 40:1, 43:13, 43:18, 43:25, 44:9

**weapons** [3] - 14:5, 14:8, 37:20

**wearing** [1] - 54:22

**week** [10] - 31:14, 35:2, 37:7, 40:7, 40:11, 40:21, 41:19, 67:4, 67:5, 94:23

**week's** [1] - 40:10

**weeks** [2] - 64:1, 68:4

**Wesson** [2] - 38:10, 40:3

**West** [2] - 1:23, 14:25

**west** [1] - 15:1

**whatsoever** [1] - 94:18

**Whereof** [1] - 97:9

**Whichever** [1] - 54:9

**whipped** [2] - 57:7, 57:8

**white** [2] - 55:3, 55:4

**whole** [5] - 36:2, 65:14, 66:12, 68:20, 69:21

**willfully** [1] - 92:7

**William** [2] - 2:19, 2:25

**WILLIAM** [2] - 2:21, 96:3

**willing** [1] - 75:7

**Winchester** [3] - 33:24, 38:9, 38:12

**wintertime** [1] - 12:2

**Wise** [22] - 58:24, 59:1, 59:3, 59:11, 59:15, 69:19, 70:9, 70:15, 71:6, 78:4, 78:9, 89:19, 90:3, 90:18, 92:9, 92:11, 92:18, 92:23, 93:5, 93:7

**wit** [1] - 92:8

**withdraw** [3] - 15:18, 63:16, 71:4

**withdrawn** [2] - 63:18, 83:2

**Withdrawn** [1] - 80:17

**WITNESS** [17] - 2:21, 2:22, 2:25, 9:25, 17:21, 17:22, 18:1, 30:18, 46:15, 46:16, 46:20, 89:1, 89:9, 96:3, 96:5, 96:7, 96:11

**witness** [7] - 7:18, 29:24, 45:14, 46:7, 46:10, 53:10, 79:24

**Witness** [2] - 54:21, 97:9

**witnesses** [1] - 93:8

**wondered** [1] - 62:6

**wood** [8] - 4:12, 4:19, 5:16, 6:14, 8:16, 9:8, 11:16, 13:20

**wooded** [3] - 4:20, 4:21, 14:14

**woods** [4] - 3:13, 4:7, 4:24, 12:19

**word** [8] - 18:2, 53:20, 54:3, 72:13, 72:15, 92:1

**words** [2] - 48:21, 48:22

**worst** [1] - 89:14, 89:16, 89:17

**written** [5] - 63:1, 63:7, 63:14, 72:14, 91:9

**wrote** [1] - 44:25

## Y

**year** [3] - 67:11, 74:14, 74:17

**years** [8] - 3:7, 3:10, 8:4, 18:12, 28:10, 65:3, 67:16, 76:1

**yourself** [4] - 32:25, 46:18, 72:21, 72:25

**yourselves** [1] - 95:2

## Z

**Zajac** [3] - 1:22, 97:3, 97:14

**zoom** [1] - 7:11